DARIN W. SNYDER (S.B. #136003) – dsnyder@omm.com  
DAVID R. EBERHART (S.B. #195474) – deberhart@omm.com  
O'MELVENY & MYERS LLP  
275 Battery Street, Suite 2600  
San Francisco, CA 94111-3305  
Telephone: (415) 984-8700  
Facsimile: (415) 984-8701  

RICHARD L. STONE (S.B. #110022) – rlstone@hhlaw.com  
KENNETH D. KLEIN (S.B. #85231) – kdklein@hhlaw.com  
HOGAN & HARTSON L.L.P.  
1999 Avenue of the Stars, Suite 1400  
Los Angeles, California 90067  
Telephone: (310) 785-4600  
Facsimile: (310) 785-4601  

Attorneys for Defendants  
NDS GROUP PLC and  
NDS AMERICAS, INC.  

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| ECHOSTAR SATELLITE CORP., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NDS GROUP PLC, *et al.*, <br><br> Defendants. | Case No. SA CV 03-950 DOC(JTLx) <br><br> **NDS'S BRIEF RE THE EXTRATERRITORIAL APPLICABILITY OF PLAINTIFFS' CLAIMS** <br><br> Date: April 18, 2008 <br> Time: 8:30 a.m. <br> Place: Courtroom 9D <br> Judge: Hon. David O. Carter |

## I. INTRODUCTION

Plaintiffs have introduced at trial evidence of conduct that occurred outside of the United States. Plaintiffs obviously intend to use this evidence to establish certain essential elements of several of their claims. But the principles of extraterritoriality bar the use of such evidence for the purpose of proving their claims. It is generally presumed, absent clear legislative intent to the contrary, that the reach of a federal statute does not extend beyond the borders of the United States and that the reach of a California statute does not extend beyond the borders of California. Only in very specific instances may a statute reach conduct occurring in foreign jurisdictions. Plaintiffs assert causes of action under a number of statutes that do not have extraterritorial reach, but they nevertheless insist on presenting confusing and prejudicial evidence of conduct occurring in foreign jurisdictions in support of those claims, evidence that, absent clear instruction from the Court, will inevitably result in the jury mistakenly believing they can find liability against NDS for conduct that does not violate the statutes at issue because it did not occur in the United States or in California. Appropriate instructions explaining the geographic limitations of the claims at issue are therefore essential to alleviate potential jury confusion on this critical issue.

## II. STATEMENT OF FACTS

Plaintiffs assert a series of factual allegations to support their claims against NDS that involve conduct occurring solely outside of the United States. These facts include the alleged distribution of reprogrammed access cards in Canada by Al Menard. Yet, much if not all of the allegedly "illegal" conduct Plaintiffs present as evidence takes place entirely in Canada, and during a time when reprogramming and distributing access cards was legal in Canada.

As merely one example, Plaintiffs intend to present the testimony of Anthony Dionisi who claims that Al Menard met with him in either 2000 or 2001 in Toronto,

Canada, where Dionisi allegedly witnessed Menard reprogram 52 EchoStar access cards. The cards were allegedly reprogrammed for Dionisi, who was a resident of Canada, and another gentleman who lived in Quebec, Canada.  But Menard's alleged acts of reprogramming in Canada were legal in Canada when they allegedly occurred.  Prior to 2002, the manufacture and sale of decoding systems that allowed an individual to receive U.S. satellite programming without authorization from the provider was not illegal in Toronto, Canada.  *R. v. Branton* (2001), 53 O.R. (3d) 737 (C.A.).  It was not until December 2002 that interception of U.S. satellite signals became illegal in Canada.  *Bell Express Vu LP v. Rex* [Can 2002] 2 S.C.R. 469.

### III.  ARGUMENT

#### A.  General Principals of Extraterritoriality

It is a "long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)).  Thus, courts have made abundantly clear that there is a presumption that federal statutes do not have extraterritorial application unless Congress clearly so intends.  *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 188 (1993); *Arabian Am. Oil*, 499 U.S. at 248; *U.S. v. Neil*, 312 F.3d 419, 421 (9th Cir. 2002).  Indeed, Congressional intent to apply legislation extraterritorially must be plain because the presumption against extraterritorial application is "difficult to overcome."  *Blaricom v. Burlington N.R.R. Co.*, 17 F.3d 1224, 1226 (9th Cir. 1994).  To overcome this heavy presumption, a court must: (1) examine the statute for an indication that Congress intended it to apply extraterritorially, and (2) determine whether the exercise of extraterritorial jurisdiction in the case in question would comply with the principles of international law.  *See Neil*, 312 F.3d at 421; *U.S. v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002); *U.S. v. Felix-Guiterrez*, 940 F.2d 1200, 1204 (9th Cir.

1991). Legislative silence is not enough to overcome the presumption against extraterritorial application. *See Arabian Am. Oil*, 499 U.S. at 250-51 (boilerplate definitions of jurisdictional terms cannot overcome the presumption that statutes are concerned primarily with domestic conditions).

Whether a statute has extraterritorial reach is distinct from the inquiry of whether an American court has the jurisdiction over a party. Whether a court has jurisdiction over a party generally requires a court to consider whether a particular defendant has sufficient contacts with the forum state to permit the court to exercise personal jurisdiction over that defendant. *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 416 (9th Cir.1997) (describing standard for specific personal jurisdiction); *Wolf Designs, Inc. v. DHR Co.*, 322 F. Supp. 2d 1065 (C.D. Cal. 2004); *California Software, Inc. v. Reliability Research, Inc.*, 631 F. Supp. 1356 (C.D. Cal. 1986). A court's jurisdiction can extent beyond United States borders under the theories of territoriality and nationality.[1] *See Hill*, 279 F.3d at 739; *Felix-Guiterrez*, 940 F.2d at 1204. But determining jurisdiction over a party outside the United States is a separate inquiry from whether conduct outside the United States can satisfy the elements of a claim under United States law. Thus, an American court may have jurisdiction over a defendant under a minimum contacts analysis in the context of personal jurisdiction, but the defendant may not be held liable under United States law for their extraterritorial conduct. *See*, *e.g.*, Restatement (Third) of Foreign Relations Law § 421, cmt. a (1987) ("The fact that an exercise of

---

[1] Extraterritorial jurisdiction is appropriate under the territoriality theory if the acts performed outside the United States are intended to, and result in, substantial effects with the United States. *See In re Simon*, 153 F.3d 991, 995 (9th Cir. 1998); *compare United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 6 (1st Cir. 1998) (foreign price-fixing agreement with principle purpose of effecting United States commerce subject to extraterritorial jurisdiction); *with F. Hoffmann-La Roche Ltd v. Empagran S.A.*, 542 U.S. 155, 165-66 (2004) (no extraterritorial jurisdiction over anti-competitive conduct where foreign harm alone gave rise to claim).The nationality theory permits jurisdiction over acts by a United States citizen that occur outside of the United States. *See United States v. Hill*, 279 F.3d 731, 739-40 (9th Cir. 2002).

jurisdiction to adjudicate in given circumstances is reasonable does not mean that the forum state has jurisdiction to prescribe in respect to the subject matter of the action."). In other words, a court may have the jurisdiction to reach the defendant but not the defendant's extraterritorial conduct. *Cf. Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1076 (9th Cir. 2006) (a court must have jurisdiction over a party and Congress must intend that the relevant statute apply to the situation) (citing *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818).)

### B. Extraterritorial Applicability of Plaintiffs' Claims

#### 1. The Digital Millennium Copyright Act (Claims 1 and 2) does not have Extraterritorial Effect

Defendants are entitled to an instruction specifying the limited geographic scope of Plaintiffs' DMCA claims because "the copyright laws do not apply extraterritorially" and therefore "must be read as extending no farther than the United States borders." *Subafilms, Ltd., v. MGM-Path Comm. Co.,* 24 F.3d 1088, 1094 (9th Cir. 1994) (internal quotations omitted). (See also EchoStar's Objections to NDS's Separate Proposed Jury Instructions ("Plaintiffs' Objections") at 5:1-6, citing same.) In *Subafilms*, the Ninth Circuit cited with approval *Robert Stigwood Group, Ltd v. O'Reilly, 530 F.2d 1096, 1101* (2d Cir. 1976), *cert. denied* 429 U.S. 848 (1976), noting that that case had found "that no damages could be obtained under the Copyright Act for public performances in Canada when preliminary steps were taken within the United States" and that "'[t]he Canadian performances, while they may have been torts in Canada, were not torts here.'" *Subafilms,* 24 F.3d at 1094 (quoting *Stigwood*).

As the Ninth Circuit further explained in *Allarcom Pay Television, Ltd. v, General Instrument Corp.*, "for U.S. copyright law to apply, at least one alleged infringement must be completed entirely within the United States, and [] mere authorization of extraterritorial infringement was not a completed act of infringement in the United States." 69 F.3d 381, 387 (9th Cir. 1995). The Ninth

1  Circuit concluded: "In this case, defendants either initiated a potential infringement
2  in the United States by broadcasting the Showtime signal, which contained
3  copyrighted material [into Canada], or defendants in Canada authorized people in
4  Canada to engage in infringement.  In either case, the potential infringement was
5  only completed in Canada once the signal was received and viewed.  Accordingly,
6  U.S. copyright law d[oes] not apply . . . ."  *Id.*

7  Plaintiffs have argued against NDS's proposed instruction, citing *GB*
8  *Marketing USA, Inc. v. Gerolsteiner Brunnen*, 782 F. Supp. 763 (W.D.N.Y. 1991)
9  for the proposition that "a defendant may be liable for copyright infringement
10 consummated in the United States when some conduct leading to that infringement
11 occurred outside the United States."  Plaintiffs' Objections at 5:6-10.  This
12 argument is unavailing for at least two reasons.  First, *Allarcom* is controlling Ninth
13 Circuit authority, and *GB Marketing* must be rejected if it is inconsistent with
14 *Allarcom*.  And *Allarcom* makes clear that "[g]iven the undisputed axiom that
15 United States copyright law has no extraterritorial application, it would seem to
16 follow necessarily that a primary activity outside the boundaries of the United
17 States, not constituting an infringement cognizable under the Copyright Act, cannot
18 serve as the basis for holding liable under the Copyright Act one who is merely
19 related to that activity within the United States."  *Allarcom,* 69 F.3d at 387 (quoting
20 Nimmer on Copyright § 12.04[A][3][b], at 12-86 (footnotes omitted) (1993).
21 Violations that occur partially in the United States and partially in Canada simply
22 do not meet this requirement.

23 Second, *GB Marketing* concerned the application of the copyright laws to a
24 foreign national who was "alleged to have contributed to, or authorized, a direct
25 infringement which occurred in the United States."  *GB Marketing,* 782 F. Supp. at
26 773.  Therefore, *GB Marketing* does not contradict *Allarcom* because under both
27 cases "the location of the ultimate direct infringement" must be the United States.
28 *Id.*  In other words, the conduct that is alleged to have violated U.S. copyright laws

must have occurred in the United States.

NDS's limiting instructions are appropriate and necessary because Plaintiffs have alleged numerous "facts" concerning "violations" of the DMCA by individuals acting entirely in Canada, which could easily confuse the jury. For instance, Plaintiffs have argued that testimony by Anthony Dionisi about Al Menard's supposed reprogramming of EchoStar access cards in Canada "necessarily establishes" their DMCA 1201(a)(1)(A) claim (Claim 1). *See* EchoStar's Opposition to Defendants' Motion for Summary Judgment on Issue of NDS Distribution Network, All Dependant Claims, and § 17200 Claim at 16:12-16. Plaintiffs similarly represented in the Final Joint Amended Pretrial Conference Order ("JPTCO") filed on March 4, 2008 that they would support the elements of their DMCA claims with the following:

> EchoStar also intends to rely on at least the following evidence of interception by an end user:
>
> - Menard admitted that hundreds of customers – including uniformed police officers – lined up to purchase reprogrammed cards from Dawson. Menard and the users did not believe the hacked cards were illegal in Canada at the time. (Menard Dep. 102:1-6.)
>
> - Dionisi testified that cards Menard produced for him, two of which he kept for his own use, did in fact work, allowing him to intercept DISH Network programming. (Dionisi Dep. 32:3-14.)
>
> - Menard admits to using a pirated card of the type distributed to Dawson to intercept programming. (Menard Dep. 103:24-105:3.)

JPTCO at 16:10-18.

But all of this evidence concerns activities that occurred entirely in Canada, and, as shown above, the relevant case law dictates that reprogramming activities occurring in Canada do not constitute a violation of the DMCA. To show a violation of the DMCA, Plaintiffs must prove that each of the elements for each of their claims occurred in the United States. The facts of *GB Marketing* are instructive. In that case, the defendant, a foreign national, allegedly applied labels

1  to bottles of bottled water in Germany that were copyrighted by plaintiff, without
2  plaintiff's permission. *GB Marketing,* 782 F. Supp. at 772.  This would have been a
3  violation of the copyright laws had it occurred in the United States, but since it
4  occurred in Germany, it was not. *Id* at 773.  But the plaintiff further alleged that the
5  defendant then authorized or caused the bottled water to be shipped and distributed
6  in the United States. *Id.*[2]  This distribution, if true, would have violated the
7  copyright laws because it is illegal to distribute copyrighted works without the
8  authorization of the copyright owner **in the United States**.   In other words, the
9  elements of that violation were: the 1) distribution; 2) of a copyrighted work; 3)
10 without the copyright holder's permission.  All of these elements must have
11 occurred in the United States to create a violation.  Likewise, in this case, to prove a
12 violation of the DMCA, Plaintiffs must prove that each of the elements of a
13 violation occurred in the United States.  Plaintiffs may not substitute foreign
14 conduct for proving that each of the elements of their DMCA claims occurred in the
15 United States, and NDS is entitled to an instruction clarifying their burden to the
16 jury.

17      An instruction clarifying Plaintiffs' burden to show that a violation of the
18 DMCA occurred within the United States and to impose liability and/or damages
19 only for any such violations is necessary because the jury will be prejudicially
20 confused to NDS's detriment without such an instruction since Plaintiffs have,
21 throughout the course of this litigation, asserted that purely Canadian conduct was
22 adequate to prove liability under the DMCA[3].

---

[2] Plaintiff's theory in *GB Marketing* rested in part on a theory of "contributory copyright infringement" by the German labeler.  Plaintiffs have attempted to apply contributory copyright infringement by analogy to the DMCA at summary judgment, an approach this Court described as "inventive" but unnecessary. January 16, 2008 Order Granting in Part and Denying in Part Motions for Summary Judgment, at 61:16-18.  NDS believes that contributory copyright infringement does not apply to claims under the DMCA.

[3] NDS proposes the following three alternative limiting jury instructions:
   (1)   The Digital Millennium Copyright Act applies only to acts in the

### 2. The Communications Act (Claim 3) Has Extraterritorial Effect over Signals Originating From and/or Received In the United States.

Section 605(a) of the Communications Act protects the receiving or transmission of "interstate and foreign communications," which includes television signals. 47 U.S.C. § 605(a); *see e.g.*, *Nat'l Subscription Television v. S&H TV*, 944 F.2d 820 (9th Cir. 1981). The Communications Act reaches to "all interstate and foreign communications by wire or radio . . ., which originates and/or is received within the United States . . . ." 47 U.S.C. § 152. Thus, the receipt of a United States signal outside of the United States still falls within the purview of the Communications Act. For this reason, NDS does not seek a limiting geographic instruction for the Communications Act claim.

### 3. RICO Predicate Act for Criminal Copyright Infringement 18 U.S.C. § 2319 and 18 U.S.C. § 506(a) Does Not Have Extraterritorial Effect.

The enterprise, predicate acts, and pattern of racketeering activity alleged by Plaintiffs requires conduct occurring in the United States. And RICO generally requires conduct occurring in the United States. NDS is also, however, entitled to a jury instruction regarding the geographic limitations of the specific predicate act of criminal copyright infringement alleged as part of Plaintiffs' RICO claim. Plaintiffs have asserted as a RICO predicate act criminal copyright infringement under 18 U.S.C. § 2319 and 17 U.S.C. § 506(a), which prohibit "the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or

---

United States.
(2) The Digital Millennium Copyright Act applies to acts in the United States. Each essential element of the violation must have occurred in the United States for the DMCA to be violated.
(3) The Digital Millennium Copyright Act applies to acts in the United States. It does not apply to acts, even otherwise unlawful acts, that occur, in whole or in part, in a foreign jurisdiction such as Canada. Conduct that did not occur entirely within the United States cannot be a violation of the DMCA.

more copies … of one or more copyrighted works, which have a total retail value of more than $1,000." 18 U.S.C. § 506(a)(1). As with the DMCA, violations of the criminal copyright law must comply with the *Allarcom* and *Subafilms* limitations on extraterritoriality because "conduct that does not support a civil action for infringement cannot constitute criminal conduct under 17 U.S.C. § 506(a)." *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 39 (S.D.N.Y. 1992); *see also* 4 Nimmer on Copyright § 15.01 ("Conduct that does not give rise to civil liability for copyright infringement cannot constitute criminal infringement either.")

As with their DMCA claims, Plaintiffs have communicated their intent to support their RICO claims with evidence of conduct that occurred entirely in Canada. *See, e.g.,* JPTCO at 24:5-7. Therefore, a limiting instruction is necessary to prevent jury confusion about the geographic requirements of the RICO predicate act of criminal copyright infringement because the resulting confusion would be both likely and highly prejudicial to NDS.

### 4. The California Penal Code (Claims 6 and 7) Does Not Apply to Conduct Committed Outside the State of California.

NDS is entitled to a limiting instruction on Plaintiffs' California Penal Code claims (Claims 6 and 7) because NDS cannot be held liable in a ***civil action*** instituted under these statutes for acts done entirely outside of California. California law "embodies a presumption against the extraterritorial application of its statutes." *Churchill Village L.L.C. v. General Elec. Co.,* 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000). "We ordinarily presume the Legislature did not intend the statutes of this state to have force or operation beyond the boundaries of the state. Accordingly, we do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute." *Norwest Mort., Inc. v. Superior Court,* 72 Cal. App. 4th 214, 222 (1999.)

California Penal Code sections 593d(a) and 593e(b) authorize private

1  litigants to file civil actions for violations of the criminal portions of the statute.
2  *See, e.g.,* California Penal Code § 593d(f).  As civil actions, they subject to general
3  California civil rules regarding the extraterritorial reach of California law.  *See*
4  *Heritage Cablevision of California, Inc. v. Pusateri,* 38 Cal. App. 4th 517, 522
5  (1995) ("The purpose [of 593d] is … to allow concurrent criminal and civil
6  remedies.")  Plaintiffs wrongly attempt to apply select sections of the general
7  California ***criminal*** code to argue for broader rules of extraterritoriality than would
8  ordinarily apply.  But the criminal code has extraterritorial rules designed to avoid
9  problems specific to criminal prosecution.  *See, e.g., People v. Betts,* 34 Cal. 4th
10 1039, 1043 (2005) ("Like most states, California has addressed the problem of
11 ***criminal activity*** that spans more than one state by adopting statutes that ***provide***
12 ***our state with broader jurisdiction*** over interstate crimes than existed at common
13 law.") (Emphasis added.)  Plaintiffs have presented no authority for the proposition
14 that general California criminal procedural rules should be applied to a civil action
15 simply because the authority for that civil action resides in a criminal statute.  And
16 doing so would violate rules intentionally adopted by California to govern civil
17 actions under its laws.
18       Moreover, and alternatively, even if California Penal Code Sections 27 and
19 778a apply to this civil action, as Plaintiffs argue, they do not contradict NDS's
20 limiting instruction.  Section 27 of the California Penal Code provides that the Code
21 applies to "All persons who commit, in whole or in part, any crime within this
22 state" which perfectly tracks the language of NDS's geographic limiting
23 instructions.  Cal. Pen. Code § 27.  Similarly, section 778a provides that the Code
24 applies "[w]henever a person, with intent to commit a crime, does any act within
25 this state in execution or part execution of that intent. "  Cal. Penal Code § 778a.
26 Plaintiffs incorrectly argue, in their Objections to NDS's Separate Proposed Jury
27 Instructions, that this language permits application of the Code to conduct
28 committed entirely outside of California.  However, this section has been "strictly

construed" and only applies if the acts done in California rise to the level of criminal attempt. *People v. Chapman*, 72 Cal. App. 3d 6, 10 (Cal. App. 2d 1977) (citing *People v. Buffum*, 40 Cal. 2d 709, 716 (1953)); *See also People v. Betts*, 34 Cal. 4th 1039, (2005) (finding that for § 778a to apply, defendant "with the requisite intent" must do a preparatory act in California that is more than a "de minimis act"). Thus, contrary to Plaintiffs' assertion, section 778a does not permit criminal prosecution for conduct occurring entirely outside of California.

As explained above, many of Plaintiffs' factual allegations against NDS concern conduct that occurred entirely in Canada. As with their copyright claims, Plaintiffs have stated that they plan to use the following evidence of purely Canadian conduct to support their California Penal Code claims:

- Menard admitted that hundreds of customers – including uniformed police officers – lined up to purchase reprogrammed cards from Dawson. Menard and the users did not believe the hacked cards were illegal in Canada at the time.

- Dionisi testified that cards Menard produced for him, two of which he kept for his own use, did in fact work, allowing him to intercept DISH Network programming. Menard admits to using a pirated card of the type distributed to Dawson to intercept programming.

- Dionisi testified that Al Menard had a device that was similar to the description Tarnovsky gave for his "Stinger."

- Menard used this device to reprogram EchoStar cards and did so for Dionisi in late 2000 and early 2001. At a meeting between Menard and Dionisi, Menard reprogrammed 52 EchoStar cards using this device.

JPTCO at 16:10–28; 27:20–21; 28: 21–23 (citations omitted).

In the absence of a limiting instruction, the jury might easily be confused into thinking that conduct occurring in Canada could constitute the violation of California civil law, especially given that Plaintiffs have continuously made such arguments throughout the litigation of this case. Therefore, geographic limiting instructions as to these claims are both necessary and appropriate to avoid prejudice and confusion.

## IV. CONCLUSION

Limiting instructions are a necessary and proper antidote to the jury confusion that is sure to result from Plaintiffs' strategy of presenting evidence of conduct occurring in foreign jurisdictions to prove the elements of claims that require conduct that occurred in the United States or California. The Court should adopt NDS's recommend limiting instructions to mediate the prejudice caused by Plaintiffs' confusing evidentiary tactics.

Dated: April 18, 2008

DARIN W. SNYDER
DAVID R. EBERHART
O'MELVENY & MYERS LLP

By: */s/ Darin Snyder*
    DARIN W. SNYDER
Attorneys for Defendants
NDS GROUP PLC and NDS AMERICAS, INC.

SF1:712200.4