T. WADE WELCH & ASSOCIATES
Chad M. Hagan (*pro hac vice*)
2401 Fountainview, Suite 700
chagan@twwlaw.com
Houston, Texas 77057
Telephone:  (713) 952-4334
Facsimile:   (713) 952-4994

DLA PIPER US LLP
David A. Grenardo (State Bar No. 223142)
Cynthia A. Ricketts (*pro hac vice*)
david.grenardo@dlapiper.com
cindy.ricketts@dlapiper.com
1999 Avenue of the Stars, 4th Floor
Los Angeles, CA 90067
Telephone: (310) 595-3031
Facsimile: (310) 595-3331

Attorneys for Plaintiffs
ECHOSTAR SATELLITE CORP., et al.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| ECHOSTAR SATELLITE CORP., et al.,<br><br>　　　　　　Plaintiffs/<br>　　　　　　Counterclaim<br>　　　　　　Defendants,<br><br>　v.<br><br>NDS GROUP PLC, et al.,<br><br>　　　　　　Defendants/<br>　　　　　　Counterclaim<br>　　　　　　Plaintiffs. | No. SA CV 03-950 DOC(JTL)<br><br>**ECHOSTAR'S TRIAL MEMORANDUM REGARDING THE GEOGRAPHIC PARAMETERS AND SCOPE OF CLAIMS**<br><br>Date:　April 18, 2008<br>Time:　8:30 a.m.<br>Dept:　Judge David Carter<br>　　　　Courtroom 9D |

Pursuant to the Court's April 12 request, Plaintiffs EchoStar Satellite L.L.C. f/k/a EchoStar Satellite Corporation, EchoStar Technologies Corporation, and NagraStar L.L.C. (collectively, "EchoStar" or "Plaintiffs") hereby submit the following Trial Memorandum Regarding the Geographic Parameters and Scope of each of EchoStar's claims.

## I. INTRODUCTION

Defendants  have proposed jury instructions limiting geographically EchoStar's DMCA claims.[1]  Specifically, Defendants propose separate instructions entitled "Geographic Boundary," and attempt to impose geographic boundaries or limitations on any damages that EchoStar may recover for successfully establishing its DMCA claims.  Defendants' Sep. Prop. Jury Instr. at 9-10, 13-14, 15-16, 17-18, 21-22, 23-24, attached hereto for the Court's ease of reference as Exhibit "A." Defendants also propose similar geographic limitation instructions for EchoStar's California Penal Code claims and any damages flowing from Defendants' violation of the California Penal Code.  *Id.* at 33-34, 35-36, 39-40, 41-42, 43-44, 45-47, attached hereto for the Court's ease of reference as Exhibit "B."

Defendants' arguments misstate, and each of their proposed geographic "boundary" or geographic "restriction" or "limitation" instructions misstates, the law.  Defendants' proposed instructions are intended to confuse and/or mislead the jury in its consideration of EchoStar's claims both with respect to the jury's

---

[1] Defendants do so even though the Court already considered this geographic limitation argument that Defendants raised for the first time in their summary judgment reply.  The Court refused to grant summary judgment based upon Defendants' geographic limitation arguments.  Instead, the Court held that Plaintiffs' Communications Act, 47 U.S.C. 605(a), claim survives, that Plaintiffs' Digital Millennium Copyright Act § 1201(a)(1)(A) claim survives because Plaintiffs raised a genuine issue of material fact regarding whether Tarnovsky circumvented EchoStar's conditional access system to gain access to EchoStar's programming from within the United States, and that EchoStar's California Penal Code claims survive because Tarnovsky's alleged violative acts or preparation therefore likely took place in California.  January 16, 2008 Order 1) Granting in Part and Denying in Part Defendants' Motions for Partial Summary Judgment (the "Jan. 16 Order").

ECHOSTAR'S TRIAL MEMO RE GEOGRAPHIC
PARAMETERS                                               - 1 -

determination of whether Defendants are liable under each of the statutes, and the jury's determination of the damages that EchoStar is entitled to recover if the jury agrees Defendants violated each, or all, of the statutes, which form the basis of EchoStar's claims.

Contrary to Defendants' proposed instructions, the jury is entitled to consider Defendants' and their agents' extraterritorial conduct (both outside the United States and outside the State of California) (i) because such conduct can be a violation of each of these statutes; (ii) because EchoStar can recover damages flowing from this conduct (even if the conduct is not itself an independent violation of any of these statutes); and (iii) because, at a minimum, such conduct is evidence that Defendants violated these statutes in the United States and/or in the State of California.

## II.  THE JURY MAY CONSIDER CONDUCT OUTSIDE THE UNITED STATES TO DETERMINE ECHOSTAR'S FEDERAL STATUTORY CLAIMS AGAINST DEFENDANTS.

A United States District Court may assert territorial jurisdiction over conduct occurring outside the United States if:

1) The statute expressly states that it is to have extraterritorial application;

2) The statute implies that it is to have extraterritorial application and assertion of territorial jurisdiction comports with the standards of international law; or

3) The extraterritorial conduct was intended to cause and did cause consequences in the United States.

*United States v. Neil*, 312 F.3d 419, 412 (2002) (assertion of territorial jurisdiction appropriate where statute expressly states that it is to have extraterritorial application; court is not required to consult international law unless the statute indicates as such); *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) (assertion of extraterritorial jurisdiction appropriate where the statute expressly

regulates "foreign commerce," and international law supports extraterritorial application of the law); *GB Marketing USA, Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 772-73 (W.D.N.Y. 1991) (the court asserted extraterritorial jurisdiction over conduct by a German company that occurred in Germany where the German company knew and intended for the infringing product to enter the U.S. market).

Here, EchoStar's claims arise under statutes that have express extraterritorial reach and from extraterritorial conduct that was intended to, and did, cause consequences in the United States.

**a.   The Extraterritorial Conduct Of Defendants And Their Agents Forms A Basis For Liability Under The Communications Act and The RICO Statutes.**

**i.   The Communications Act's Express Language Makes Clear That Extraterritorial Conduct May Form A Basis of Liability.**

This Court has already held that extraterritorial conduct is a basis for liability under the Communications Act, 47 U.S.C. § 605(a). Jan. 16 Order at 63.[2] The Communications Act expressly seeks to prevent violators from receiving or assisting others in receiving encrypted interstate and ***foreign*** satellite communications. 47 U.S.C. § 605(a) ("Foreign satellite communications" include satellite signals that cross countries). The jury thus is entitled to consider Defendants' and their agents' extraterritorial interception or receipt of EchoStar's programming signals, and extraterritorial distribution and use of pirated cards to intercept, receive, and extraterritorial decryption of EchoStar programming signals

---

[2] In so holding, the Court relied upon the Communication Act's express terms and because extraterritorial application comports with international law principles. Jan. 16 Order at 63. The Court's Jan. 16, 2008 Order is the law of the case. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'") (citations omitted); *Disimone v. Browner*, 121 F.3d 1262, 1266 (9th Cir. 1997).

**ECHOSTAR'S TRIAL MEMO RE GEOGRAPHIC PARAMETERS**                         - 3 -

to determine whether Defendants violated the Communications Act and the damages to EchoStar flowing from all such violations.

### ii. RICO's Express Language Also Makes Clear That Extraterritorial Conduct May Form The Basis of Liability.

The jury likewise is entitled to consider extraterritorial conduct to determine whether Defendants violated the RICO statutes. Indeed, Defendants do not dispute that their extraterritorial conduct, the extraterritorial conduct of their agents, or the extraterritorial distribution and use of pirated cards can form the basis of liability under 18 U.S.C. § 1962 (RICO) and 18 U.S.C. § 1029 (Misconduct in Connection with Access Devices upon which EchoStar, in part, bases its RICO claim). *See* Defendants' Separate Proposed Jury Instructions at 48-69 (RICO instructions lack any reference to geographic restrictions), attached hereto for the Court's ease of reference as Exhibit "C." Defendants do not dispute that their extraterritorial conduct, the extraterritorial conduct of their agents, and the extraterritorial distribution and use of pirated cards may form the basis for liability under the RICO statutes because Defendants must know that the law is clear that the jury may properly consider this conduct.

The plain and unambiguous terms of both 18 U.S.C. § 1962 and 18 U.S.C. § 1029 reflect Congress's clear intent to regulate extraterritorial conduct: these statutes expressly apply to conduct that affects foreign commerce. 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or ***foreign*** commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt") (emphasis added); 18 U.S.C. § 1029(a) ("…if the offense affects interstate or ***foreign*** commerce, [the actor shall] be punished as provided in subsection (c) of this section") (emphasis added); *United States v. Ivanov*, 175 F.

Supp. 2d 367, 375 (D. Conn. 2001) (concluding that "the plain language of § 1029 indicates a congressional intent to apply the statute extraterritorially").

The extraterritorial application of RICO and 18 U.S.C. § 1029 also patently comports with international law for the same reasons that this Court previously held that extraterritorial application of the Communications Act comports with the principles of international law.[3]  The Haifa attack, the drafting of the Headend Project report, the distribution and use of pirated cards, and the Internet posting of the EchoStar hack both within and outside the United States had, and was intended to have, a detrimental affect upon Plaintiffs within the United States.  *See* Jan. 16 Order (the territorial principle allows the Court to assert jurisdiction over extraterritorial conduct in violation of the Communications Act because the alleged distribution scheme adversely affected Plaintiffs in the United States).  Plaintiffs also are U.S. nationals, as are Defendants NDS Americas and Tarnovsky.  *See id.* (the passive personality and nationality principles permit jurisdiction over Defendants' extraterritorial conduct in violation of the Communications Act because Plaintiffs and Defendants NDS Americas and Tarnovsky are U.S. nationals).  The jury thus is entitled to consider the Defendants' and their agents' extraterritorial conduct and the extraterritorial distribution and use of pirated cards, among other extraterritorial conduct introduced at trial, when determining if Defendants are liable under the RICO statutes (and any damages flowing from such unlawful conduct).  *Id.*

---

[3] The international law principles include territorial, national, protective, universality, and passive personality principle.  *Hill*, 279 F.3d at 739.

**b.     The Extraterritorial Conduct Of Defendants And Defendants' Agents And The Extraterritorial Distribution And Subsequent Use Of Pirated Cards Forms A Basis For Liability And Damages For EchoStar's Copyright Claims Under the Digital Millennium Copyright Act ("DMCA").**

**i.     The jury may consider the extraterritorial conduct of Defendants and Defendants' agents in determining if Defendants violated the DMCA.**

Although the traditional copyright laws of the United States generally do not apply to infringement that occurs solely outside of the United States, as the Court previously recognized, United States copyright laws apply to extraterritorial conduct that is intended to and does have consequences in the United States. *See GB Marketing USA*, 782 F. Supp. at 772-73 (German company liable for infringement when it knew that the infringing product would ultimately be distributed in the United States).

Although there are no cases addressing one way or the other the extraterritorial application of the DMCA,[4] the same rationale and purpose for the extraterritorial application of traditional U.S. copyright laws apply with equal, if not greater, force to the extraterritorial application of the DMCA. The very purpose of the DMCA is "to modernize copyright protection as a response to the development of new technologies which both enabled new forms of copyright protection as well as *new forms of copyright infringement*," *IQ Group v. Wiesner Publ'g, Inc.*, 409 F. Supp. 2d 587, 597 (D.N.J. 2006) (emphasis added). Indeed, such "new forms" of copyright infringement include the very conduct of which EchoStar complains here– hacking EchoStar's SmartCard, producing a device to circumvent EchoStar's conditional access system, continued circumvention of EchoStar's conditional

---

[4]None of the United States Courts of Appeal or the District Courts has addressed in published opinions the extraterritorial application of the DMCA and whether the rationale for extraterritorial application of the traditional copyright laws applies to the DMCA. The extraterritorial application of the DMCA is thus one of first impression before this Court.

access system, and the Internet publication of the EchoStar hack and resulting mass circumvention of EchoStar's conditional access system.

The very nature of the Internet and its global availability make it particularly fertile ground for copyright infringement, itself requiring the expansion of any territorial reach of the U.S. copyright laws, which is precisely why Congress enacted the DMCA. *E.g., A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 2002 U.S. Dist. LEXIS 16323 (S.D.N.Y. 2002) (applying an injunction extraterritorially where a defendant marketed and used copyrighted marks on the Internet); *Hageseth v. Superior Court*, 150 Cal. App. 4th 1399, 1402 (Cal. Ct. App. 2007) (laws and legal principles "have been adjusted to accommodate evolving social, economic, and political needs" and "progress and technology" and "those who claim their Internet-related conduct should be exempt from a traditional legal principle because the conduct is not within the paradigm for which the rule was designed bear the burden of establishing the fact"); *Expediters Int'l v. Direct Line Cargo Mgmt. Servs.*, 995 F. Supp. 468, 477 (D.N.J. 1998) (allowing entity to direct its foreign agent to do its "dirty work" outside of the country "would be to hinder the deterrent effect of the [Copyright Act] and to thwart its underlying purpose").

Therefore, to the extent that the December 2000 Internet postings of the EchoStar hack contributed to the circumvention of EchoStar's conditional access system within or without the United States, or led to the distribution of pirated cards intended to circumvent EchoStar's conditional access system, for instance, Defendants intended their conduct to cause harm within the United States and their conduct did cause harm to Plaintiffs in the United States.  In these circumstances, the jury's consideration of this extraterritorial conduct is entirely consistent with traditional copyright territoriality principles.  In fact, the principles of international law support the extraterritorial application of the DMCA for the very same reasons that these principles support the extraterritorial application of the Communications

Act and the RICO statutes.  *See infra* at p. 7.  Defendants' hack of EchoStar's SmartCard, their continuous circumvention of EchoStar's conditional access device and that of their agents, the posting of the EchoStar hack, and resulting multitude of acts of circumvention caused harm to Plaintiffs, U.S. nationals, within the United States.

Accordingly, the jury is entitled to consider the extraterritorial conduct of Defendants, their agents, and the extraterritorial distribution and use of pirated cards when determining if Defendants violated the DMCA.

> ii.   **The jury may consider extraterritorial conduct of Defendants and their agents when determining the damages resulting from Defendants' DMCA violations.**

When a defendant has infringed a copyright within the United States and that infringement in turn led to or caused infringement abroad, the copyright holder may recover not only for damages resulting from the copyright infringement in the United States, but also for damages flowing from the subsequent extraterritorial infringement – even if that infringement is not independently actionable.  *See Los Angeles News Serv. v. Reuters TV Int'l*, 149 F.3d 987 (9th Cir. 1998) (U.S. copyright holder entitled to damages for unauthorized foreign distribution of copyright material where distribution was a result of a copyright infringement within the United States).  Even if extraterritorial acts of circumvention are not independently actionable as a violation of U.S. law, EchoStar nonetheless is entitled to damages flowing from acts of circumvention that occur outside the United States that were caused by or resulted from any violation of the DMCA by Defendants or their agents within the United States.  *See id.*

> iii.   **The jury may consider the extraterritorial conduct as evidence of violations within the United States.**

Even if the Court concludes that the DMCA should not be applied extraterritorially, the jury, at a minimum, is entitled to consider extraterritorial

conduct as circumstantial evidence that the conduct of Defendants and/or their agents in the United States violates the DMCA.  For example, in *NFL v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12 (2d Cir 2000), the Second Circuit affirmed a district court's entry of summary judgment in the plaintiff's favor when the defendant, PrimeTime 24 Joint Venture ("PT24"), was found to have infringed upon the NFL's copyright by transmitting the NFL's copyrighted material via satellite to households in Canada without a valid copyright license.[5]  The final act of PT24's unauthorized public performance occurred in Canada, while PT24's uplink of the copyrighted material occurred in the United States.  *Id.* at 12-13.

The Court held that because copyright protection applies to each step in the process of unauthorized distribution, PT24 was liable for copyright infringement for its uplink of the copyrighted material in the United States because it ultimately led to the unauthorized distribution of copyright-protected programming outside the United States.  The Court made this holding even though the unauthorized distribution in Canada did not violate copyright law in Canada.  *Id*.  The Court thus clearly considered PT24's extraterritorial conduct in determining if PT24 had violated the U.S. copyright laws in the United States.  Indeed, if PT24's extraterritorial conduct (*i.e.*, the transmission of copyrighted material in Canada) had not been considered, PT24 would not have been in violation of the applicable copyright laws because, under the Court's rationale, PT24's uplinking of the copyrighted materials would not alone have been considered an actionable

---

[5] The Satellite Home Viewer Act, 17 U.S.C. § 119, which, like the DMCA, is part of the Copyright Act, grants a compulsory copyright license to satellite carriers, such as PT24, to provide out of market network programming to households who do not receive an adequate signal from their local network (*i.e.*, "unserved households").  Without the compulsory copyright license, satellite carriers, such as PT24, are not authorized to transmit network programming to households via satellite (or otherwise).  *PrimeTime 24 Joint Venture*, 211 F.3d at 12.  PT24 attempted to evade the copyright laws of the United States by transmitting via satellite network programming to households located just across the U.S. border in Canada (similar to Defendants' activities in Windsor, Canada – just across the border from Detroit).  *Id.*

infringement.  *Id*.  Similarly, at a minimum, the jury here is entitled to consider all relevant conduct *wherever* that conduct occurred to determine whether Defendants violated the DMCA within the United States.

The law thus supports instructing the jury that it may consider the extraterritorial conduct to determine whether Defendants are liable under the DMCA and/or in calculating the amount of EchoStar's damages if the jury agrees Defendants violated the DMCA.[6]  At a minimum, the jury should be instructed that it may consider the extraterritorial conduct as circumstantial evidence of whether Defendants violated the DMCA within the United States (even if the Court finds that the extraterritorial conduct of Defendants and their agents itself cannot be a basis of liability under the DMCA).  Defendants' proposed instructions, which severely limit the jury's consideration of their extraterritorial conduct and the extraterritorial conduct of their agents, are inappropriate, are contrary to the law, and will mislead and/or confuse the jury.  Indeed, because Defendants' proposed instructions misstate the law and are likely to confuse the jury if they are given, these instructions are likely to result in reversible error.  *See Gambini v. Total Renal Care, Inc.,* 486 F.3d 1087, 1093 (9th Cir. 2007) (Reversible error where jury instructions failed to "fairly and adequately" cover the issues presented and to state the law correctly, and therefore were ultimately misleading).

---

[6] The Court has previously ruled that Plaintiffs may only seek damages for violations of DMCA § 1201(a)(1)(A) that occurred after October 28, 2000, and violations of DMCA § 1201(a)(2) that occurred after June 6, 2000.  July 26, 2005 Order Granting in Part and Denying in Part Motions to Dismiss for Failure to State a Claim by NDS Group PLC and NDS Americas, Inc. ("Jul. 26 Order") at 5-7, 9-18.  This brief does not address whether the jury may consider Defendants' extraterritorial conduct prior to these dates, but simply addresses whether the jury may consider Defendants' extraterritorial conduct in general, without reference to time limitations.

### III. THE JURY MAY CONSIDER CONDUCT THAT OCCURRED OUTSIDE THE STATE OF CALIFORNIA TO DETERMINE VIOLATIONS OF THE CALIFORNIA PENAL CODE.

The California Penal Code applies to persons who (1) commit, in whole or in part, any crime within the state; (2) cause, aid, advise, or encourage another to commit a crime within the state, or (3) commit *non de minimis* preparatory actions outside of the state with the intent that the crime will be completed within the state. Cal. Penal Code §§ 27(a)(1), 778; *People v. Brown*, 91 Cal. App. 4th 256, 266 (2001). Therefore, by its express terms, the California Penal Code applies to Defendants' conduct, and the conduct of its agents, that occurred outside the State of California when there is evidence, as here, that the conduct was intended to and did cause harm within the State of California. *See People v. Betts*, 34 Cal. 4th 1039, 1046 (Cal. 2005) (California's criminal statutes apply to conduct "that takes place outside of the state if the results of the crime are intended to, and do, cause harm within the state"); *People v. Weeren*, 26 Cal. 3d 654, 666 (Cal. 1980) (California courts may apply California's penal code to conduct that occurred outside the State of California). Consistent with the law, the Court has already ruled that EchoStar's claims under the California Penal Code are viable even if no pirated card was ever purchased, sold, or distributed within the United States because Tarnovsky likely undertook *non de minimus* preparatory acts within the State of California. Jan. 16 Order at 65.

The California Penal Code expressly encompasses extraterritorial conduct (*i.e.*, conduct that occurs outside the State of California). Thus, for the same reasons that the jury is entitled to consider the conduct of Defendants and Defendants' agents outside the United States and the extraterritorial distribution and use of pirated cards when determining Defendants' liability under the various federal statutes, the jury is entitled to consider the conduct of Defendants and their

agents that occurred outside the State of California in determining whether Defendants violated the California Penal Code.

For example, the jury may consider Defendants' and their agents' hacking and circumvention of EchoStar's conditional access system in Israel and Canada, and payments to Tarnovsky that originated in Canada and were circulated through Texas, to determine whether Defendants and/or their agents posted the EchoStar hack on the Internet or otherwise provided the EchoStar hack to satellite pirates in California, resulting in continued circumvention of EchoStar's conditional access device in California (and elsewhere), and the distribution of pirated cards throughout North America and in the State of California.[7] *See PrimeTime 24 Joint Venture*, 211 F.3d at 12. Defendants' proposed instructions must be rejected because they misstate the law and will mislead and/or confuse the jury, potentially resulting in reversible error. *Gambini,* 486 F.3d at 1093.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Separate Proposed Jury Instructions, which attempt to exclude from the jury's consideration extraterritorial conduct that occurred outside the United States and outside the State of California with respect to EchoStar's claims under the California Penal Code and the various Federal statutes, are improper and contrary to the law. EchoStar instead requests that the Court:

- instruct the jury that it may freely consider all extraterritorial conduct when determining if Defendants violated the Communications Act and RICO (including violations of 18 U.S.C. § 1039) and to calculate any damages to which EchoStar may be entitled; and

---

[7] To the extent that Defendants are liable for violations of the California Penal Code based on out-of-state conduct, then contrary to Defendants' assertion that the jury may not award punitive damages based on out-of-state conduct, it follows that such conduct may also be the basis for a punitive damages award, since punitive damages are expressly provided for in the statute. Cal. Pen. Code § 593e(c )(2); Defendants' Sep. Prop. Jury Instr. at 47.

ECHOSTAR'S TRIAL MEMO RE GEOGRAPHIC
PARAMETERS                                    - 12 -

- instruct the jury that it may freely consider all extraterritorial conduct when determining if Defendants violated the DMCA, committed criminal copyright infringement, and/or violated the California Penal Code, and to calculate any damages flowing therefrom to which EchoStar may be entitled; or in the alternative

- instruct the jury that it may consider extraterritorial conduct to calculate any damages to which EchoStar may be entitled flowing from Defendants' violations of the DMCA, RICO (through criminal copyright infringement), and the California Penal Code; or, in the alternative,

- instruct the jury that it may consider extraterritorial conduct as circumstantial evidence that Defendants violated the DMCA, committed criminal copyright infringement, and violated the California Penal Code within the United States and California, respectively.

DATED:  April 18, 2008

Respectfully submitted,

**DLA PIPER US LLP**

By:  s/Cynthia A. Ricketts
Cynthia A. Ricketts
Attorneys for Plaintiffs
ECHOSTAR SATELLITE CORPORATION,
ECHOSTAR COMMUNICATIONS
CORPORATION, ECHOSTAR TECHNOLOGIES
CORPORATION, AND NAGRASTAR L.L.C.

Additional Counsel:

**T. WADE WELCH & ASSOCIATES**
T. Wade Welch (*pro hac vice*)
Ross W. Wooten (*pro hac vice*)
David M. Noll (*pro hac vice*)
2401 Fountainview, Suite 700
Houston, Texas 77057
Telephone:  (713) 952-4334
Facsimile:   (713) 952-4994

**ECHOSTAR'S TRIAL MEMO RE GEOGRAPHIC PARAMETERS**

- 13 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DLA PIPER US LLP**
David A. Grenardo (State Bar No. 223142)
Cynthia A. Ricketts (*pro hac vice*)
1999 Avenue of the Stars, 4th Floor
Los Angeles, CA 90067
Telephone: (310) 595-3031
Facsimile: (310) 595-3331

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  THE JURY MAY CONSIDER CONDUCT OUTSIDE THE UNITED STATES
     TO DETERMINE ECHOSTAR'S FEDERAL STATUTORY CLAIMS
     AGAINST DEFENDANTS .............................................................................................. 2

     a.   The Extraterritorial Conduct Of Defendants And Their Agents Forms A
          Basis For Liability Under The Communications Act and The RICO
          Statutes ................................................................................................................ 3

          i.    The Communications Act's Express Language Makes Clear That
                Extraterritorial Conduct May Form A Basis of Liability ........................... 3

          ii.   RICO's Express Language Also Makes Clear That Extraterritorial
                Conduct May Form The Basis of Liability ................................................. 4

     b.   The Extraterritorial Conduct Of Defendants And Defendants' Agents And
          The Extraterritorial Distribution And Subsequent Use Of Pirated Cards
          Forms A Basis For Liability And Damages For EchoStar's Copyright
          Claims Under the Digital Millennium Copyright Act ("DMCA") ...................... 6

          i.    The jury may consider the extraterritorial conduct of Defendants
                and Defendants' agents in determining if Defendants violated the
                DMCA ....................................................................................................... 6

          ii.   The jury may consider extraterritorial conduct of Defendants and
                their agents when determining the damages resulting from
                Defendants' DMCA violations ................................................................. 8

          iii.  The jury may consider the extraterritorial conduct as evidence of
                violations within the United States ........................................................... 8

III. THE JURY MAY CONSIDER CONDUCT THAT OCCURRED OUTSIDE THE
     STATE OF CALIFORNIA TO DETERMINE VIOLATIONS OF THE
     CALIFORNIA PENAL CODE ........................................................................................ 11

IV.  CONCLUSION .......................................................................................................... 12

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4  *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 2002 U.S. Dist. LEXIS 16323 (S.D.N.Y. 2002) ........................ 7

5  *Disimone v. Browner*, 121 F.3d 1262 (9th Cir. 1997) .................... 3

6  *Expediters Int'l v. Direct Line Cargo Mgmt. Servs.*, 995 F. Supp. 468 (D.N.J. 1998) ........................ 7

7  *Gambini v. Total Renal Care, Inc.,* 486 F.3d 1087 (9th Cir. 2007) ........................ 10, 12

8  *GB Marketing USA, Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763 (W.D.N.Y. 1991) ........................ 3, 6

9  *Hageseth v. Superior Court*, 150 Cal. App. 4th 1399 (Cal. Ct. App. 2007) .................... 7

10  *IQ Group v. Wiesner Publ'g, Inc.*, 409 F. Supp. 2d 587 (D.N.J. 2006) ........................ 6

11  *Los Angeles News Serv. v. Reuters TV Int'l*, 149 F.3d 987 (9th Cir. 1998) .................... 8

*NFL v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir 2000) ........................ 9, 10, 12

12  *People v. Betts*, 34 Cal. 4th 1039 (Cal. 2005) ........................ 11

13  *People v. Brown*, 91 Cal. App. 4th 256 (2001) ........................ 11

*People v. Weeren*, 26 Cal. 3d 654 (Cal. 1980) ........................ 11

14  *United States v. Alexander*, 106 F.3d 874 (9th Cir. 1997) ........................ 3

15  *United States v. Hill*, 279 F.3d 731 (9th Cir. 2002) .................... 2, 5

16  *United States v. Ivanov*, 175 F. Supp. 2d 367 (D. Conn. 2001) ........................ 5

*United States v. Neil*, 312 F.3d 419 (2002) ........................ 2

17

## STATUTES

18  17 U.S.C. § 119 ........................ 9

19  17 U.S.C. § 1201(a)(1)(A) ........................ 1, 10

17 U.S.C. § 1201(a)(2) ........................ 10

20  18 U.S.C. § 1029 ........................ 4, 5

21  18 U.S.C. § 1029(a) ........................ 4

22  18 U.S.C. § 1039 ........................ 12

18 U.S.C. § 1962 ........................ 4

23  18 U.S.C. § 1962(c) ........................ 4

24  47 U.S.C. § 605(a) ........................ 3

25  47 U.S.C. 605(a) ........................ 1

Cal. Pen. Code § 593e(c )(2) ........................ 12

26  Cal. Penal Code § 27(a)(1) ........................ 11

27  Cal. Penal Code § 778 ........................ 11

28