1    HOGAN & HARTSON L.L.P.
     Richard L. Stone (SBN 110022)
2    Kenneth D. Klein (SBN 85231)
     1999 Avenue of the Stars, Suite 1400
3    Los Angeles, California 90067
     Telephone:  (310) 785-4600
4    Facsimile:  (310) 785-4601
     E-mail: rlstone@hhlaw.com
5    E-mail: kdklein@hhlaw.com

6    O'MELVENY & MYERS
     Darin W. Snyder (SBN 136003)
7    275 Battery Street, Suite 2600
     San Francisco, CA  94111-3305
8    Telephone:  (415) 984-8700
     Facsimile: (415) 984-8701
9    E-mail: DSnyder@omm.com

10   Attorneys for Defendants
     NDS GROUP PLC and NDS AMERICAS, INC.

11

12                 UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14                      SOUTHERN DIVISION

15

16   ECHOSTAR SATELLITE CORP., et          Case No. SA CV 03-950 DOC (JTL)
     al.,
17                                          **NDS'S MOTION FOR JUDGMENT
           Plaintiffs and Counterclaim      AS A MATTER OF LAW RE
18         Defendants,                       PLAINTIFFS' CARD SWAP
                                            DAMAGES; DECLARATION OF
19              v.                          JULIE SHEPARD IN SUPPORT
                                            THEREOF**
20   NDS GROUP PLC, et al.,
                                            Date: May 2, 2008
21         Defendants and Counterclaim      Courtroom: 9D
           Plaintiffs.                      Judge: David O. Carter
22

23

24

25

26

27

28

## I.     Introduction

Under unambiguous written warranties between Plaintiffs and the manufacturer of Plaintiffs' satellite television smart cards, Kudelski, Plaintiffs were contractually entitled to receive replacement smart cards at Kudelski's "direct marginal manufacturing cost" in the event of a breach in Plaintiffs' anti-piracy security system that could only be remedied by a card swap.[1]  During Plaintiffs' case in chief, Christophe Nicolas, Kudelski/NagraCard's chief Technology Officer and the only Kudelski employee proffered by Plaintiffs, testified that Plaintiffs' security system was supposedly so badly compromised by the December 2000 Internet postings that the smart cards had to be swapped.  Likewise, the only EchoStar employee proffered to testify about the smart card warranties, EchoStar's corporate controller Paul Orban, testified that as a result of EchoStar's system being hacked, a card swap was necessary.  This is precisely the situation covered by the smart card warranties.  Plaintiffs cannot have it both ways.  If the hack of their system (which they blame on NDS) did not necessitate a card swap, Plaintiffs cannot blame NDS for the cost of having to do the card swap.  On the other hand, if Plaintiffs contend the December 2000 Internet postings forced a card swap, Plaintiffs cannot dispute that the smart card warranty, and the discounted price for replacement smart cards, applied.  As the Court knows, Plaintiffs have elected to proceed down the latter path, leaving the Court with no choice but to rule that the warranties applied.

Yet even though Plaintiffs were entitled to obtain replacement smart cards at a discounted price, they never even attempted to enforce their warranty rights.  Under well settled law, Plaintiffs were legally obligated to mitigate their alleged card swap damages by obtaining the replacement cards at the discounted warranty rate.

---

[1] NDS Group PLC and NDS Americas, Inc. are referred to collectively as "NDS." Plaintiffs EchoStar Communications Corporation, EchoStar Satellite L.L.C., and EchoStar Technologies Corporation are referred to collectively as "EchoStar." "NagraStar" refers to plaintiff NagraStar L.L.C.  NagraStar and EchoStar are referred to collectively as "Plaintiffs".

1    Accordingly, Plaintiffs cannot, as a matter of law, recover card swap damages above

2    and beyond Kudelski's direct marginal manufacturing costs for the smart cards.

3          However, because Plaintiffs have failed to produce any evidence of Kudelski's

4    direct marginal manufacturing costs for the smart cards (the only card swap damages

5    Plaintiffs could have suffered under the plain language of the warranties), no

6    reasonable jury can possibly calculate Plaintiffs' alleged card swap damages.  Because

7    of the complete absence of such evidence, and because there is no reasonable basis for

8    a jury to compute Plaintiffs' alleged card swap damages, Plaintiffs should be

9    precluded from seeking any card swap damages as a matter of law.

10          In short, this motion – which is being filed in response to the Court's previous

11    warning to Plaintiffs that a directed verdict may be granted on this exact issue – seeks

12    judgment as a matter of law (1) limiting Plaintiffs' recovery of card swap damages to

13    Kudelski's "direct marginal manufacturing cost" of the replacement smart cards, and

14    (2) precluding Plaintiffs recovery of any card swap damages whatsoever based on the

15    complete absence of evidence at trial concerning Kudelski's "direct marginal

16    manufacturing cost" of the replacement smart cards.

17

18    **II.    The Smart Card Warranties and The Court's Prior Ruling**

19          As the Court knows, plaintiff EchoStar encrypts its satellite broadcasts using

20    conditional access system ("CAS") technology provided by plaintiff NagraStar.  An

21    essential component of the CAS consists of access cards known as "smart cards,"

22    which are supplied by non-party NagraCard (a Kudelski affiliate) to NagraStar.  Under

23    the Kudelski smart card purchase agreement with NagraStar (in which it holds a 50%

24    interest), Kudelski provides the following warranty against piracy of the Smart Cards:

25          5.3    Additional Warranty.  Kudelski further warrants the security of

26          the Kudelski conditional access system provided by Kudelski, and

27          expressly agrees that **if the security of the conditional access system**

28          **is breached, and replacement of Smart Cards is reasonably**

1      **necessary to cure the breach**, notwithstanding the Smart Card pricing

2      specified in Sections 3.1 and 7.2, Kudelski will, at the highest priority

3      within aggressive manufacturing lead times, replace all outstanding

4      Smart Cards which were delivered by Kudelski no more than 48

5      months prior to the date of such notice, and which are in use by end-

6      users of the conditional access system or are in NagraStar's

7      inventories, **at a cost to NagraStar equal to the direct marginal cost**

8      **of manufacturing the Smart Cards (i.e., exclusive of all overhead**

9      **costs)**.

10  *See* Trial Exh. 691 (emphasis added).  Consistent with this provision, NagraStar's

11  agreement with EchoStar provides a parallel warranty:

12      Section 5.3 <u>Additional Warranty</u>.  NagraStar further warrants the

13      security of the conditional access system provided EchoStar and its

14      Affiliates, and expressly agrees that **if the security of the conditional**

15      **access system is breached**, NagraStar will immediately notify

16      Kudelski with a demand for fastest possible replacement, and upon

17      receipt of replacement Smart Cards from Kudelski, immediately

18      replace all outstanding Smart Cards which were delivered by

19      NagraStar to EchoStar no more than 48 months prior to the date of

20      such notice, and which are in use by end-users of the conditional

21      access system or are in EchoStar's inventories, **at a cost to EchoStar**

22      **equal to the cost properly charged NagraStar by Kudelski for the**

23      **Smart Cards**.

24  *See* Trial Exh. 692 (emphasis added).  The warranty thus expressly provides that

25  where a breach to the security of the CAS necessitates a card swap, Plaintiffs are only

26  required to pay the direct marginal costs of the replacement cards.

27      Plaintiffs have repeatedly alleged throughout this case that the December 2000

28  Internet postings by "xbr21" and "Nipper2000" resulted in the full compromise of

WLA - 097141/000020 - 383791 v3

1  Plaintiffs' DNASP-II encryption platform, the CAS they were using at the time.  As

2  the Court has previously observed, "EchoStar's theory is that the December 2000

3  postings necessitated the swap out of all DNASP-II cards, including ROM 2, ROM 3,

4  ROM 10 and potentially ROM 11." *See* Ruling on Motion in Limine No. 1.

5  In its pretrial Motion in Limine No. 1, NDS argued that because EchoStar has

6  taken the position that its CAS was breached, there can be no question that EchoStar

7  was contractually entitled to purchase replacement smart cards "at a cost to NagraStar

8  equal to the direct marginal cost of manufacturing the Smart Cards (i.e., exclusive of

9  all overhead costs)." *See* Trial Exhs. 692, 691.  As such, NDS sought to preclude

10  Plaintiffs from seeking any card swap damages beyond what Plaintiffs were

11  contractually entitled to pay under the smart card warranties:  Kudelski's "direct

12  marginal cost of manufacturing the Smart Cards (exclusive of all overhead costs)."

13  The Court denied NDS's motion, and ruled that EchoStar would be permitted to

14  present evidence to the jury concerning whether it took "reasonable steps" to mitigate

15  its card swap damages. *See* Ruling on Motion in Limine No. 1.  However, the Court

16  warned that "EchoStar has been advised that if it fails to present sufficient evidence

17  concerning the card swap and the warranty provisions, the Court is amenable to a

18  directed verdict in this regard." *See id.* (emphasis added).  Thus, the Court essentially

19  gave Plaintiffs an opportunity to either prove that the warranty provision did not

20  apply, or that Plaintiffs took sufficiently reasonable steps to enforce and benefit from

21  the warranty  but were unsuccessful at getting Kudelski to comply with the contract.

22  Now that Plaintiffs have fully presented their case to the jury, there can be no

23  question that the smart card warranties applied here.  And because Plaintiffs have not

24  proffered a shred of evidence of Kudelski's "direct marginal cost of manufacturing the

25  Smart Cards" – i.e., the only card swap damages Plaintiffs could possibly be entitled

26  to – Plaintiffs cannot substantiate any card swap damages as a matter of law.

27

28

4

1  **III.    Plaintiffs Cannot Recover Any Card Swap Damages As a Matter of Law**

2       Rule 50(a) of the Federal Rules of Civil Procedure "allows the trial court to

3  remove cases or issues from the jury's consideration 'when the facts are sufficiently

4  clear that the law requires a particular result.'" *Weisgram v. Marley Co.*, 528 U.S.

5  440, 448 (2000) (citing 9A C. Wright & A. Miller, Federal Practice and Procedure §

6  2521, p. 240 (2d ed. 1995). Judgment as a matter of law (commonly referred to as a

7  "directed verdict") is proper "where the evidence permits only one reasonable

8  conclusion as to the verdict." *Meehan v. County of Los Angeles*, 856 F.2d 102, 106

9  (1988) (citing *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir. 1985). In ruling on

10  a motion for judgment as a matter of law, "the court is to inquire whether there is any

11  'legally sufficient evidentiary basis for a reasonable jury to find for [the opponent of

12  the motion].'" *Weisgram*, 528 U.S. at 453-54.

13       A judgment as a matter of law is appropriate to remove a claimed item of

14  damages from the jury's consideration, when such damages are either not available

15  under the applicable law or unsupported by the evidence. *See Portland 76 Auto/Truck*

16  *Plaza, Inc. v. Union Oil Co. of California*, 153 F.3d 938, 947 (9th Cir. 1998)

17  (affirming judgment as a matter of law in defendant's favor on one of plaintiff's items

18  of damages); *Ward v. City of San Jose*, 967 F.2d 280, 286 (9th Cir. 1991) (affirming

19  directed verdict on plaintiff's punitive damages claim where there was no evidence

20  that the defendants acted with malice or oppression).  Courts have specifically held

21  that where a plaintiff's damages are subject to a contractual limitation of liability, and

22  where the plaintiff fails to present legally sufficient evidence that the contract does not

23  apply, judgment as a matter of law should be granted to preclude recovery of damages

24  greater than those permitted by the contract. *Hartford Ins. Co. v. Bellsouth Tel., Inc.*,

25  2005 WL 6111633, *3 (S.D. Fla., Sept. 21, 2005) (granting motion for judgment as a

26  matter of law and precluding plaintiff from seeking damages in an amount greater than

27  permitted by contractual limitation on liability).

28

5

VSLA - 097141/000020 - 383791 v3

A. **The Terms of The Warranty Agreement Entitled Plaintiffs to Discounted Replacement Smart Cards In the Event of a Security Breach Requiring a Card Swap**

The interpretation of a contract is a question of law, and it is the Court's role to make such determinations on a motion for a directed verdict. *Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 277 (9th Cir. 1992) (holding that district court should have directed verdict on issue of subcontractor's obligations under construction contract); *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 786 (9th Cit. 2006) (upholding district court's treatment of contract construction as question of law); *Lincoln National Corp. v. Takecare, Inc.*, 1998 WL 281290, *3 (N.D. Cal., May 11, 1998) (the interpretation of a contact is a judicial function).

As discussed above, the smart card warranty provisions entitled Plaintiffs to a reduced price for replacement smart cards "if the security of the conditional access system is breached, and replacement of Smart Cards is reasonably necessary to cure the breach." Trial Exhs. 691, 692. In the event of such a security breach, Kudelski contractually bound itself to "replace all outstanding Smart Cards which were delivered by Kudelski no more than 48 months prior to the date of such notice" and to charge Plaintiffs no more than Kudelski's "direct marginal cost of manufacturing the Smart Cards (i.e., exclusive of all overhead costs)." *See* Trial Exh. 691. These are straightforward contract terms, and Plaintiffs have not shown, or even argued, that the warranties were ambiguous. In fact, EchoStar' corporate controller, Paul Orban – one of only two EchoStar employees to testify about the warranties – testified that this is precisely what he understood the warranties to mean. *See* Apr. 17, 2008 Trans., Vol.4, p. 27:22-28:2; *see also*, p. 32:2-4 ("Q: "The lower warranty price applies if there is a security breach, and that's the reason, right? A: Yes."). Plaintiffs also admit these were the same warranties that were in effect in 2004 (when the relevant card swap took place) and had never been amended. *See* Apr. 17, 2008 Trans., Vol.4, p. 26:20-

1  27:6.  Accordingly, the Court should find, as a matter of law, that under the plain

2  language of the warranties, if Plaintiffs' CAS were breached to the point that a card

3  swap was necessary to cure the breach, Plaintiffs could obtain a smart card discount

4  by simply asking for it.  *See Brinderson*, 971 F.2d at 277; *Wall*, 447 F.3d at 786;

5  *Lincoln*, 1998 WL 281290 at *3.

6

7        **B.    Plaintiff Had an Affirmative Duty to Enforce the Terms of the**

8              **Warranties**

9        It is well settled that "[a] plaintiff who suffers damage as a result of either a

10  breach of contract or a tort has a duty to take reasonable steps to mitigate those

11  damages and <u>will not be able to recover for any losses which could have been thus</u>

12  <u>avoided</u>."  *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993) (emphasis added);

13  *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1994) (a plaintiff must do

14  "all that could be reasonably expected [of it] by way of mitigation"); *R.B. Matthews,*

15  *Inc. v. Transamerica Transp. Svcs., Inc.*, 945 F.2d 269, 275 (9th Cir. 1991) (citing

16  "general rule that a buyer of goods must attempt to minimize damages").

17        A plaintiff's failure to mitigate can be decided as a matter of law.  *See Farmer*

18  *Bros.*, 31 F.3d at 906 (holding that employment discrimination plaintiff failed to

19  mitigate her damages as a matter of law by stopping her job search for new

20  employment); *West v. Bechtel Corp.*, 96 Cal. App. 4th 966, 985 (2002) (where only

21  one conclusion can be drawn from the evidence, court may rule as a matter of law that

22  plaintiff failed to mitigate its damages).  Courts routinely limit or reduce damages

23  based on an injured party's failure to mitigate.  *See Thrifty-Tel, Inc. v. Bezenek*, 46

24  Cal. App. 4th 1559, 1569 (1996) (because defendant  telephone carrier knew that

25  defendants had previously hacked phone system but made no effort to stop defendants

26  until after defendants hacked system for a second time, court held that phone carrier

27  was precluding from recovering damages caused by second hack); *Shaffer*, 17 Cal.

28  App. 4th at 38-39 (reducing available damages by 25% available to purchaser of

1   defective house where 25% of total property damage could have been avoided by

2   plaintiffs' reasonable care and diligence).

3       Plaintiffs' entire case is premised on the allegation that NDS's supposed hack of

4   EchoStar's CAS necessitated a multi-million dollar card swap.  If Plaintiffs were to

5   argue that the warranty provision did not apply, they would necessarily be conceding

6   that the breach of their security system did not necessitate a card swap, thereby

7   precluding them from blaming NDS for the cost of that card swap.  On the other hand,

8   if Plaintiffs blame NDS for the card swap, and allege that NDS caused the outright

9   destruction of Plaintiffs' CAS that could only be remedied by a card swap, Plaintiffs

10  have no choice but to concede that the smart card warranties applied.  Plaintiffs have

11  chosen the latter position.

12      At trial, EchoStar readily admitted that its 2004 card swap was necessitated by a

13  security breach.  Mr. Orban, one of only two EchoStar employees proffered by

14  plaintiffs to testify about the card swap, testified that "as a result of our system being

15  hacked, we had to replace all of the Smart Cards that are in all the set-top boxes for all

16  of our customers." *See* Apr. 17, 2008 Trans., Vol.3, p. 85:14-16.  Mr. Orban also

17  testified that "we did the swap, because we were hacked, and we had to secure our

18  system. . . .  it was discussed many, many times that we were hacked, and we had to

19  swap out the Smart Cards to secure our system." *See* Apr. 18, 2008 Trans., Vol.1, p.

20  24:22-25:7.

21      And, more importantly, EchoStar cannot claim with a straight face that

22  Kudelski, the smart card manufacturer, would have refused to comply with its

23  warranty obligations or disputed whether Plaintiffs' CAS was sufficiently "breached"

24  to necessitate a card swap.  Plaintiffs' key witness at trial was none other than

25  Christophe Nicolas, the Senior Vice President and Chief Technology Officer for

26  NagraCard (i.e., Kudelski) and the only Kudelski employee proffered as a witness by

27  Plaintiffs. *See* Apr. 15, 2008 Trans., Vol.1, p. 9:22-24.  Mr. Nicolas testified

28  unequivocally that the December 2000 Internet postings caused such a severe security

8

1    breach in EchoStar's CAS that "the only option that you have is to swap, to change –

2    exchange that hardware." *See* Apr. 15, 2008 Trans., Vol.1, p. 72:10-11 (emphasis

3    added).  Mr. Nicholas testified:

4         Q:  So as a result of the different flavors that derived from the

5         December 2000 Nipper posting, EchoStar and NagraStar were

6         forced to swap out the DNASP-II system, is that correct?

7         A:  That's correct.

8    *See* Apr. 15, 2008 Trans., Vol.1, p. 72:19-23 (emphasis added).

9         This testimony alone shows that NagraCard – the only company in a position to

10   refuse compliance with the warranty – concedes that the warranty provision applied.

11   Thus, EchoStar's legal duty to mitigate its card swap damages consisted of nothing

12   more than simply asking for the contractually agreed about discounted smart card

13   price – which Kudelski concedes was applicable.

14

15   **C.    Plaintiff Failed to Mitigate Their Damages By Failing to Enforce the**

16         **Smart Card Warranties**

17        Despite the fact that Plaintiffs had a contractual right to discounted replacement

18   smart cards, and even though the provider of those smart cards agreed that Plaintiffs'

19   CAS was so severely breached that a card swap was necessary, Plaintiffs sat on their

20   rights and did nothing to obtain the benefit of those discounts.  Plaintiffs were very

21   much aware of their rights under the smart card warranties – they had invoked those

22   provisions in the past.  On July 2, 1999, after EchoStar's security system was

23   compromised by "instructions published on the internet that permit emulation of the

24   Smart Card," EchoStar sent a letter to NagraStar invoking the warranty and

25   demanding a card swap at the discounted rate equal to Kudelski's direct marginal

26   manufacturing costs.  *See* Trial Exh. 828.  But when it came time for the 2004 card

27   swap – the one that Plaintiffs blame on NDS and for which they seek millions of

28   dollars in damages – Plaintiffs ignored the warranties.

WLA - 097141/000020 - 383791 v3

1    After two weeks of presenting evidence and testimony to the jury, EchoStar has

2    failed to present a <u>single</u> document or witness showing that EchoStar even attempted

3    to invoke the warranty provisions, as it was entitled and obligated to do, and obtain its

4    replacement smart cards at a greatly reduced price.  In fact, Plaintiffs' evidence shows

5    the complete opposite.  EchoStar's Chairman and Chief Executive Officer, Charles

6    Ergen, admitted at trial that EchoStar never even requested that NagraStar or Kudelski

7    comply with the smart card warranty:

8            Q:  And am I correct that after the December 2000 postings, you

9                 don't know of any letter being sent by EchoStar's corporate

10               counsel requesting a card swap after the December 2000

11               postings?

12           A:  I don't know, no.

13           Q:  And you did not direct any lawyer to send a letter to the card

14               supplier demanding a card swap as a result of the December

15               2000 postings which are the subject of this lawsuit, correct?

16           A:  No.

17                                    *  *  *

18           Q:  Did you send or authorize any lawyer to send a letter

19               demanding a card swap as a result of the December 2000

20               postings?

21           A:  No.

22   *See* Apr. 9, 2008 Trans., Vol.5, p. 68:7-16, 69:1-4.

23           In short, Plaintiffs' own evidence shows that (1) the smart card manufacturer

24   who was obligated to sell replacement smart cards at a discounted rate agreed that the

25   security breach in EchoStar's CAS necessitated a card swap, and (2) EchoStar never

26   sought to (or even attempted to) enforce its rights under the warranty provision in

27   order to obtain the discounted rate for replacement smart cards.  Had Plaintiffs acted

28   on the warranty provisions of their smart card purchase agreements (as they had done

WLA - 097141/000020 - 383791 v3

in the past), Plaintiffs could have avoided all costs of the 2004 card swap above and beyond the direct marginal cost of manufacturing the replacement cards.  It was both their right and their responsibility to enforce this warranty, but Plaintiffs utterly failed to take these simple, reasonable steps to mitigate their damages.  Based on this evidence, no reasonable juror could possibly find that Plaintiffs took "reasonable steps" to mitigate its card swap damages and avoid unnecessary costs. *Shaffer*, 17 Cal. App. 4th at 41; *R.B. Matthews*, 945 F.2d 269 at 275 (citing "general rule that a buyer of goods must attempt to minimize damages"); *Farmer Bros.*, 31 F.3d at 906 (a plaintiff must do "all that could be reasonably expected [of it] by way of mitigation"). Thus, at a minimum, Plaintiffs' card swap damages must be limited to direct marginal cost of manufacturing the replacement cards. *See Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1569 (1996) (precluding plaintiff from recovering damages for losses that could have been avoided through reasonable mitigation efforts); *Shaffer*, 17 Cal. App. 4th at 38-39 (same).

### D.   Plaintiffs Have Presented No Evidence of Kudelski's "Direct Marginal Cost of Manufacturing the Smart Cards," the Only Card Swap Damages Plaintiffs Could Possibly Recover

Damages must be established with "reasonable certainty," and a "reasonable basis for computation must exist." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).  Monetary damages must be non-speculative and "sufficiently supported by evidence." *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004).   This is especially true when the plaintiff has exclusive control over the financial records that supposedly evidence plaintiff's damages. *Lindy*, 982 F.2d at 1407 (denying damages award to plaintiff in trademark infringement action because plaintiff was in best position to produce records of specific lost sales at issue but failed to furnish the court with any such documentation). A court may enter a directed verdict on damages if the plaintiff fails to produce any

11

1   evidence to support the damage calculation. *Deaktor v. Fox Grocery Co.*, 475 F.2d

2   1112, 1116 (3rd Cir. 1973) (affirming directed verdict as to plaintiff's alleged

3   damages where plaintiff failed to proffer any evidence of "relevant cost figures

4   necessary to determine net profit" and thus "did not meet their burden of establishing

5   the quantum of damages"), *cert. denied*, 414 U.S. 867 (1973); *see also*, *Polar Bear*,

6   384 F.3d at 708 (reversing district court's denial of directed verdict on unsupported

7   and speculative portion of damage claim); *Tunis Bros. Co., Inc. v. Ford Motor Co.*,

8   952 F.2d 715, 736 (3rd Cir. 1991) (where damages are based on net profits, plaintiffs

9   must produce evidence of costs; "absent quantification of numerous costs . . . the jury

10  was left to speculate as to the amount of net profits recoverable in compensatory

11  damages."); *Computer Access Technology Corp. v. Catalyst Enterprises, Inc.*, 273 F.

12  Supp. 2d 1063, 1076-1077 (N.D. Cal. 2003) (granting motion for new trial on

13  damages and finding that plaintiff failed to present sufficient evidence of lost sales due

14  to trademark infringement such that jury had no reasonable basis for damage

15  computation).

16      As discussed above, the only card swap damages to which Plaintiffs could be

17  entitled are Kudelski's direct marginal cost of manufacturing the replacement smart

18  cards. Plaintiffs have not proffered <u>any</u> documents or testimony evidencing

19  Kudelski's direct marginal costs of manufacturing the replacement smart cards. In

20  fact, Mr. Orban (EchoStar's corporate controller whose job it was to account for the

21  card swap costs) testified he has never even seen any documentation of the direct

22  marginal cost of manufacturing the smart cards:

23      Q: Have you seen any documents of the direct marginal cost of

24      manufacturing?

25      A: No, I have never seen anything like that.

26                          * * *

27      Q: Has anyone ever shown you documents evidencing the

28      direct marginal cost of manufacturing the Smart Cards?

12

1    A: No, I have never seen that.

2  *See* Apr. 17, 2008 Trans., Vol.4, p. 28:7-9, 28:16-18, 32:5-8.

3    Because Plaintiffs have failed to provide any evidence of these costs, and no

4  reasonable basis for computing Plaintiffs' alleged card swap damages exists, the Court

5  has no choice but to deny Plaintiffs' card swap damage claim as a matter of law.  Fed.

6  R. Civ. P. 50(a); *Deaktor*, 475 F.2d at 1116; *Lindy*, 982 F.2d at 1407.

7

8  **III.  Conclusion**

9    For the foregoing reasons, NDS respectfully requests that the Court grant

10  NDS's motion and enter judgment as a matter of law (1) limiting Plaintiffs' recovery

11  of card swap damages to Kudelski's "direct marginal manufacturing cost" of the

12  replacement smart cards, and (2) precluding Plaintiffs recovery of any card swap

13  damages whatsoever based on the complete absence of evidence at trial concerning

14  Kudelski's "direct marginal manufacturing cost" of the replacement smart cards.

15

16

17  Dated:  April 27, 2008                    HOGAN AND HARTSON, L.L.P.

18

19

20                    By_____ *Richard L. Stone*
                            Richard L. Stone

21                    Attorneys for Defendants NDS GROUP PLC
22                    and NDS AMERICAS, INC.

23

24

25

26

27

28

13

WLA - 097141/000020 - 383791 v3