**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Case No. SACV 03-0950 DOC (JTLx)                                            Date: May 6, 2008

Title: ECHOSTAR SATELLITE CORP., et al. v. NDS GROUP PLC, et al.

---

DOCKET ENTRY
          [I hereby certify that this document was served by first class mail or Government messenger service, postage prepaid, to all counsel (or parties) at their respective most recent address of record in this action on this date.]
                                                            Date:_____ Deputy Clerk: _____

---

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

   Kristee Hopkins                              Not Present
   Courtroom Clerk                              Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:   ATTORNEYS PRESENT FOR DEFENDANTS:

         NONE PRESENT                                 NONE PRESENT

---

PROCEEDING (IN CHAMBERS): ORDER RE RULE 50 MOTIONS

          Plaintiffs and Defendants have each moved, pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law with respect to certain claims.  The Court addresses each of the Rule 50 motions in the instant Minute Order.

**I.    LEGAL STANDARD**

          If, after the evidence is closed, there is only one reasonable conclusion that a jury may reach, the Court may grant a judgment as a matter of law as to any claim or defense in issue.  Fed. R. Civ. P. 50(a); *see also Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998).  The standard for granting judgment as a matter of law mirrors the standard for granting summary judgment.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).  If there is substantial evidence to support a contention, the Court may not grant a judgment as a matter of law.  *Watec Co. v. Liu*, 403 F.3d 645, 651 n.5 (9th Cir. 2005).  "Substantial evidence" must be sufficient for reasonable minds to accept it as support for a conclusion, even when the evidence might also support a contrary conclusion.  *George v.*

*City of Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992).

In making its determination, the Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994). However, the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248-49, 106 S. Ct. at 2510. The Court may not weigh the evidence nor assess the witnesses' credibility. *Reeves*, 530 U.S. at 150, 120 S. Ct. at 2110; *George*, 973 F.2d at 709.

If the Court does not grant the relief and instead allows the case to go to the jury, a party may seek a renewed motion for a judgment as a matter of law within ten days after the entry of judgment. Fed. R. Civ. P. 50(b). However, a party may not make a post-judgment motion for judgment as a matter of law unless it has first raised the issue at the close of evidence and prior to its submission to the jury. *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

## II.   DISCUSSION

### A.   DISGORGEMENT REMEDY UNDER CALIFORNIA PENAL CODE § 593e

In mid-1999, DirecTV renewed its contract with NDS for conditional access services rather than enter a new contract with Kudelski and NagraVision. According to Plaintiffs, this resulted from activities that violated California Penal Code § 593e(b), which provides:

> Every person who, without the express authorization of a subscription television system, knowingly and willfully manufactures, imports into this state, assembles, distributes, sells, offers to sell, possesses, advertises for sale, or otherwise provides any device, any plan, or any kit for a device or for a printed circuit, designed in whole or in part to decode, descramble, intercept, or otherwise make intelligible any encoded, scrambled, or other nonstandard signal carried by that subscription television system, is guilty of a misdemeanor.

Specifically, Plaintiffs charge that NDS was responsible for three internet postings in 1998, which compromised NagraStar's conditional access system by providing the "piracy community" with portions of the code from a Nagra smart card.

Based on this purported violation, Plaintiffs now seek damages under § 593e(c), which provides for an election by the subscription television provider (EchoStar) of either statutory damages of an aggregate of $500 to $10,000 per violation, or three-times the actual damages suffered plus any revenues obtained by the defendant (NDS) "as a result of the violation or violations." Plaintiffs' suit potentially gives rise to billions of dollars in damages, a portion of which are revenues from NDS

renewed Conditional Access System contract with DirecTV, allegedly caused by a series of three internet postings in 1998.

The Court finds, as a matter of law, that Plaintiffs are not entitled to disgorgement of NDS' revenues from this contract based on this late-developed disgorgement theory for the following reasons: 1) there has been no evidence from which a reasonable jury could conclude that the 1998 postings were a "device, plan or kit" for purposes of § 593e(b); 2) EchoStar has failed to submit evidence from which a reasonable jury could conclude that the revenues derived from the 1998 contract were the "result of" the alleged statutory violations; 3) the statute of limitations bars claims arising from conduct in 1998; and 4) the disgorgement remedy may violate due process.

### 1. The 1998 Postings Were Not a "Device, Plan, or Kit"

Concerning the December 2000 postings, which were by and large the focus of this lawsuit, Plaintiffs' theory was that the December 2000 "Nipperclauz" posting contained a methodology or a "plan" to decrypt EchoStar's conditional access system. Even this is a bit of an interpretive stretch as the Nipperclauz methodology was a set of instructions for causing an EEPROM dump on the ROM 3 EchoStar card, and not clearly a "plan" for a device or printed circuit – i.e. a set of instructions for actually building a decoder or cable box. Although the California cases interpreting this statute are few and far between, it is unlikely that the December 2000 postings fall squarely within the definition that the legislature intended for the word "plan" in the context of a statute enacted in the 1980's that appears to target cable boxes and the plans that one could obtain for building such devices. However, the December 2000 postings certainly contain a set of instructions that could be used to decrypt EchoStar's satellite programming and, therefore, fit somewhat awkwardly within the text of § 593e(b).

It would strain the text of § 593e(b) beyond reason to conclude that annotated portions of the code from a ROM 3 card posted in 1998 were a "plan." Portions of the EchoStar ROM 3 code do not contain instructions for creating any device that would decrypt EchoStar's signal. While a sufficiently skilled pirate could potentially modify this code and program cards using the modified code, this is not even remotely connected to the ordinary definition of "plan." It would be akin to suggesting that a schematic for a legitimate cable television receiver is the same thing as a guide to building an illegal cable box. The Court cannot adopt this interpretation.

Accordingly, the Court finds as a matter of law that the 1998 postings were not a "device, plan, or kit" as required by § 593e(b).

### 2. Revenues from the NDS/DirecTV Contract Did Not "Result From" Violation

of § 593e

EchoStar's contention that the NDS/DirecTV contract "resulted from" a violation of § 593e(b) is unfounded as a matter of both statutory interpretation and undisputed fact. First, suggesting that the revenues derived from a contract to provide services unrelated to the underlying violation of § 593e as "resulting from" that violation is tenuous. While EchoStar has suggested that the 1998 postings were a but-for cause of DirecTV choosing NDS over Nagra/Kudelski to act as its CAS provider, such a far reaching theory of causation cannot have been what the California legislature intended when it enacted § 593e. Instead, it appears that § 593e targets operations based on the sale of piracy devices. However, the NDS/DirecTV contract generated revenues for NDS as a result of NDS providing conditional access services unrelated to piracy of EchoStar. To suggest that all of these revenues were a result of prior efforts at piracy is disingenuous. It takes a fair measure of interpretive gymnastics to bootstrap all of the revenues from an $800 million contract through a misdemeanor statute that provides for fines of, at most, $20,000 per violation.

In addition to being untenable as a matter of statutory interpretation, Plaintiffs' theory for disgorgement of revenues lacks evidentiary support from which a reasonable jury could find in their favor. Although EchoStar did present evidence that NDS officers were fearful of losing DirecTV's business in the 1998 time frame, this does not establish a but-for relationship between the NDS/DirecTV contract and the 1998 postings. Indeed, Dr. Ray Kahn, the only witness presented from DirecTV, testified conclusively that piracy of EchoStar's CAS system was not a determinative factor in the decision to enter a contract with NDS. He indicated that every system was eventually pirated and the more important inquiry was how the CAS provider dealt with such piracy. Additionally, he indicated that, although DirecTV was seeking information from NDS's competitors, it was not financially feasible to replace NDS as DirecTV's CAS provider in 1998 or 1999 due to intellectual property rights held by NDS and the expense of replacing CAS infrastructure. He stated that this was true regardless of piracy and foreclosed using any company aside from NDS when the contract was entered.

Testimony by CEO of the Kudelski Group and the Nagra companies, Andre Kudeski, also provided testimony that corroborated the fact that the December 1998 postings did not cause DirecTV to choose NDS as its conditional access supplier. He indicated that the two considerations in the decision were the lack of security of the DNASP-II platform as well as the possibility of litigation with NDS (presumably over intellectual property rights) if Kudelski were selected. On cross examination he elaborated that he believed that the reason that DirecTV regarded the DNASP-II system as insecure was that NDS showed DirecTV the Headend report. Even if one were to believe Kudelski's testimony concerning the decision-making process of DirecTV – which he does not have personal knowledge of, and which is largely based on hearsay – his testimony indicates that it was this report, rather than the 1998 postings, which killed the Kudelski/DirecTV deal. Additionally, counsel for EchoStar/NagraStar sent Kudelski a letter regarding the warranty on the DNASP-II system in 1999 following the postings which Kudelski did not honor and did not consider a "real demand" for a warranty-based card swap.

Moreover, Kudelski, the party allegedly injured by the postings, did not sue based on the postings and the allegedly lost revenues. This suggests that Kudelski did not consider the piracy threat serious in 1998-1999, and provides circumstantial evidence that piracy was not a serious consideration for DirecTV.

Based on this evidence, no reasonable jury could conclude that the NDS/DirecTV contract "resulted from" the piracy of EchoStar's CAS system or the 1998 postings.

### 3. The Statute of Limitations Bars Plaintiffs' Claim for Disgorgement

In its July 26, 2005 Order regarding NDS' Motion to Dismiss the Fourth Amended Complaint the Court concluded: a) that Plaintiffs' claims accrued in 1998; b) that each reprogrammed access card or posting constituted an independent violation of law that accrued at the time it was created; and c) that any violations of § 593e occurring after June 6, 2000 were within the statutory period but that all violations outside of this period were barred by the statute of limitations. In that order, the Court noted that if EchoStar could prove a conspiracy, California's "last overt act" doctrine might allow EchoStar to reach back into earlier time periods.

The "last overt act" doctrine is novelty of California law that provides that the statute of limitations for causes of action based on a civil conspiracy does not begin to run until the last overt act in furtherance of that conspiracy occurs. *See Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 787 (1979) ("when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the "last overt act" pursuant to the conspiracy has been completed.") According to Plaintiffs, the last overt act occurring as part of the "conspiracy" in this case was the publication of the ROM 3 hack methodology and/or the EEPROM contents of the ROM 3 card in December 2000. Plaintiffs seek to reach back to the 1998 postings on the theory that these were part of the same "conspiracy" as the December 2000 postings.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-511 (1994) (citation omitted). Therefore, a conspiracy must be defined in reference to an underlying wrong: in this case, violation of California Penal Code § 593. Where the acts of the conspiracy are continuing wrongs, an entire course of conduct may be the subject of a conspiracy. *See e.g. Wyatt*, *supra* (holding that continuing fraud was part of same conspiracy); *People v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102 (conspiracy to enter long term leases to avoid rent control laws); *Schessler v. Keck*, 125 Cal. App. 2d 827, 832 (1954) (multiple publications in furtherance of conspiracy to defame); *Belli v. Roberts Bros. Furs*, 240 Cal. App. 2d 284, 287 (1966) (same). However, where the goal of the alleged conspiracy is a discrete act or a series of discrete acts, the underlying conspiracy must be more definite. *See In re Microsoft Corp. Antitrust Litig.*, MDL 1332, Civ. JFM 04-3705, 2005 WL 906364 at *3 (D. Md. April 18, 2005) (rejecting application of last overt act rule in case without

continuing relationship); *see also Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp 634, 648-49 (N.D. Cal. 1993) (same analysis applied to misappropriation of trade secrets because the wrong is not continuing). "[S]eparate conspiracies may not be characterized as a single grand conspiracy for procedural advantage." See Gibson v. United States, 781 F.2d 1334, 1340 (9th Cir. 1986).

       Even accepting the premise that the statute of limitations begins to run upon the last overt act of the conspiracy, the scope of conspiracy remains the fundamental question. *See Wyatt*, *supra* (last overt act in conspiracy to defraud is cashing check); *Beaumont Inv., Ltd.* (collecting payments). To determine when the "last overt act" occurred, one must first determine the wrongful goal of the conspiracy. It is only logical that "upon successful attainment of the substantive offense which is the primary object of the conspiracy, the period of the statute of limitations for the conspiracy begins to run at the same time as the substantive offense itself." *See People v. Zamora*, 18 Cal. 3d 538, 560 (1976). In other words, "an overt act in furtherance of the conspiracy cannot be committed subsequent to the completion of the object of the conspiracy." Id. As the Northern District of California put it: acts that "are repeated or committed after the goal of the conspiracy has been largely achieved cannot sensibly be characterized as acts 'in furtherance' of the original conspiracy." *Intermedics*, 822 F. Supp. at 649 (emphasis added). *See also Agnew v. Parks*, 172 Cal. App. 2d 756, 765 (1959) (finding two "separate, distinct and completed acts" to engage in similar conduct on two separate occasions).

       The "last overt act" doctrine " makes sense in cases such as *Wyatt* and *Beaumont* in which the defendants had conspired to design and abuse a continuing relationship from which it was impractical for plaintiffs to escape." *In re Microsoft*, *supra*. It also may well make sense in defamation cases, *see e.g. Schlesser, supra*; *Belli ,supra*., where the ultimate underlying harm (in that case, damage to reputation) is the same, or cases such as auto theft rings or drug trafficking conspiracies where there is a continuing course of similar conduct, *see Zamora*. However, the ultimate thrust of the last overt act rule is akin to that recognized under federal law: that the statute of limitations on a conspiracy to commit an underlying wrong begins to run when the last overt act in furtherance of the conspiracy occurs and not when the first such act occurs. The application of this generally recognized principle to continuing conspiracies is where California law differs from federal law, and where the key issue lies in the present case.

       In cases where the conspiracy does not clearly involve a continuing violation, a unitary harm, or a consistent pattern of identical or nearly-identical conduct, the application of the "last overt act" doctrine is problematic. Taken at face value, its purpose is to determine when the statute of limitations begins to run on a conspiracy to commit some underlying wrong – basing accrual on the last overt act in furtherance of achieving that wrong. It was not designed to connect separate underlying wrongs. For example, *Wyatt* and *Beaumont* involved collecting payments pursuant to an underlying fraud or improper agreement. These collections were not independent violations, but were parts of the same basic wrongful act – i.e. the commission of fraud or entering the unlawful contracts. However, where the conduct is a series of discrete wrongs, even if related, the doctrine cannot logically tie those acts together.

In the present case, the Court is somewhat skeptical of characterizing the conduct that occurred in the 1997-1999 time frame as part of the same conspiracy as the December 2000 posting which, until quite recently, was the crux of Plaintiff's case. Plaintiffs have identified three basic periods in their alleged conspiracy to harm EchoStar and NagraStar: 1) a series of postings of ROM 3 code in 1998; 2) sales of reprogrammed cards first appearing in 1999 (notably occurring after the NDS/DirecTV contract was entered); and 3) the December 2000 postings.

These different acts cannot plausibly be construed as a continuing conspiracy spanning the entire period of 1998 through 2000. Therefore, the 1998 postings are not brought within the limitations period by the December 2000 postings. First, if the goal of the 1998 postings was to "torpedo" negotiations between NagraVision/Kudelski and DirecTV, the ultimate goal of that conspiracy was achieved no later than August 1999 when DirecTV signed a new contract with NDS. Acts occurring after this contract was finalized cannot, as a matter of logic, have been in furtherance of a conspiracy to disrupt the NagraVision/Kudelski deal. *See Zamora*, *supra*.

Additionally, even though the Court could conclude that the 1998 postings were part of a conspiracy, that the 1999-2001 reprogramming activities were part of a conspiracy, and that the December 2000 postings were part of a conspiracy, it cannot conclude that these were all part of a grand conspiracy to harm EchoStar and NagraStar. They each involve different conduct in different time periods. Each involves a separate, discrete series of acts that appears wholly unrelated to the others except in the most general sense. Although the 1998 postings and the December 2000 postings all involved posting things on the internet, there is no explanation for the more than two-year gap in time between them. *See Agnew*, *supra*. (conspiring to prevent testimony in Plaintiffs' favor in 1946 and 1948 lawsuits involves discrete conspiracies). Moreover, the 1999 reprogramming activity apparently did not begin until after the Nagra/DirecTV deal fell apart, and resulted in monetary gains to the principals, distinguishing it from the 1998 and the 2000 alleged conspiracies.

Finally, and most fundamentally, the equities do not favor tolling the statute of limitations in this case. *See Averbach v. Vnescheconombank*, 280 F. Supp. 2d 945, 957-58 (N.D. Cal. 2003) (distinguishing *Wyatt* because plaintiff failed to exercise reasonable diligence in filing suit although no barrier existed). Nothing prevented Plaintiffs from filing suit in 1998, 1999, 2000, 2001 or 2002. Nor have the parties allegedly injured by the 1998 Postings, NagraVision and Kudelski, ever filed suit in this matter. Instead, EchoStar and NagraStar waited nearly five years to file suit. These facts demonstrate that tolling is unjustified, particularly under such dubious circumstances.

Accordingly, the three-year statute of limitations on the California Penal Code claims bars claims for conduct occurring in 1998, and the "last overt act" doctrine fails to revive those claims.

### 4. Due Process May Preclude Disgorgement

Under California law, the type of disgorgement recognized in § 593e is referred to as

"non-restitutionary disgorgement." It constitutes a separate, broader remedy from restitution:

> Disgorgement is a remedy that is broader than restitution. Disgorgement may be a synonym for restitution, but more often than not, disgorgement refers to a remedy for those who were not direct victims of an unfair practice. In this nonrestitutionary sense, disgorgement requires the surrender of all profits earned as a result of an unlawful practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice.

Park v. Cytodyne Technologies, Inc., GIC 768364, 2003 WL 21283814 at *23 (Cal. Super. May 30, 2003). As Plaintiffs pointed out during oral argument, disgorgement under § 593e is plainly punitive in nature: it appears in a section that provides for trebled actual damages in addition to revenues; the same section indicates that revenues are not to be included in "actual damages;" and gives the disgorged revenues to the signal provider, who would not have profited from the devices in defendants' stead. Indeed, the remedy is designed to punish a wrongdoer.

However, due process sets limits on punitive damages. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 524 U.S. 424, 433-34, 121 S. Ct. 1687 (2001) ("The Due Process Clause of its own force also prohibits the States from imposing "grossly excessive" punishments on tortfeasors . . .") (citations omitted). The Court is advised to consult the following factors in determining whether the amount of a damage award would be appropriate: 1) the degree of reprehensibility of Defendants' conduct (the most important factor); 2) the ratio of actual or potential damages to punitive damages; and 3) "the civil penalties authorized or imposed in similar cases." See BMW of North Am. Inc. v. Gore, 517 U.S. 559, 575 (1996) ($2 million punitive damages award improper where actual damage is, at most, $4,000);

*Reprehensibility of Defendants' Conduct:*

There is no argument that, if proven, defendants conduct was anything but reprehensible. The conduct alleged involved the intentional and unlawful sabotage of a competitor's multi-million dollar Conditional Access System. The allegations in this case are far-reaching and astounding. However, the Court pauses briefly to note that the Plaintiffs' conduct has also been far from squeaky clean.

*Ratio of Actual Damages to Punitive Damages:*

In the present case, the companies that were actually harmed by the alleged sabotage of the Nagra/DirecTV deal, NagraVision and Kudelski, are not parties to this suit. Additionally, EchoStar has presented little (if any) evidence that the 1998 postings caused any material part of the harms alleged under its alternative theories of damages – i.e. the card swap and lost profits from piracy.

Indeed, if the 1998 postings were the cause of the card swap, then Plaintiffs' claim relating to the swap would be, as addressed more fully below, time barred. To the contrary much of the evidence, even from EchoStar's own witnesses, indicates that in 1998 EchoStar piracy was at a "hobbyist level." Instead, most of EchoStar's witnesses indicated that the December 2000 postings marked the "turning point" in EchoStar piracy and necessitated the card swap. Additionally, according to Plaintiffs, the NDS employees accused of engaging in a distribution network for reprogrammed access cards already allegedly had knowledge of the hack methodology and the contents of the EchoStar cards before the December 1998 postings. Therefore, as a matter of logic, the December 1998 postings could not have caused their piracy. Accordingly the measure of damages attributable to the 1998 postings is limited if not *de minimis*.

The Supreme Court has suggested that a "single digit multiplier" is more likely to comport with due process. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424-25, 123 S. Ct. 1513 (2003) ($145 million punitive damages award is inappropriate where actual damages are $1 million). Indeed, the Court has frequently found a four-to-one ratio as near the limit of constitutional validity. *See e.g. Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 111 S. Ct. 1032 (1991) (more than four-to-one ratio is close to, but does not cross, the constitutional line); Gore, 517 U.S. at 581 (citing four-to-one ratio and noting history of double, treble and quadruple damages). While there is no bright-line arithmetical rule for the propriety of punitive damages, the Supreme Court has strongly suggested that a 9:1 multiplier is close to the outer limit and that if not in the neighborhood of 4:1 punitive damages should be limited to at least the same area code.

The potential $800 million recovery in addition to trebled actual damages and discretionary punitive damages is constitutionally infirm given that the predicate for these damages is conduct for which any actual harm fell on non-parties, and where the harm to the parties is ethereal if not altogether non-existent.

*Comparison to Civil Penalties Authorized or Imposed*:

California Penal Code § 593e(c) provides for an election of remedies of statutory or actual/punitive damages. The statutory damages component provides for $500 to $10,000 per device, plan or kit. The three 1998 postings would give rise to, at most, $30,000 of statutory damages. Additionally, if § 593e(b) was violated "knowingly and willfully and for purposes of commercial advantage or private financial gain," the penalty may be enhanced by as much as $50,000. Similarly, the criminal penalties for the misdemeanor offense include $10,000 for the first conviction and $20,000 for a subsequent conviction as well as, at most, one year in jail.

Not only are the penalties authorized by the statute wholly incommensurate with the nearly $1 billion sought by Plaintiffs, they suggest that the statute's authors did not contemplate this sort of damages action when they wrote the misdemeanor at issue. It is simply the case that the legislature did not contemplate this sort of damages action arising out of a statute apparently designed

to prevent proliferation of cable boxes.

When considering the three factors identified in *Gore*, the Court concludes that the disgorgement of revenues would be an inappropriate punitive remedy. Although Defendants' alleged conduct was certainly reprehensible, that reprehensibility cannot justify the damage award contemplated by Plaintiffs. Indeed, the claimed damages are wholly incommensurate with the alleged harm, if any, arising from the 1998 postings and are completely out of line with the damages authorized by statute.

Accordingly, the disgorgement of revenues appears to be a grossly excessive punitive sanction as applied to this case.

### 5. Conclusion

The Court is deeply troubled that Plaintiffs chose to raise their claim for disgorgement nearly 10 years after the alleged misconduct, during the trial of a suit that had, until the eve of trial (or even during trial) focused on entirely separate, and timely raised, misconduct. In addition to being dissimilar from the damages contemplated by the California legislature when enacting the statute at issue, and being damningly tardy, allowing Plaintiffs to force this claim through a misdemeanor statute would violate fundamental fairness to a degree that the Court cannot accept.

In addition, considering the potential for statutory damages under both California and Federal law, there are potentially billions of dollars in damages. Accordingly, there is little need for EchoStar to pursue this additional theory to arrive at a damage award that far exceeds any actual damages suffered.

Accordingly, Defendants' Motion for a Judgment as a Matter of Law as to Disgorgement is hereby GRANTED. Additionally, Plaintiffs' Motion for a Judgment as a Matter of Law as to Disgorgement is hereby DEEMED MOOT.

### B. STATUTE OF LIMITATIONS ON CARD SWAP

Defendants argued in a Rule 50 Motion at the close of their case, that because witnesses testified that the 1998 internet postings were an underlying cause of the 2002-2004 card swap of the DNASP-II CAS for the Aladin CAS, damages related to the card swap are barred by the statute of limitations. The Court has already concluded that conduct occurring before June 6, 2000 is not properly part of Plaintiffs' claims due to the three year statute of limitations on many of Plaintiffs' claims. Indeed, even under the four-year statute of limitations of RICO, conduct which occurred in 1998 could not fall within the statutory period. Therefore, if the card swap was necessitated by the 1998 postings, Defendants claim that they cannot, as a matter of law, be liable for the swap.

In response, Plaintiffs claim that the December 2000 postings, and uncontrollable piracy arising from those postings caused the need to swap out the DNASP-II system. Indeed, a number of Plaintiffs' witnesses have testified that once the December 2000 posting exposed a hardware weakness in the DNASP-II ROM 3 card, the system required replacement. There is evidence in the record that could support both theories of causation – i.e. that the 1998 postings or the December 2000 postings necessitated replacement.

However, the jury need not reach such a definite conclusion to find in Plaintiffs' favor on the card swap. 17 U.S.C. § 1203(c)(2) provides that damages are available as follows:

> The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

(emphasis added). Under traditional principles of causation, conduct need not be the sole proximate cause of harm in order for the actor to be liable for that harm. *See Lindsey v. Navistar Intern. Transp. Corp.*, 150 F.3d 1307, 1317 (11th Cir. 1998); *Oberson v. U.S. Dept. of Agriculture, Forest Service*, 514 F.3d 989, 1000 (2008) (recognizing same principle under Montana law); *Third Eye Blind, Inc. v. Near North Ent. Ins. Servs., LLC*, 127 Cal. App. 4th 1311, 1319 (2005) (". . . the law recognizes that there my be multiple causes of [an] injury.") Even if the 1998 postings were a proximate cause of the card swap, if the December 2000 postings were also a proximate cause of that swap, Plaintiffs can still recover.

Because evidence has been presented from which the jury could reasonably conclude that the December 2000 posting and the piracy associated with that posting was a proximate cause of the card swap, a Judgment as a Matter of Law is inappropriate.

Therefore, Defendants' Motion for Judgment as a Matter of Law based on the 1998 postings is hereby DENIED.

    C.    **FAILURE TO ENFORCE THE WARRANTY PROVISIONS**

Defendants argue, as they did at summary judgment and through a Motion in Limine, that Plaintiffs' card-swap related damages should be limited because Plaintiffs failed to enforce the warranty on the cards provided by NagraStar and NagraCard. Indeed, both Christophe Nicholas, NagraCard's only representative to testify, and Paul Orban, EchoStar's controller, testified that the December 2000 postings caused the card swap – apparently triggering the warranty provisions. Instead, EchoStar and NagraStar renegotiated their contracts so that EchoStar would pay a reduced price for smart cards for the DNASP-II card swap and would have the cards replaced for free if the Aladin

system was compromised.

As the Court noted in both its Summary Judgment Order and its Order on Defendants' Motions in Limine, the issue regarding the warranty provisions is one of mitigation: Plaintiffs had an affirmative obligation to undertake reasonable efforts to mitigate their damages. If Plaintiffs had failed to present sufficient evidence that they attempted to mitigate, as the Court noted in its ruling on the Motion in Limine, Plaintiffs' damages could be limited to those prescribed by the warranty. However, there is evidence in the record from which a reasonable jury could conclude that EchoStar and NagraStar did take reasonable steps to mitigate their damages. For instance, they obtained a reduced price on the Aladin ROM cards and additional stipulations from NagraCard. Additionally, EchoStar and NagraStar undertook ECMs and patches in an effort to reduce the impact of the December 2000 postings and other forms of piracy that allegedly arose from those postings.

Defendants are certainly entitled to argue that these efforts did not rise to the level of reasonableness, and that it was unreasonable for EchoStar to accept a card swap on terms less favorable than those offered by the warranty provision. This is a strong argument, and a reasonable jury could certainly conclude that EchoStar's and NagraStar's efforts failed to rise to the level of reasonableness. But, because there is sufficient evidence in the record to support either theory, a directed verdict is inappropriate at present. Additionally, the jury will be instructed to reduce damages for the card swap based on Plaintiffs' failure, if any, to mitigate.

Therefore, Defendants' Motion for a Judgment as a Matter of Law based on EchoStar and NagraStar's failure to enforce the warranty provisions is DENIED.

### D. UNCLEAN HANDS

Unclean hands is an equitable doctrine which holds that "he who comes into equity must come with clean hands." *Ellenburg v. Brockway, Inc*., 763 F.2d 1091, 1097 (9th Cir. 1985). It provides a defense where the party seeking relief engaged in inequitable conduct that makes the relief it is seeking unfair. However, "misconduct in the abstract unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963). The relationship between the Plaintiffs' claims and the Defendants' unclean hands must be direct. *See Cal. Satellite Sys., Inc. v. Nichols*, 170 Cal. App. 3d 56, 70 (1985); *see also Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists*, 227 Cal. App. 2d 675, 728 (1964) ("The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.") "What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant." *Republic*, *supra*.

The issue presented to the Court on EchoStar's Motion for Judgment as a Matter of Law and its previously filed motion to strike is whether EchoStar's and/or NagraStar's conduct in acquiring several thousand pages of stolen documents and using those documents as evidence in this suit is "related to the claims" that Plaintiffs make in this case. In other words, is the misappropriation of Defendant's trade-secret documents sufficiently connected to EchoStar and NagraStar's claims to justify Plaintiffs' claims in whole or in part?

As the Court noted, this question is intimately connected with the scope of the alleged conspiracy at issue in this case. If Plaintiffs had convinced the Court of a broad anti-competitive conspiracy, then a broader range of unfair or inequitable conduct by Plaintiffs would fall within the "transaction" at issue. On the other hand, where the conspiracy at issue is sufficiently narrow and well-defined, Plaintiffs' conduct must be more directly related to the alleged harm in order for unclean hands to apply. In the present case, the Court substantially narrowed the alleged conspiracies at issue. Therefore, a direct and specific relationship between the unclean hands and Plaintiffs' injuries must be present.

However, the conduct urged by Defendants is largely confined to what might be categorized as foul-play during litigation. Typically improper tactics during the course of litigation do not infect the transaction underlying that litigation. *See Fibreboard*, 227 Cal. App. 2d at 728-29 ("relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court.") (collecting cases). By the time Plaintiffs' misconduct occurred their claims had already existed for some time. This precludes a finding that the two were related, and no reasonable jury could reach such a conclusion. Additionally, as a factual matter, although many of the documents related to NDS' purported piracy, the misappropriation of those documents was not related to that piracy. *See Regents of Univ. of Cal. v. Micro Therapeutics, Inc.*, C 03-5669 JW, 2006 WL 449134 at *3 (misappropriation of documents and inequitable conduct before the PTO is not unclean hands as to antitrust suit in District Court). Indeed, litigation misconduct is the proper subject of motions for sanctions, not for an unclean hands defense to the suit itself. Finally, on the question of whether this litigation tactic makes it inequitable to allow Plaintiffs to proceed, the Court notes that there has been no dearth of gamesmanship on either side.

Likewise, Plaintiffs have raised the affirmative defense of unclean hands as to Defendants' counterclaim. Given the Court's finding that the alleged misappropriation was unrelated to Defendants' conduct, the reverse must also be true: that Defendants' conduct was not related to the misappropriation. Accordingly, the Court must strike Plaintiffs' affirmative defense of unclean hands.

Accordingly, EchoStar's Motion for Judgment as a Matter of Law is GRANTED on Defendants' unclean hands defense. EchoStar's Motion to Strike is DEEMED MOOT. EchoStar's unclean hands defense is also STRICKEN.

E.   **DAMAGES UNDER CUTSA**

Plaintiffs move for judgment as a matter of law with respect to damages on Defendants' counterclaim under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426.

Unlike an ordinary tort claim, three separate theories of damage are available under CUTSA: a) out of pocket losses; b) unjust enrichment; or c) reasonable royalty (where the former two measures cannot be proved). *See* Cal. Civ. § 3426.3(b); *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991, 1000. The Federal Circuit has confirmed the appropriate framework for analyzing damages under CUTSA, as follows:

> The correct approach under California law is to evaluate the evidence of the Plaintiffs' actual loss and the Defendants' unjust enrichment caused by the misappropriation. If the plaintiff has failed to produce sufficient proof on either score, the court may look to evidence of a reasonable royalty. <u>Failure to produce evidence of actual loss, unjust enrichment, or a reasonable royalty results in the assessment of zero damages under California law</u>.

*Litton Sys., Inc. v. Ssangyong Cement Indus., Co., Ltd.*, 107 F. 3d 30, 1997 WL 59360 (Fed. Cir. Feb.13, 1997) (unpublished disposition) (emphasis added). In *Unilogic, Inc. v. Burroughs Corp.*, the court held that nonsuit is proper where there is no support for out-of-pocket losses or unjust enrichment, and no calculation of a "reasonable royalty." *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 628 (1992); *see also Morlife, Inc. v. Perry*, 55 Cal. App. 4th 1514, 1529 (1997) (citing *Unilogic* for the proposition that a party cannot recover on a "reasonable royalty" theory where it presents no evidence of what royalty would be "reasonable" under the circumstances). The *Unilogic* court proceeded to explain that nonsuit was appropriate because the nonmoving party "did not present evidence of damages specific to the dispute at hand and relevant to the measures of damages under Civil Code section 3426.3." *Unilogic*, 10 Cal. App. 4th at 627. While the court found that the testimony "may have served as a starting point" for damages, the claim for unjust enrichment failed because none of the evidence "directly addressed the degree to which [the moving party] was enriched." *Id.* at 628.

Here, the evidence presented by Defendants regarding damages on their counterclaim is minimal. Specifically, it consists of testimony by Reuven Hasak ("Hasak") and Dov Rubin that Defendants would be harmed if the documents were in the hands of pirates or competitors. In addition, Hasak indicated that the harm could not be quantified.

This evidence simply states general and speculative assertions of harm. Such general assertions fail to "present evidence of damages specific to the dispute at hand and relevant to the measures of damages under Civil Code section 3426.3." *See id.* at 627. Testimony that unquantifiable harm occurred only serves as a "starting point" for damages; the claim for damages fails because the testimony does not directly address the degree of harm. *See id.* at 628.

Without evidence pertaining to actual loss and unjust enrichment, no reasonable jury

could calculate these damages. Accordingly, Plaintiffs are entitled to judgment as a matter of law with respect to these damages. Plaintiffs' Motion for Judgment as a Matter of Law on Defendants' CUTSA counterclaim damages is hereby GRANTED. Because the jury will not be instructed on damages, Plaintiffs' defense of failure to mitigate is hereby STRICKEN.

## III. DISPOSITION

For the above mentioned reasons, the Court makes the following rulings on the Rule 50 Motions:

1)  Defendants' Motion for a Judgment as a Matter of Law as to Disgorgement is hereby GRANTED.

2)  Plaintiffs' Motion for a Judgment as a Matter of Law as to Disgorgement is hereby DEEMED MOOT.

3)  Defendants' Motion for Judgment as a Matter of Law that damages related to the card swap are barred by the statute of limitations based on the 1998 postings is hereby DENIED.

4)  Defendants' Motion for a Judgment as a Matter of Law based on EchoStar and NagraStar's failure to enforce the warranty provisions is DENIED.

5)  Plaintiffs' Motion for Judgment as a Matter of Law is GRANTED on Defendants' unclean hands defense. Plaintiffs' Motion to Strike the unclean hands defense is DEEMED MOOT.

6)  Plaintiff's affirmative defense of unclean hands is STRICKEN.

7)  Plaintiffs' Motion for Judgment as a Matter of Law on Defendants' CUTSA counterclaim damages is hereby GRANTED.

8)  Plaintiffs' defense of failure to mitigate is STRICKEN.