DARIN W. SNYDER (S.B. #136003) – dsnyder@omm.com
DAVID R. EBERHART (S.B. #195474) – deberhart@omm.com
O'MELVENY & MYERS LLP
275 Battery Street, Suite 2600
San Francisco, CA  94111-3305
Telephone:  (415) 984-8700
Facsimile:   (415) 984-8701

RICHARD L. STONE (S.B. #110022) – rlstone@hhlaw.com
KENNETH D. KLEIN (S.B. #85231) – kdklein@hhlaw.com
HOGAN & HARTSON L.L.P.
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone:  (310) 785-4600
Facsimile:   (310) 785-4601

Attorneys for Defendants
NDS GROUP PLC and
NDS AMERICAS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ECHOSTAR SATELLITE CORP., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NDS GROUP PLC, *et al.*,<br><br>Defendants. | Case No. SA CV 03-950 DOC(JTLx)<br><br>**NDS'S OBJECTIONS TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE SECTION 17200** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

I.    ARGUMENT:  PLAINTIFFS' PROPOSED FINDINGS OF FACT ARE IMPROPER ................................................................................. 2

    A.    EchoStar's Proposed Findings Of Fact Cannot Be Reconciled With The Jury's Findings Of No Liability On Three Claims And Findings Of No Oppression, Fraud, Malice Or Conspiracy ................ 2

        1.    The Jury's Findings Of No Liability Under Three Statutes Cannot Be Reconciled With A Finding That NDS Posted A Hack Methodology On The Internet........................................ 3

        2.    The Jury's Findings Of Nominal Damages, No Oppression, Fraud Or Malice, And No Conspiracy Cannot Be Reconciled With A Finding That NDS Posted A Hack Methodology On The Internet ..................................... 6

    B.    The Jury's Verdict Is Supported Only By Tarnovsky's November 12, 2000 Test Of Pirate Code He Discovered On The Internet ................................................................................. 7

        1.    The P1 Test Was Undisputed At Trial ....................................... 9

        2.    The P1 Test Was A Technical Violation Of The Three Statutes Under Which NDS Was Found Liable And Was Not A Violation Of The Three Statutes For Which NDS Was Not Found Liable.............................................................. 11

        3.    The Damages Award Can Only Be Supported By The P1 Test .............................................................................. 13

II.    OBJECTIONS TO PROPOSED FINDINGS OF FACT ............................. 15

    GENERAL OBJECTIONS .......................................................................... 15

    OBJECTIONS TO SPECIFIC FINDINGS OF FACT ................................ 15

III.    ARGUMENT AND OBJECTIONS TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW........................................................................ 54

    A.    Plaintiffs' Proposed Conclusions Of Law Conflict With The Jury Verdict And Thus Violate The Seventh Amendment ................ 54

    B.    Plaintiffs' Lack Of Standing Defeats Their UCL Claim ................... 55

**TABLE OF CONTENTS**
**(continued)**

Page

C.      NDS Did Not Engage In Unfair Business Practices ........................... 57

D.      Plaintiffs Are Not Entitled To Any Remedy Under The UCL ........... 59

    1.      Plaintiffs' Restitution Claim Has Already Been Rejected
By The Court As Improper And Contrary To Law ................. 60

    2.      There Are No Grounds For An Injunction ............................... 63

    3.      Plaintiffs' Unclean Hands Preclude Any UCL Remedy .......... 65

IV.     NDS'S PROPOSED FINDINGS OF FACT ............................................... 66

V.      DISCUSSION AND NDS'S PROPOSED CONCLUSIONS OF LAW ...... 68

A.      A Finding Of Liability Under Section 17200 Would Violate The
Seventh Amendment ........................................................................ 68

B.      Plaintiffs Lack Standing To Recover Under California Business
And Professions Code Section 17200 ................................................ 69

NDS PROPOSED COL 2. NDS has not engaged in an unfair business
practice in violation of California Business & Professions Code
§ 17200 ......................................................................................... 70

C.      NDS Has Not Engaged In Unfair Business Practices ........................ 70

D.      Plaintiffs Are Not Entitled To Restitution Or An Injunction ............. 71

    1.      Plaintiffs May Not Receive Restitution .................................. 71

    2.      There Are No Grounds For An Injunction ............................... 72

    3.      Plaintiffs' Unclean Hands Preclude Any UCL Remedy .......... 73

# TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*Am. States Ins. Co. v. Federmann Constr. Co.*,
  No. CV 04-1635 FMC (FMQx), 2004 WL 5458406 (C.D. Cal.
  Dec. 3, 2004) ........................................................................................ 64, 73

*Barquis v. Merchants Collection Ass'n*,
  7 Cal. 3d 94 (1972) .................................................................................... 63

*Belton v. Comcast Cable Holdings, LLC*,
  151 Cal. App. 4th 1224 (2007) .............................................................. 58, 70

*Buller v. Sutter Health*,
  160 Cal. App. 4th 981 (2008) ..................................................................... 58

*Colgan v. Leatherman Tool Group, Inc.*,
  135 Cal. App. 4th 663 (2006) ................................................................ 60, 72

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal. 4th 163 (2000) ..........................................................................passim

*Daro v. Superior Court*,
  151 Cal. App. 4th 1079 (2007) .............................................................. 56, 69

*Day v. AT&T Corp.*,
  63 Cal. App. 4th 325 (1998) .................................................................. 60, 72

*Feitelberg v. Credit Suisse First Boston, LLC*,
  134 Cal. App. 4th 997 (2005) ................................................................ 59, 71

*Gafcon, Inc. v. Ponsor & Assocs.*,
  98 Cal. App. 4th 1388 (2002) ................................................................ 63, 72

*Internet Specialties West, Inc. v. ISPWest*,
  No. CV 05-3296 FMC, 2006 WL 4568073 (C.D. Cal. Nov. 14,
  2006) ........................................................................................................... 3

*Kendall-Jackson Winery, Ltd. v. Superior Court*,
  76 Cal. App. 4th 970 (1999) .................................................................. 66, 74

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003)..................................................................................passim

*L.A. Police Protective League v. Gates*,
    995 F.2d 1469 (9th Cir. 1993)................................................................3, 55, 68

*Madrid v. Perot Sys. Corp.*,
    130 Cal. App. 4th 440 (2005)..........................................................................passim

*MGA Entm't, Inc. v. Mattel, Inc.*,
    No. CV 05-2727 NM (RNBx), 2005 WL 5894689 (C.D. Cal.
    Aug. 26, 2005)..............................................................................................57

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1059 (C.D. Cal. 2003)..........................................................61

*People v. Baker*,
    126 Cal. App. 4th 463 (2005)..........................................................................62

*People v. E.W.A.P., Inc.*,
    106 Cal. App. 3d 315 (1980)............................................................................63

*People v. Toomey*,
    157 Cal. App. 3d 1 (1984)................................................................................62

*Puentes v. Wells Fargo Home Mortgage, Inc.*,
    160 Cal. App. 4th 638 (2008)....................................................................59, 71

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
    133 Cal. App. 4th 1277 (2005)..........................................................58, 70, 71

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,
    No. C-07-0635 JCS, 2007 WL 1455903 (N.D. Cal. May 16, 2007) ..............57

*United States v. Sequel Contractors, Inc.*,
    402 F. Supp. 2d 1142 (C.D. Cal. 2005)..............................................61, 62, 63

*Walker v. USAA Cas. Ins. Co.*,
    474 F. Supp. 2d 1168 (E.D. Cal. 2007)..........................................................56

# TABLE OF AUTHORITIES
## (continued)

Page

## STATUTES

17 U.S.C. § 1201(a)(1) ............................................................2, 3, 14

17 U.S.C. § 1201(a)(2) ..................................................................passim

18 U.S.C. § 1963(c) ...........................................................2, 3, 5, 14

47 U.S.C. § 605(a) .....................................................................11, 12, 13

Cal. Bus. & Prof. Code § 17200 ....................................................passim

Cal. Bus. & Prof. Code § 17203 ....................................................passim

Cal. Bus. & Prof. Code § 17204 ...........................................55, 56, 69

Cal. Penal Code § 593d(a) ..............................................6, 11, 12, 56

Cal. Penal Code § 593e(b) .............................................................passim

## OTHER AUTHORITIES

Black's Law Dictionary 976 (8th ed. 2004) ..........................................7

## RULES

FRCP 15(a) ...........................................................................................60

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VII...............................................................54, 69

# PRELIMINARY STATEMENT

NDS Group PLC and NDS Americas, Inc. (collectively "NDS") hereby submits its Objections to Plaintiffs' Proposed Findings of Fact and Conclusions of Law re Section 17200 (the "Proposed FOF/COL").  The Proposed FOF/COL seek to rewrite the result of the trial and must be rejected.  The Proposed FOF/COL proceed from the assumption that the jury found NDS responsible for posting on the Internet code intended to harm Plaintiffs, but this assumption is fundamentally inconsistent with the jury's findings.  The jury declined to find liability on the DMCA causes of action that would have been violated if NDS had made that posting.  Instead, the jury found liability for one-month's subscription revenue based on a single test of pirate software downloaded from the Internet.  The Seventh Amendment flatly prohibits Plaintiffs' effort to erase this verdict.

Nor are Plaintiffs entitled to the "restitution" they seek.  Among other reasons, their claim for restitution was long ago stricken by the Court as unsupported by the law.  Moreover, the "restitution" they request is an improper demand for an award of the same damages that were denied by the jury, and California law strictly prohibits such "backdoor" requests for damages.  Here, restitution cannot be awarded because NDS never took from Plaintiffs $94 million or property worth that amount.

Section I of these objections addresses the reasons why the Proposed FOF/COL are fundamentally contrary to the jury's verdict.  Section II addresses the reasons why particular proposed findings of fact are contrary to the evidence, in addition to being contrary to the verdict.  Section III discusses the reasons why Plaintiffs' proposed conclusions of law are contrary to established Section 17200 authority.  Section IV sets forth NDS's proposed findings of fact with citations to the evidence.  Section V provides NDS's proposed conclusions of law and the authority and argument supporting those conclusions.

## I.   ARGUMENT:  PLAINTIFFS' PROPOSED FINDINGS OF FACT ARE IMPROPER

### A.   EchoStar's Proposed Findings Of Fact Cannot Be Reconciled With The Jury's Findings Of No Liability On Three Claims And Findings Of No Oppression, Fraud, Malice Or Conspiracy.

The Proposed FOF/COL are fundamentally inconsistent with the jury's verdict, which is perhaps a reflection of the fact that counsel submitting the proposal did not attend most of the trial.  The jury found NDS not liable under three statutes: DMCA § 1201(a)(1), DMCA § 1201(a)(2) and RICO § 1963(c); in addition, the jury awarded EchoStar only nominal damages, found that NDS did not act with fraud, oppression or malice, and found that NDS did not participate in a conspiracy.  For each claim where the jury found liability, on the other hand, interception of a signal was required.  These findings cannot be reconciled with Plaintiffs' proposed findings of fact, which require no interception of a signal and, as a whole, attempt to pin liability on NDS for the very contentions that were indisputably rejected by the jury.  The section headings of Plaintiffs' proposed findings of fact concisely illustrate the stark contrast with the verdict:

- Afraid of Losing Their Largest Customer, Defendants Engaged in a Series of Schemes to Hack and Pirate Satellite Television Providers.
- Defendants Hacked Plaintiffs' CAS for Competitive Advantage, Not to Improve Their Own System.
- Defendants Provided the Headend Report, or Portions of It, to Tarnovsky to Facilitate the Piracy of EchoStar Cards.
- Tarnovsky Posted the EchoStar Code on the Internet.
- Plaintiffs Were Materially Harmed by Defendants' Conduct.

It is hard to imagine a greater departure from the verdict.  At their heart, these proposed findings would have this Court rule that NDS made the so-called "Nipper

Post"[1] that resulted in widespread piracy of EchoStar's system.  But the central

factual question at trial was who made that posting, and the verdict is consistent

only with one conclusion: NDS did not do so.  Responsibility for the Nipper Post

would entail liability under at least the DMCA claims, but the jury found no such

liability.  And the claims on which the jury did find liability required interception of

a signal, yet the Nipper Post involved no interception.  Plaintiffs' post-verdict

attempt to make NDS liable for the Nipper Post is entirely at odds with the jury's

findings.  As Plaintiffs must know, any ruling on the equitable claims "must follow

the jury's implicit or explicit factual determinations."  *L.A. Police Protective*

*League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993); *see also Internet Specialties*

*West, Inc. v. ISPWest*, No. CV 05-3296 FMC, 2006 WL 4568073, at *3 (C.D. Cal.

Nov. 14, 2006) ("the Court is bound by the jury's findings of fact").  Because the

jury's verdict conclusively rejected NDS's responsibility for the Nipper Post, the

Proposed FOF/COL must be rejected.

### 1.    The Jury's Findings Of No Liability Under Three Statutes Cannot Be Reconciled With A Finding That NDS Posted A Hack Methodology On The Internet.

The jury found NDS not liable under three statutes:  DMCA

§ 1201(a)(1), DMCA § 1201(a)(2) and RICO § 1963(c).  These findings of non-

liability cannot be reconciled with a finding that NDS was responsible for the

Nipper Post.

To find liability under DMCA § 1201(a)(1), it was necessary to find

that NDS circumvented a technological measure used by EchoStar.  *See* Given Jury

Instructions (Docket No. 1110) at 29 (Jury Instruction No. 26).  To "circumvent a

---

[1]    This "method" posting was actually a re-post on DR7.com by XBR21 of
content that contained a "signature" from Nipper Clauz '00.  NDS will, however,
use the term used in Plaintiffs' proposed FOF/COL—"Nipper Post"—in order to
make clear that the parties are currently referring to the same posting.

technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise avoid, bypass, remove, deactivate or impair a technological measure." *Id.* Moreover, the jury was instructed that NDS would be contributorily liable for the circumvention by third parties if NDS had reason to know of the circumvention and induced or materially contributed to the circumvention. *See* Given Jury Instructions (Docket No. 1110) at 31 (Jury Instruction No. 27). And Plaintiffs argued in closing that a finding that NDS was responsible for the Nipper Post compelled a finding of liability under the DMCA:

> But once you find out they hacked it and they posted it,
> pretty much you end up answering all the questions "yes."
> So we suggest you answer the first question, [on the
> verdict form] "Yes, they violated the DMCA."

Plaintiffs' Closing Argument Trial Transcript 5/7/08, Vol. 2 at 15:11-14. Finally, the Proposed FOF/COL, specifically contend that pirated ROM3 cards made using the Nipper Post (supposedly published by NDS) "then could be used to circumvent Plaintiffs' security system and steal EchoStar's copyrighted programming"— language that closely tracks the standard for liability under § 1201(a)(1). *See* Proposed FOF/COL at 11.

Thus, if the jury had determined that NDS was responsible for the Nipper Post—as the Proposed FOF/COL would have it—the jury should have found NDS at least contributorily liable for circumvention of EchoStar's CAS, since (a) the face of the Nipper Post indicates that it was intended to circumvent EchoStar's CAS and (b) it was undisputed that the posting had at least some impact on the pirate community's ability to pirate the DISH Network, if only until February 2001. The jury's finding of no 1201(a)(1) liability stands in clear contradiction to the Proposed FOF/COL.

Similarly, DMCA § 1201(a)(2) required trafficking in a technology, product, service, device, component, or part thereof that is primarily designed to

NDS'S OBJECTIONS TO PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW
Case No. SA CV 03-950 DOC(JTLx)

1  circumvent a technological measure.  *See* Given Jury Instructions (Docket

2  No. 1110) at 37 (Jury Instruction No. 32).  Again, the jury was instructed that NDS

3  could also be found contributorily liable under the statute if it knew that others

4  trafficked in a technology or device and it induced or materially contributed to that

5  trafficking.  *See* Given Jury Instructions (Docket No. 1110) at 39-40 (Jury

6  Instruction No. 33).  If the jury had found that NDS was responsible for the Nipper

7  Post, the jury almost certainly would have found NDS either directly liable (for

8  trafficking in a "technology") or secondarily liable (for materially contributing to

9  others trafficking in pirate devices) under DMCA § 1201(a)(2).  The jury's finding

10  of no liability can only be read as a rejection of the claim that NDS was involved in

11  the Nipper Post.

12            Finally, the jury's finding of no liability for the RICO § 1963(c) claim

13  leads to the same conclusion.  A finding of liability under this statute required at

14  least two violations of either the predicate act of criminal copyright infringement or

15  the predicate act of trafficking in reprogrammed EchoStar access cards.  *See* Given

16  Jury Instructions (Docket No. 1110) at 81-84 (Jury Instruction No. 65).  Again, the

17  jury was instructed that NDS could be found contributorily liable for intentionally

18  inducing or materially contributing to the criminal copyright infringement of others.

19  *Id.* at 82-83.  Had the jury found the 85 "facts" proposed by Plaintiffs—which

20  include responsibility for the Nipper Post, "steal[ing] EchoStar's copyrighted

21  programming," and collusion with pirates, engineers and others in "a series of

22  schemes to hack and pirate satellite television providers" in a pattern of activity that

23  supposedly included a nearly identical hack of Canal+ (*see* Proposed FOF/COL at

24  2, 10-11)—the jury might also have found NDS liable under RICO.  That the jury

25  did not find NDS liable on this claim further demonstrates that the Proposed

26  FOF/COL are an unsupportable contradiction of the verdict.

27

28

2.     **The Jury's Findings Of Nominal Damages, No Oppression, Fraud Or Malice, And No Conspiracy Cannot Be Reconciled With A Finding That NDS Posted A Hack Methodology On The Internet.**

The jury's damages awards cannot be reconciled with the Proposed FOF/COL.  The jury found actual damages of $45.69 under two of the statutes and the minimum possible statutory damages ($500 and $1,000) for the two statutes where such damages were presented.  *See* Verdict Form (Docket No. 1109) at 3-5. The Proposed FOF/COL, by contrast, assert that Plaintiffs were harmed in the amount of over $94 million.  *See* Proposed FOF/COL at 12.  It is obvious that the long, methodical scheme described in the Proposed FOF/COL—which supposedly ended with NDS causing the Nipper Post and Plaintiffs suffering massive damage—is impossible to reconcile with the jury's finding of nominal damages. Had the jury found NDS responsible for the Nipper Post and found that the posting caused Plaintiffs $94 million in damage, the jury instructions would have required the jury to return a verdict of $94 million, not a verdict of $45.69.  And, as discussed below, that $45.69 award is conclusively tied to NDS's one-time test of pirate code found on the Internet.  The contrast between the jury's nominal award and Plaintiffs' proposed $94 million award demonstrates the profound conflict between the facts necessarily found by the jury and the facts proposed by Plaintiffs.

The Proposed FOF/COL also contradict the jury's findings as to "oppression, fraud, or malice."  The jury found NDS liable under three claims, and for two of those claims the jury was required to answer additional, more specific questions regarding its finding of liability.  Under California Penal Code §§ 593d(a) and 593e(b), the jury was specifically asked whether NDS acted with "oppression, fraud, or malice."  *See* Verdict Form (Docket No. 1109) at 4 and 6.  In both instances the jury answered "no."  Had the jury determined that NDS was responsible for the Nipper Post, the jury very likely would have found that NDS

1  acted with oppression, fraud or malice.  The 85 proposed "facts" would represent

2  the very dictionary definition of malice: "the intent, without justification or excuse,

3  to commit a wrongful act."  Black's Law Dictionary 976 (8th ed. 2004).  And

4  Plaintiffs urged this precise point in closing: "'Have they acted with oppression

5  fraud or malice' we know they acted with malice, because that was the only reason

6  they would do this."  Plaintiffs' Closing Argument Trial Transcript 5/7/08, Vol. 2 at

7  17:7-10.  That the jury did not find NDS guilty of oppression, fraud or malice

8  further demonstrates that the jury did not find NDS responsible for the Nipper Post

9  or the scheme set forth in the Proposed FOF/COL.

10  Finally, after finding liability under § 593e(b), the jury was asked

11  whether NDS had engaged in a conspiracy to violate that statute.  The jury

12  answered "no."  Although it is possible to imagine a scenario where responsibility

13  for the Nipper Post would not require a conspiracy, it is much more difficult to

14  reconcile the "no conspiracy" finding with Plaintiffs' 85 proposed findings of fact,

15  which includes such "facts" as NDS's responsibility for the Nipper Post, NDS's

16  responsibility for a similar Canal+ posting, and NDS's support of various pirates.

17  Here again, the jury's findings contradict Plaintiffs' contentions.

18  Altogether, the jury's findings of no liability for three of the claims

19  brought against NDS, the awarding of only nominal damages under the three claims

20  where liability was found, the findings of no oppression fraud or malice, and the

21  finding of no conspiracy conclusively demonstrate that the jury found NDS was not

22  responsible for the Nipper Post and that Plaintiffs' 85 paragraphs of proposed

23  findings of fact are untenable.  The verdict cannot be erased in the way Plaintiffs

24  propose.

25

26  **B.      The Jury's Verdict Is Supported Only By Tarnovsky's November 12, 2000 Test Of Pirate Code He Discovered On The Internet.**

27

28  In contrast to the "facts" proposed by Plaintiffs, the verdict does

1   support one finding of fact: that NDS, through its employee Christopher Tarnovsky,

2   engaged in a one-time test of pirate code that Tarnovsky found on the Internet and

3   that could be used to reprogram the DirecTV P1 card made by NDS (the "P1

4   Test").  It was undisputed that the P1 Test was conducted in November 2000, and

5   that it involved placing code downloaded from a website into a P1 smart card, then

6   placing the smart card into an EchoStar receiver and determining whether the

7   configuration could receive the full array of EchoStar's Dish Network

8   programming.  Testimonial and documentary evidence admitted at trial confirmed

9   these facts: both Tarnovsky and his immediate superior, John Norris, testified to the

10  P1 Test, and a contemporaneous email confirmed it.  EchoStar and NDS, moreover,

11  both referred to the P1 Test during closing arguments.

12          The P1 Test was the only act presented at trial that could possibly fit

13  the jury's findings regarding liability, lack of liability, lack of conspiracy, and lack

14  of oppression, fraud or malice.  The actual damages found by the jury—$45.69—

15  directly correspond to the fact that the P1 Test was the sole basis for liability.  That

16  amount matches the precise amount of the average revenue per user ("ARPU") for

17  one month's subscription to DISH Network in 2000, the year that the test occurred.

18  Moreover, the jury found that NDS was responsible only for a single violation, and

19  awarded statutory damages based on that single violation, facts that match the one-

20  time nature of the P1 Test.

21          Thus, the verdict can only be consistent with an act that involved a

22  single interception of EchoStar's signal occurring in the year 2000.  EchoStar has

23  pointed to no other act that could have precipitated such small actual and statutory

24  damages figures, and no other theory was presented at trial that could have resulted

25  in the precise amount found by the jury.  In sum, the evidence presented at trial, the

26  elements of the three claims for which NDS was ultimately found liable, and the

27  nature and amount of the damages found all conclusively demonstrate that the

28  jury's verdict was based solely on the P1 Test.

### 1.      The P1 Test Was Undisputed At Trial.

The jury was thoroughly informed of the existence and purpose of the
P1 Test at trial, and neither NDS nor any witness disputed that the P1 Test
occurred.  Tarnovsky testified that he conducted the P1 Test, and that he did so
because NDS was concerned that one of its older access cards for its customer
DirecTV could be reprogrammed for use in EchoStar piracy.  *See* Tarnovsky Trial
Testimony, 4/23/08, Vol. 3 at 20:7-23:1.  As he explained, NDS was "quite
disturbed to see that on the Internet, someone could download a file on the public
WWW Internet sites that would download into this DirecTV period 1 access card
[and] convert the chip to run on an EchoStar's [sic] set-top box." *Id.* at 22:13-17.
Tarnovsky further explained that he tested the code because:  "[i]t doesn't look
good if this really does work.  So this was an laboratory experiment in an NDS-
built lab for work purposes, not for recreational television viewing." *Id.* at 22:23-
25.  John Norris, Tarnovsky's immediate supervisor, similarly testified that he
witnessed the Test:

> Q.   And what Mr. Tarnovsky did was, he took an
> EchoStar hack off the Internet and demonstrated for you
> that it worked, right?
> A.   Correct.
> Q.   And Mr. Tarnovsky was able to receive all of
> EchoStar's programming for free, correct?
> A.   Correct.

Norris Trial Testimony, 4/17/08, Vol. 1 at 22:2-22:8.

The P1 Test was further confirmed by a contemporaneous email
written by Mr. Norris describing it, and noting that it occurred on November 12,
2000.  TR EX 51 ("when I was at Mike's yesterday he took an EchoStar hack file
from the internet, put it in a P01, put the P01 into an E* receiver and got all
programming").  This email was entered into evidence.

1            In addition, in closing arguments, both parties referred to the P1 Test.

2    EchoStar referenced the Test **twice**:

3            And do we know that Mr. Tarnovsky did this?  If
     you look at the November 2000 e-mail -- remember

4    Mr. Norris was on the stand?  Mr. Noll was questioning
     him.  Mr. Norris was at Mr. Tarnovsky's home, and right

5    there in front of Mr. Norris, Mr. Tarnovsky

6    reprogrammed an EchoStar access card.  And you can see
     that in Exhibit 51.

7

8            So if there's any doubt in your mind that
     Mr. Tarnovsky, Mr. Norris, and NDS Americas were

9    involved in this, that should be the end of the matter.

10   Plaintiffs' Closing Argument Trial Transcript 5/7/08, Vol. 1 at 46:11-19.

11           Now, I made a mistake earlier when I talked to you

12   about Exhibit 51.  I said that Mr. Tarnovsky
     reprogrammed an EchoStar access card, and actually,

13   what he did is he reprogrammed a DirecTV card, a period
     1 card, to make it able to get EchoStar programming,

14   which is even worse, because now you have all the
     EchoStar cards out in the field.  There's millions of these

15

16   cards.  Then you have all the DirecTV period 1 cards, so
     you've got many more cards.  So it just gets worse for

17   them.

18

19   Plaintiffs' Closing Argument Trial Transcript 5/7/08, Vol. 2 at 8:23-9:6.

20   And NDS similarly admitted that the Test occurred during closing arguments:

21           Now, the third claim is related to the

22   Communications Act.  And that claim requires that you
     find a number of things related to the receipt of EchoStar

23   programming.  And again, it requires that you find that it
     occurred after June of 2000.

24

25           The only evidence that you've heard of the receipt
     of EchoStar programming by anyone associated with

26   NDS is Mr. Tarnovsky's experiment in the fall of 2000.
     One time.  Reprogramming of a DirecTV card.

27

28   Defendants' Closing Argument Trial Transcript 5/7/08, Vol. 3 at 65:18-66:1.

In sum, the P1 Test was the only interception of EchoStar's programming by NDS proved at trial.

> **2.    The P1 Test Was A Technical Violation Of The Three Statutes Under Which NDS Was Found Liable And Was Not A Violation Of The Three Statutes For Which NDS Was Not Found Liable.**

The jury's findings of liability also match the P1 Test.  The jury found NDS liable for a single violation of the Communications Act, 47 U.S.C. § 605(a), causing actual damages of $45.69 and finding alternatively the minimum possible statutory damages of $1,000.  *See* Verdict Form (Docket No. 1109) at 3.  The jury also found NDS liable under California Penal Code § 593d(a) causing actual damages of $45.69, further finding that NDS did not act with oppression, fraud or malice.  *Id.* at 4.  The jury also found NDS liable under California Penal Code § 593e(b) for a single violation causing no actual damages and granted the minimum possible statutory damages of $500.  *Id.* at 5.   Under the § 593e(b) claim the jury again found that NDS did not act with oppression, fraud or malice and further found that NDS did not engage in a conspiracy.  *Id.* at 6.  The only plausible act by NDS that could have supported a finding against NDS under these specific claims and for these specific amounts is the P1 Test of November 12, 2000.

Each of the three statutes that the jury found NDS violated were technically violated by the P1 Test (although NDS argued at trial and believes that such a finding was not required under the law).  Section 605(a) was violated if two elements were met: 1) EchoStar's programming signals were interstate or foreign satellite communications; and 2) NDS intercepted those signals.  *See* Given Jury Instructions (Docket No. 1110) at 46 (Jury Instruction No. 38).  Any violation of § 605(a) also had to have occurred after June 6, 2000 to result in a finding of liability.  *See* Given Jury Instructions (Docket No. 1110) at 48 (Jury Instruction No. 39).  It was undisputed that EchoStar's signals were interstate satellite

1   communications.  Since the P1 Test admittedly intercepted those signals and

2   occurred in November 2000, it was a technical violation of § 605(a).

3            Similarly, § 593d(a) was violated if NDS made or maintained an

4   unauthorized connection to any component of EchoStar's system or to any other

5   media or receiver attached to EchoStar's system.  *See* Given Jury Instructions

6   (Docket No. 1110) at 51 (Jury Instruction No. 42).  A violation of § 593d(a) also

7   had to be partially executed in California and had to have occurred after June 6,

8   2000.  *See* Given Jury Instructions (Docket No. 1110) at 56 (Jury Instruction

9   No. 45) and at 57 (Jury Instruction No. 46).  Again, the P1 Test fits the criteria: it

10  was an unauthorized connection to a component of EchoStar's system and occurred

11  in California in November 2000.  Moreover, the jury did not find that NDS acted

12  with oppression fraud, or malice in violating § 593d(a).  *See* Verdict Form (Docket

13  No. 1109) at 4.  This finding flows logically from the jury finding that, with the P1

14  Test, NDS technically violated the law while causing minimal and unintentional

15  harm to EchoStar.

16           Finally, § 593e(b) was violated by the possession of any device

17  designed to intercept an encoded signal carried by EchoStar.  *See* Given Jury

18  Instructions (Docket No. 1110) at 60 (Jury Instruction No. 49).  A violation of

19  § 593e(b) also had to be partially executed in California and had to have occurred

20  after June 6, 2000.  *See* Given Jury Instructions (Docket No. 1110) at 64 (Jury

21  Instruction No. 52) and at 65 (Jury Instruction No. 53).  Tarnovsky's loading of the

22  pirate code he discovered on the Internet onto a DirecTV card in California in

23  November 2000 created a device designed to intercept EchoStar's signal.  This

24  device was in NDS's possession (through Tarnovsky) and thereby technically

25  violated the statute.  Again, the jury did not find that NDS acted with fraud,

26  oppression, or malice in violating § 593d(a), a result that squares with a finding of

27  liability based on the P1 Test.  *See* Verdict Form (Docket No. 1109) at 6.  The jury

28  also found that NDS did not engage in a conspiracy in violating § 593e(b), a result

1   that makes sense if the violation was caused by the P1 Test, which involved only

2   Tarnovsky and Norris acting in their capacities as NDS employees.  *Id.*

3           **3.      The Damages Award Can Only Be Supported By The**

4                   **P1 Test.**

5           The damages awarded by the jury can only be supported by its reliance

6   on the P1 Test as the basis of liability.  Specifically, the jury awarded actual

7   damages of $45.69 under two of the claims, an amount equal to EchoStar's ARPU

8   for a single subscriber for a single month in the year 2000.  Orban Trial Testimony,

9   4/18/08, Vol. 1 at 16:12-21;  TR EX 651-39, -44; TR EX 406-01:

10
11
12

| | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| ARPU[t] | $  42.90 | $  45.69 | $  49.63 | $  49.48 | $  51.30 |

13   ARPUs for every other year presented to the jury were different (*i.e.*, 1999=$42.90;

14   2001=$49.63; 2002=$49.48; 2003=$51.30) and no other number presented at trial

15   corresponds to this damages figure.  Thus, the precise amount of actual damages

16   awarded by the jury corresponds only to that November 2000 Test—particularly in

17   combination with the jury's finding that there was only a single violation of the

18   Communications Act and § 593e(b).  No other evidence proved a single violation of

19   any kind by NDS that could be compensated by the award of a single month's 2000

20   ARPU.

21           The minimal statutory damages amounts found by the jury also support

22   a finding of liability based on the P1 Test.  The $1,000 in statutory damages

23   awarded under the 47 U.S.C. § 605(a) claim was the lowest possible amount the jury

24   could give after a finding of liability.  None of EchoStar's other allegations

25   correspond to such a finding—of a single interception of EchoStar's satellite

26   communications resulting in minimal unintentional damage to EchoStar.

27
28

NDS'S OBJECTIONS TO PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW
Case No. SA CV 03-950 DOC(JTLx)

1             Furthermore, the jury awarded no actual damages and only the lowest

2  mandatory statutory damages for a single violation under § 593e(b).  Again, this

3  award fits uniquely with the P1 Test, since mere possession (as opposed to use) of

4  the DirecTV card loaded with the pirate code Tarnovsky obtained from the Internet

5  caused no actual damage to Plaintiffs, even if possession was a technical violation of

6  the law.

7             The jury's verdict conclusively shows that the jury did not find NDS

8  liable for the Nipper 2000 posting or the other unlawful acts alleged by EchoStar at

9  trial.  Instead, the jury found NDS liable under three of the claims presented for

10  unintentional violations caused by the P1 Test resulting in nominal damages to

11  EchoStar.  Plaintiffs' attempt to recast the jury's verdict as a victory on the most

12  hotly contested allegations in the case is entirely untenable and must be rejected as

13  inconsistent with the jury's verdict.  It blatantly contradicts the jury's findings of:

14       •   no liability under DMCA § 1201(a)(1), DMCA § 1201(a)(2) and

15          RICO § 1963(c),

16       •   only a single violation of the law,

17       •   actual damages equal to only a single months' 2000 ARPU for a

18          single DISH network subscription,

19       •   only the lowest possible amounts of statutory damages,

20       •   no oppression, fraud or malice, and

21       •   no participation by NDS in any conspiracy.

22  Given the unambiguous meaning of the jury's verdict, the Proposed FOF/COL must

23  be rejected.

24

25

26

27

28

## II.   OBJECTIONS TO PROPOSED FINDINGS OF FACT

### GENERAL OBJECTIONS

NDS objects to the section headings in the Proposed FOF/COL. Those headings are contrary to the verdict and, like many of the proposed findings themselves, are unsupported by the evidence in this case.

### OBJECTIONS TO SPECIFIC FINDINGS OF FACT

In addition to its general objection that the proposed findings of fact ("FOF") are contrary to the verdict, NDS objects to the individual proposed FOF as follows:

**PROPOSED FOF 1.**     EchoStar is one of the largest satellite providers in the United States and offers about 500 television channels with various subscription packages to consumers. (Ergen Trial Testimony, 4/9/08, Vol. 5 p. 8:18-9:20.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 2.**     Under the name DISH Network, EchoStar provides programming to paying subscribers. (*Id.* pp. 7:17-8:10, 8:18-9:20.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 3.**     EchoStar generally pays the programming companies a fee for each subscriber to which it broadcasts the programming. (*Id.*)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 4.**     EchoStar contracts with programming companies such as Disney, which owns ESPN and the Disney Channel. (*Id.* p. 9:9-20.)

1    **NDS RESPONSE:**  No objection.

2

3    **PROPOSED FOF 5.**    EchoStar also has its own copyrighted

4  programming that it broadcasts on the DISH Network to paying subscribers. (*Id.*

5  p. 10:20-23.)

6    **NDS RESPONSE:**  No objection.

7

8    **PROPOSED FOF 6.**    EchoStar makes a substantial investment in

9  encryption systems or conditional access systems ("CAS") to prevent people from

10  taking its satellite signals without authorization. (*Id.* p. 11:8-22.)

11    **NDS RESPONSE:**  No objection.

12

13    **PROPOSED FOF 7.**    A CAS allows a customer to receive only

14  channels for which the customer pays by sending a key through the satellite to the

15  "SmartCard" in the customer's set-top box; the key unlocks the channels for which

16  the customer has paid (and does not unlock the channels for which the customer has

17  not paid).  (*Id.* p. 13:17-12; Lenoir Trial Testimony, 4/10/08, Vol. 1, p. 52:22-53:4.)

18    **NDS RESPONSE:**  No objection.

19

20    **PROPOSED FOF 8.**    Plaintiff NagraStar is a joint venture of Echo

21  Star and the Kudelski Group in Switzerland. (Ergen Trial Testimony 04/9/08,

22  Vol. 5 p. 50:2 1-p. 51:7.)

23    **NDS RESPONSE:**  No objection.

24

25    **PROPOSED FOF 9.**    NagraStar provides the SmartCards used in

26  EchoStar's CAS, as well as security-related and maintenance services to EchoStar.

27  (Lenoir Trial Testimony 04/10/08, Vol. 1, pp. 52:22-53:4; 55:10-15.)

28    **NDS RESPONSE:**  No objection.

**PROPOSED FOF 10.**    Defendant NDS also provides CASs and is the biggest competitor of the Kudelski Group. (*Id.* p. 59:8-11.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 11.**    NDS has 32% of the market and NagraStar has 30% of the market. (*Id.* p. 60:6-8.)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects that the cited testimony does not support the claimed market share for NagraStar, and no admitted evidence supports that claim.  NDS further objects to the extent that this finding of fact implies that the stated market share percentages are for the period relevant to the litigation or are limited to the United States.  It is correct that (a) Digit estimated that as of September 2007, NDS had 32% of the *worldwide* CAS market for digital television households and the Kudelski Group had 29% of that same market and (b) NDS republished those estimates on its website.  (Lenoir Trial Testimony, 4/10/08, Vol. 1 at 61:6-19.)

**PROPOSED FOF 12.**    At all times relevant to this lawsuit, NDS provided DirecTV's CAS in the United States. (Shkedy Trial Testimony 04/10/08, Vol. 3, p. 10:20-11:1; Dov Rubin Trial Testimony, 4/22/08, Vol. 1, p. 13:20-24.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 13.**    DirecTV was NDS's largest customer in the United States. (Dov Rubin Trial Testimony, 4/22/08, Vol. 1, p. 14:6-11.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 14.**    In 1997-2002, Defendants experienced significant problems with the circumvention of their encryption technology (i.e., CAS) by pirates in both the United States and Europe. (Shkedy Trial Testimony

04/10/08, Vol. 3, p. 10:20- 11:1; Dov Rubin Trial Testimony, 4/17/08, Vol. 1, pp. 68:11-17; 78:15-79:1; Norris Trial Testimony, 4/16/08, Vol. 4, p. 24:6-25:5; Tarnovsky Trial Testimony 04/23/08, Vol. 1 p. 58:9-15.)

**NDS RESPONSE:** NDS objects to this proposed finding of fact. NDS objects that none of the evidence, cited or otherwise, establishes that NDS experienced any "problems with the circumvention of their encryption technology" in the 1997-2002 period by pirates in Europe. In fact, the trial testimony of Christopher Tarnovsky immediately following that cited by Plaintiffs directly rebuts the notion (*see* Tarnovsky Trial Testimony 4/23/08, Vol. 1 at 58:16-20; *see also id.* at 59:7-11), as does the testimony of two other witnesses (*see* Segoly Trial Testimony, 4/11/08, Vol. 2 at 83:21-84:1; D. Rubin Trial Testimony, 4/22/08, Vol. 2 at 13:21-14:9). NDS further objects to the extent that the phrase "Defendants experienced significant problems with the circumvention of their encryption technology (*i.e.*, CAS) by pirates in … the United States" is meant to imply that those problems were a significant threat to NDS's customer relationship with DirecTV, because none of the evidence, cited or otherwise, establishes such a point. It is correct that the NDS CAS provided to DirecTV experienced piracy during the years 1997 to 2002 except for NDS's P4 cards introduced in 2002, which were never subject to piracy. (*See* Kahn Trial Testimony, 5/2/08, Vol. 2 at 38:1-12.)

**PROPOSED FOF 15.** As a result, DirecTV was considering other suppliers, including NagraStar, and NDS was afraid it was going to lose DirecTV, its largest customer. (Dov Rubin Trial Testimony, 4/22/08, Vol. 1, p. 58:9-19; Andre Kudelski Trial Testimony, 5/6/08, Vol. 1, p. [trans. not yet avail.])

**NDS RESPONSE:** NDS objects to this proposed finding of fact. NDS objects that none of the evidence, cited or otherwise, establishes that DirecTV ever considered NagraStar as a supplier; to the contrary, the unrebutted evidence

1  establishes that DirecTV would never consider NagraStar as a supplier because it

2  was controlled by EchoStar, DirecTV's competitor.  (*See* Kahn Trial Testimony,

3  5/2/08, Vol. 2 at 26:14-22, 35:8-11.)  NDS further objects that the evidence

4  establishes that DirecTV was not considering any replacement of NDS during the

5  relevant time period and that DirecTV's consideration of other vendors was not

6  "as a result" of any piracy of DirecTV's system.  (*See* Kahn Trial Testimony,

7  5/2/08, Vol. 2 at 14:23-15:6, 44:21-45:15; Vol. 3 at 10:15-11:5, 11:12-14:10.)

8  NDS further objects that no evidence, cited or otherwise, establishes that NDS

9  "was afraid it was going to lose DirecTV."

10

11       **PROPOSED FOF 16.**    At the same time, NDS sought EchoStar as a

12  customer. (Dov Rubin Trial Testimony, 4/22/08, Vol. 1, p. 77:25-78:17.)

13       **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

14  NDS objects that none of the evidence, cited or otherwise, establishes that NDS

15  sought EchoStar as a customer for CAS technology or services "at the same time"

16  or at any time in the 1997-2000 period.  The cited testimony supports only the fact

17  that in 2000 NDS sought to sell other products, such as middleware and interactive

18  applications, to EchoStar.

19

20       **PROPOSED FOF 17.**    To prevent losing DirecTV as a customer,

21  NDS developed a strategy of co-opting the pirates; in other words, "pay[ing] them

22  not to pirate your system and hope they pirate your competition." (TR EX 360.)

23       **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

24  No evidence, cited or otherwise, supports the notion that NDS had or developed

25  such a strategy, whether to "prevent losing DirecTV as a customer" or otherwise.

26  NDS further objects that the evidence establishes that DirecTV was not considering

27  any replacement of NDS during the relevant time period and that DirecTV's

28  consideration of other vendors was not "as a result" of any piracy of DirecTV's

system.  (*See* Kahn Trial Testimony, 5/2/08, Vol. 2 at 14:23-15:6, 44:21-45:15; Vol. 3 at 10:15-11:5, 11:12-14:10.)  NDS also objects to the implication that NDS hoped that its employees would pirate its competitors; to the contrary, the evidence establishes that NDS specifically instructed any ex-pirates that it retained or contracted with that they were to cease all piracy activities.  (*See* Peled Trial Testimony, 5/6/08, Vol. 2 at 68:10-22; Hasak Trial Testimony, 5/1/08, Vol. 1 at 20:2-21:3.)  NDS further objects to the implication that it hired any ex-pirates during the time period that DirecTV was considering other vendors, because the evidence establishes that NDS hired Messrs. Tarnovsky and Kommerling well before that time.  (*See* Norris Trial Testimony, 4/16/08, Vol. 4 at 23:2-5 (NDS hired Chris Tarnovsky in 1997); Mordinson Trial Testimony, 4/10/08, Vol. 4 at 53:3-7 (NDS retained Oliver Kommerling in 1997); Kahn Trial Testimony, 5/2/08, Vol. 2 at 19:8-20:2 (NDS and DirecTV began renegotiating contract in April 1998).)

NDS further objects to Plaintiffs' citation to a purported exhibit—referenced as "TR EX 360" in the proposed findings of fact, but actually TR EX 390—that was specifically excluded from evidence by the Court Order.  (Minute Order dated April 14, 2008.)

**PROPOSED FOF 18.**   NDS was aware that it was helpful to its marketing efforts to tell customers that its competitor's CAS had been hacked or compromised. (Segoly Trial Testimony 04/11/08, Vol. 2, p. 82:25-83:7 ("If competitor is hacked or compromised, yes, it is important for marketing and sales."), p. 85:1-5 (talking about EchoStar's system: "if it's hacked, and if it's available on the Internet, and if there are devices out there, then yes, it is important."); Dov Rubin Trial Testimony, 4/22/08, Vol. 1, p. 26:18, 27:2-33:16; TR EX 1270.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 19.**   As part of the company strategy, starting in 1997, NDS initiated efforts to recruit and employ satellite hackers Christopher Tarnovsky ("Tarnovsky") and Oliver Kommerling ("Kommerling"), whom Defendants believed to be a major source of their piracy problems. (Norris Trial Testimony 04/17/08, Vol. 2, p. 73:3- 20.)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects that to the extent that "the company strategy" is intended to reference the strategy alleged in proposed finding of fact 17.  There is no evidence, cited or otherwise, supporting the notion that NDS had or developed such a strategy.

**PROPOSED FOF 20.**   Indeed, Tarnovsky admitted that prior to going to work for NDS, he was engaged in compromising NDS's CAS, which allowed DirecTV programming to be stolen. (Tarnovsky Trial Testimony 04/23/08, Vol. 1, pp. 52:14-21, 58:13-14; Vol. 3, p. 55:25-58:5.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 21.**   Tarnovsky freely admitted that he was a "hacker." (Id. p. 55:2-4; TR EX 6-A ("My name is Chris Tarnovsky, and I'm a hacker.").) Specifically, Ron Ereiser ("Ereiser") hired Tarnovsky to hack the DirecTV system and paid Tarnovsky $20,000. (Tarnovsky Trial Testimony 04/23/08, Vol. 3 p. 58:15-59:5.)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects that "My name is Chris Tarnovsky, and I'm a hacker" incorrectly quotes Mr. Tarnovsky's 1995 email in which he wrote, "My name is Chris Tarnovsky!  I am a hacker/programmer very much into Electronics / Ham Radio / Modems / Video Access Control(!) / and anything else outthere [*sic*] I find interesting."  (TR EX 6A.)

1       **PROPOSED FOF 22.**   Tarnovsky worked with Ereiser for

2  approximately nine months before going to work for NDS as discussed further

3  below. (*Id.* p. 60:1-5.)

4       **NDS RESPONSE:**  No objection.

5

6       **PROPOSED FOF 23.**   NDS was aware of Tarnovsky's and

7  Kommerling's hacking activities – in fact, NDS recruited Tarnovsky and

8  Kommerling because NDS considered them to be the "two best hackers in the

9  world," even though they considered these hacking activities to be illegal. (Norris

10  Trial Testimony 04/16/08, Vol. 4, p. 23:23- 24:5; Dov Rubin Trial Testimony,

11  4/22/08, Vol. 1, p. 15:3-6; Segoly Trial Testimony 04/11/08, Vol. II, p. 73:18-23;

12  Hasak Trial Testimony 05/01/08, Vol. 1, p. 77:10-24.).

13       **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

14  NDS objects to the extent that the proposed finding of fact is intended to imply that

15  NDS knew of any piracy activities by Messrs. Tarnovsky or Kommerling during

16  the time they worked for NDS because no evidence, cited or otherwise, supports

17  that notion.

18

19       **PROPOSED FOF 24.**   When NDS hired Tarnovsky, NDS knew that

20  Tarnovsky had relationships with known pirates and that his friend Alan Menard

21  ("Menard") was using a pirate card Tarnovsky had developed to hack DirecTV.

22  (Tarnovsky Trial Testimony 04/23/08, Vol. 3, p. 36:25-37:7.)

23       **NDS RESPONSE:**  No objection.

24

25       **PROPOSED FOF 25.**   NDS also knew that there was a risk that

26  Tarnovsky would continue to engage in his illegal hacking activities. (Dov Rubin

27  Trial Testimony, 4/22/08, Vol. 1, p. 15:3-12; Segoly Trial Testimony, 4/11/08,

28  Vol. 2, pp. 77:22-78:2, 78:13-16.)

1       **NDS RESPONSE:**  No objection.

2

3           **PROPOSED FOF 26.**   NDS nonetheless hired Tarnovsky. (Dov

4    Rubin Trial Testimony, 4/22/08, Vol. 1, p. 15:3-12.)

5           **NDS RESPONSE:**  No objection.

6

7           **PROPOSED FOF 27.**   NDS set up a lab for Tarnovsky in his house

8    and allowed Tarnovsky to work from his house during the nearly ten (10) years he

9    was a NDS employee. (Tarnovsky Trial Testimony, 4/23/08, Vol. 2 at 3:4-9; Vol. 3

10   at 23:2-9 (house was an "NDS-equipped lab"); Hasak Trial Testimony, 5/1/08,

11   Vol. 1 at 22:18-23:12 (NDS installed an alarm to secure lab in Tarnovsky's home).)

12          **NDS RESPONSE:**  No objection.

13

14          **PROPOSED FOF 28.**   When NDS hired Tarnovsky, they paid him

15   $65,000 a year, $14,000 in moving expenses, and a $10,000 loan that could be

16   forgiven in two years. (Tarnovsky Trial Testimony 04/25/08, Vol. 3 at 63:8-13.)

17          **NDS RESPONSE:**  No objection.

18

19          **PROPOSED FOF 29.**   Defendants "reversed engineered" and

20   "hacked" Plaintiffs' security system at Defendants' research laboratory in Haifa,

21   Israel over a period of six (6) months. (Shkedy Trial Testimony 04/10/08, Vol. 2,

22   p. 57:13-19; see TR EX 2-A (Initial Draft of Headend Report); TR EX 98 (Headend

23   Report); Dov Rubin Trial Testimony, 4/17/08, Vol. 1, pp. 74:3-74:15, 75:18-76:24;

24   Hasak Trial Testimony, 5/1/08, Vol. 1, p. 71:18-21.)

25          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

26   NDS objects to the extent that this proposed finding of fact implies that NDS

27   "reverse engineered" or "hacked" any version of Plaintiffs' security system other

28   than ROM3, because no evidence, cited or otherwise, supports that proposition.

- 23 -

1  NDS further objects to the extent that this proposed finding of fact is meant to

2  imply that NDS was in any way involved with the piracy of Plaintiffs security

3  system, because no evidence supports that notion and the jury found to the contrary.

4

5  **PROPOSED FOF 30.**   Defendants' engineers Zvi Shkedy and

6  David Mordinson extracted the proprietary ROM and EEPROM codes from the

7  microprocessor of one of Plaintiffs' access cards and analyzed the code to identify

8  weaknesses and vulnerabilities (which was the purpose of the hacking).  (Shkedy

9  Trial Testimony 04/10/08, Vol. 2, p. 57:13-19.)

10  **NDS RESPONSE:**  No objection.

11

12  **PROPOSED FOF 31.**   Mordinson and Shkedy traveled to New

13  Jersey to log data needed to complete the hack. (*Id.* p. 23:15-24:17.)

14  **NDS RESPONSE:**  No objection.

15

16  **PROPOSED FOF 32.**   Reuven Hasak, one of the senior officers of

17  NDS at the time, set Mordinson and Shkedy up with someone in New Jersey so

18  they could log communications between a set-top box and the Smart Card.  (*Id.*)

19  **NDS RESPONSE:**  No objection.

20

21  **PROPOSED FOF 33.**   Mordinson and Shkedy later traveled to

22  Windsor, Canada, via Cleveland and Baltimore, to successfully test the hack in

23  someone's basement.  (Shkedy Trial Testimony 04/10/08, Vol. 3, pp. 25:3-8, 75:12-

24  16; Mordinson Trial Testimony 04/11/08, Vol. 1, pp. 32:6-11, 33:2-12, 35:15-36:1,

25  36:9-14; Vol. 2 at p. 32:18-33:5.)

26  **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

27  NDS objects to the extent that this proposed finding of fact implies that there was

28  something nefarious about the location chosen for the test; in fact, the evidence

1    establishes that the "basement" was a room on the first floor of the house that had a

2    window for convenient access to the backyard where the satellite dish was located.

3    (*See* Mordinson Trial Testimony, 4/11/08, Vol. 1 at 69:10-70:3.)

4

5           **PROPOSED FOF 34.**   Defendants then prepared a written report

6    that described, in detail: (1) the secret characteristics Defendants discovered in

7    Plaintiffs' microprocessor, (2) the technique Defendants developed to exploit those

8    characteristics, and (3) the process to effectuate a commercial hack of Plaintiffs'

9    encryption system in the United States.  (Shkedy Trial Testimony 04/10/08, Vol. 3,

10   p. 19:17-19; Mordinson Trial Testimony, 4/10/08, [SPEC] VOL., p. 42:25-16.)

11          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.  No

12   evidence, whether cited or otherwise, supports the notion that Defendants prepared

13   any written report, whether the Headend Report or otherwise, that described in any

14   manner **"**the process to effectuate a commercial hack of Plaintiffs' encryption

15   system in the United States."  To the contrary, the evidence established that the

16   process developed by NDS was not consistent with a commercial hack because it

17   terminated in an infinite loop.  (*See* Jones Trial Testimony, 4/29/08, Vol. 2, at 26:2-

18   27:14.)  Furthermore, the jury's verdict is contrary to such a notion.

19

20          **PROPOSED FOF 35.**   This report was called the "Headend Report."

21   (Shkedy Trial Testimony 04/10/08, Vol. 3, pp. 7:1-6, 8:5-8, 19:17-19; Mordinson

22   Trial Testimony 04/11/08, Vol. No. 1, p. 5:17-25; TR EX 2A (Initial Draft Headend

23   Report dated 10/27/98); TR EX 98 (final Headend Report).)

24          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.  To

25   the extent that this proposed finding of fact implies that the Headend Report

26   contained the content referenced in proposed finding of fact 34, NDS objects that

27   no evidence, whether cited or otherwise, supports the notion that the Headend

28   Report described in any manner **"**the process to effectuate a commercial hack of

1  Plaintiffs' encryption system in the United States." Furthermore, the jury's verdict
2  is contrary to such a notion.
3
4      **PROPOSED FOF 36.**   The Headend Report is a "how to" manual
5  for how to break the CAM for the EchoStar system. (Avi Rubin Trial Testimony,
6  4/16/08, Vol. 2, p. 72:5-14.)
7      **NDS RESPONSE:**  NDS objects to this proposed finding of fact.  The
8  Headend Report does not state that it is such a manual, the persons who created the
9  Headend Report did not testify that it was such a manual, and Avi Rubin is not
10  competent to testify that it was such a manual.  (*See* TR EX 98-01.)
11
12      **PROPOSED FOF 37.**   It describes what is in various memory
13  locations, and it gives the code for a message that can be used to run the attackers'
14  code on the card by exploiting certain vulnerabilities. (*Id.* p. 72:5-14.)
15      **NDS RESPONSE:**  NDS objects to this proposed finding of fact.
16  NDS objects to the implication that the code in the Headend Report was ever used,
17  or intended to be used, for any purpose other than for NDS's testing of the results
18  of its reverse engineering efforts, because no evidence, whether cited or otherwise,
19  supports that notion.  Furthermore, the jury's verdict is contrary to such a notion.
20
21      **PROPOSED FOF 38.**   Importantly, there is nothing in the Headend
22  Report about improving the robustness of Defendants' own product. (Avi Rubin
23  Trial Testimony, 4/16/08, Vol. 3, p. 27:11-28:12.)
24      **NDS RESPONSE:**  NDS objects to this proposed finding of fact.
25  NDS objects to the notion that it is "important," or in any way relevant to the
26  propriety of NDS's reverse engineering project, that the Headend Report does not
27  specifically discuss improving the robustness of NDS's products.  The purpose of
28  the report was to describe the reverse engineering work on Plaintiffs' conditional

1   access system not to specifically identify ways to improve NDS's products, and the

2   persons who wrote that report were not the persons who designed NDS's products.

3   (*See* TR EX 98-01; Mordinson Trial Transcript 4/11/08, Vol. 2 at 41:12-18.)

4   Furthermore, NDS did improve its products by applying the lessons learned from

5   reverse engineering of competitor products.  (*See* Shkedy Trial Transcript 4/10/08,

6   Vol. 3 at 49:22-52:20 (identifying improvements in NDS technology that were

7   derived from reverse engineering); Peled Trial Transcript 5/6/08, Vol. 3 at 35:11-20

8   (information learned from reverse engineering competitors was used to make NDS

9   chips more secure).)  Finally, the jury's verdict is contrary to such a notion.

10

11          **PROPOSED FOF 39.**    Indeed, the Headend Report does not contain

12   a single section describing how Defendants could use the hacked methodology and

13   the information they learned from the hack of Plaintiffs' security system to improve

14   Defendants' technology. (TR EX 98 (Headend Report).)

15          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

16   NDS objects to the notion that it is "important," or in any way relevant to the

17   propriety of NDS's reverse engineering project," that the Headend Report "does not

18   contain a single section describing how Defendants could use the hacked

19   methodology and the information they learned from the hack of Plaintiffs' security

20   system to improve Defendants' technology."  The purpose of the report was to

21   describe the reverse engineering work on Plaintiffs' conditional access system not

22   to specifically identify ways to improve NDS's products, and the persons who

23   wrote that report were not the persons who designed NDS's products.  (*See* TR EX

24   98-01; Mordinson Trial Testimony, 4/11/08, Vol. 2 at 41:12-18.)  Furthermore,

25   NDS did improve its products by applying the lessons learned from reverse

26   engineering of competitor products.  (*See* Shkedy Trial Testimony, 4/10/08, Vol. 3

27   at 49:22-52:20 (identifying improvements in NDS technology that were derived

28   from reverse engineering).)  Finally, the jury's verdict is contrary to such a notion.

**PROPOSED FOF 40.**   In fact, the ST Thomson chip ST16CF54 CPU, which is the microprocessor chip in Plaintiffs' SmartCard and the subject of the Headend Report, was never a chip that NDS used. (Shkedy Trial Testimony 04/10/08, Vol. 3, pp. 9:18-10:3, 10:9-19; TR EX 2-A (Initial Draft of Headend Report) at p. 11; TR EX 98 (Headend Report).)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects to the notion that whether or not NDS used the ST16CF54 has any bearing on the propriety of NDS's reverse engineering project.  Furthermore, the evidence demonstrates that lessons learned from reverse engineering a chip can be applied to different chips (*see* Shkedy Trial Testimony 4/10/08, Vol. 3 at 17:22-18:9, 49:22-52:20), and that NDS considered using ST chips like the one used by EchoStar (*see* Mordinson Trial Testimony, 4/11/08, Vol. 2 at 39:17-21).  Finally, the jury's verdict is contrary to such a notion.


**PROPOSED FOF 41.**   Knowing the structure of the fields of the memory code in Plaintiffs' access card from ST Thomson did not make NDS's security technology any more secure. (Shkedy Trial Testimony 04/10/08, Vol. 3, p. 27:2-5.)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects to the notion that whether or not "knowing the structure of the fields of the memory code in Plaintiffs' access card from ST Thomson" made "NDS's security technology any more secure" has any bearing on the propriety of NDS's reverse engineering project.  Furthermore, NDS did improve its products by applying the lessons learned from reverse engineering of competitor products. (*See* Shkedy Trial Testimony, 4/10/08, Vol. 3 at 49:22-52:20 (identifying improvements in NDS technology that were derived from reverse engineering).) Finally, the jury's verdict is contrary to such a notion.

1   **PROPOSED FOF 42.** The hack of Plaintiffs' security system was

2 not done to combat the piracy that DirecTV (and thus NDS) was suffering. (Shkedy

3 Trial Testimony 04/10/08, Vol. 3, p. 10:20-11:1.)

4   **NDS RESPONSE:** NDS objects to this proposed finding of fact.

5 NDS objects to the notion that whether or not the "hack of Plaintiffs' security

6 system was [] done to combat the piracy that DirecTV (and thus NDS) was

7 suffering" has any bearing on the propriety of NDS's reverse engineering project.

8 Further, although the Headend Report did not directly combat the piracy then

9 experienced by DirecTV, NDS did improve its products to make them more

10 resistant to piracy by applying the lessons learned from reverse engineering of

11 competitor products.  (*See* Shkedy Trial Testimony, 4/10/08, Vol. 3 at 49:22-52:20

12 (identifying improvements in NDS technology that were derived from reverse

13 engineering).)  Finally, the jury's verdict is contrary to such a notion.

14

15   **PROPOSED FOF 43.** Rather, the Headend Report "teaches anyone

16 that reads it how to create a 3M hack of the EchoStar access cards."  (Shkedy Trial

17 Testimony 04/10/08, Vol. 3, p. 28:6-9; TR EX 98 (Headend Report).)

18   **NDS RESPONSE:** NDS objects to this proposed finding of fact.

19 NDS objects to the notion that whether or not the Headend Report "teaches anyone

20 that reads it how to create a 3M hack of the EchoStar access cards" has any bearing

21 on the propriety of NDS's reverse engineering project.  Additionally, the cited

22 testimony specifically indicates that the identified portion of the Headend Report

23 "teaches NDS how to protect [itself] in not having the same error also."  Further,

24 NDS generally improved its products to make them more resistant to piracy by

25 applying the lessons learned from reverse engineering of competitor products.

26 (*See* Shkedy Trial Testimony, 4/10/08, Vol. 3 at 49:22-52:20 (identifying

27 improvements in NDS technology that were derived from reverse engineering).)

28 Finally, the jury's verdict is contrary to such a notion.

**PROPOSED FOF 44.**   The Headend Report thus describes how a satellite hacker, or pirate, can view EchoStar's signals without paying for them. (Shkedy Trial Testimony 04/10/08, Vol. 3, p. 13:9-13; TR EX 2-A (Initial Draft of Headend Report, p. 13, ¶ 3.5.2); TR EX 98 (Headend Report).)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects to the notion that the information described in the Headend Report made NDS's reverse engineering project somehow improper.  Further, none of the evidence, whether cited or otherwise, supports the notion that any "satellite hacker or pirate" ever used the information in the Headend Report to view EchoStar's signals without paying for them.  Finally, the jury's verdict is contrary to such notions.

**PROPOSED FOF 45.**   Indeed, the Headend Report expressly states, "This is a classic 3M hack. The subscriber subscribing to a basic package of service for a minimal possible charge can view any services, excluding PPV, even if he/she is not authorized to view them."  (Shkedy Trial Testimony 04/10/08, Vol. 3, p. 12:23-13:5; TR EX 2-A (Initial Draft of Headend Report, p. 13, ¶ 3.5.2); TR EX 98 (Headend Report).)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects to the notion that the quoted portion of the Headend Report made NDS's reverse engineering project somehow improper.  Further, the jury's verdict is contrary to such a notion.

**PROPOSED FOF 46.**   Defendants did not keep [sic] Headend Report confidential. Instead, NDS gave the report to Kommerling. (Shkedy Trial Testimony 04/10/08, Vol. 3, p. 19:3- 9.)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. Nothing in the evidence, cited or otherwise, supports the notion that giving a copy

- 30 -

1   of the Headend Report to Mr. Kommerling meant that NDS "did not keep [the]

2   Headend Report confidential." To the contrary, Mr. Kommerling was working with

3   NDS at that time. (*See* Shkedy Trial Testimony, 4/10/08, Vol. 3 at 57:3-8.)

4   No evidence, cited or otherwise, supports the notion that NDS "did not keep [the]

5   Headend Report confidential" in any fashion. In fact, the evidence affirmatively

6   establishes that NDS did keep that report confidential. (*See id*. at 57:3-20;

7   Mordinson Trial Testimony, 4/11/08, Vol. 1 at 61:20-62:6.) Finally, the jury's

8   verdict is contrary to the notion that NDS "did not keep [the] Headend Report

9   confidential."

10

11          **PROPOSED FOF 47.**   Additionally, Tarnovsky had a number of

12   "technical exchanges" with the engineers in Haifa, Israel and saw the Headend

13   Report at one of the "technical exchanges" with Mordinson. (Tarnovsky Trial

14   Testimony 04/23/08, Vol. 3, p. 11:5-14.)

15          **NDS RESPONSE:** NDS objects to this proposed finding of fact. To

16   the extent that this proposed finding is intended to imply that Mr. Mordinson

17   showed any portion of the Headend Report to Mr. Tarnovsky at any time other than

18   August 2001 in California, it is not supported by any evidence, whether cited or

19   otherwise. To the contrary, the testimony is clear that Mr. Mordinson showed

20   Mr. Tarnovsky only a small portion of the Headend Report, that this occurred in

21   2001 in California, and that Mr. Tarnovsky never saw the Headend Report at any

22   other time. (*See* Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 78:18-81:7, 18:5-8.)

23   Documentary evidence also establishes that Mr. Mordinson visited Mr. Tarnovsky

24   in California in August 2001. (TR EX 1443; TR EX 1452.)

25

26          **PROPOSED FOF 48.**   Mordinson also flew to California and

27   showed Tarnovsky portions of the Headend Report. (*Id.* p. 11:5-13:24).

28

NDS'S OBJECTIONS TO PROPOSED FINDINGS
                                               OF FACT AND CONCLUSIONS OF LAW
                                               Case No. SA CV 03-950 DOC(JTLx)

1    **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

2    Mr. Mordinson did not "also" show portions of the Headend Report to

3    Mr. Tarnovsky in California; instead, the August 2001 meeting in California was

4    the only time Mr. Mordinson showed Mr. Tarnovsky any portion of the Headend

5    Report, and no evidence, cited or otherwise, is to the contrary.  Rather, the

6    testimony is clear that Mr. Mordinson showed Mr. Tarnovsky only a small portion

7    of the Headend Report, that this occurred in 2001 in California, and that

8    Mr. Tarnovsky never saw the Headend Report at any other time.  (*See* Tarnovsky

9    Trial Testimony, 4/23/08, Vol. 3 at 78:18-81:7, 18:5-8.)  Documentary evidence

10   also establishes that Mr. Mordinson visited Mr. Tarnovsky in California in August

11   2001.  (TR EX 1443; TR EX 1452.)

12

13   **PROPOSED FOF 49.**   When asked direct questions as to the timing

14   of when he saw the Headend Report, Tarnovsky provided inconsistent answers: at

15   trial, he attempted to testify that he was certain he saw the Headend Report after the

16   December 2000 postings (Id., p. 17:17-18:8); at his deposition, Tarnovsky said that

17   it was more likely than not that he saw the Headend Report in 1999; and at several

18   other points, Tarnovsky said it was in 2001 after the December 2000 posting; at one

19   point, Tarnovsky also said that he saw the Headend Report during the "P3 era."

20   (Id., p. 16:25-17:11.)

21   **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

22   No evidence, cited or otherwise, supports the assertion that Mr. Tarnovsky provided

23   "inconsistent answers" regarding when he saw portions of the Headend Report or

24   that he "attempted to testify" to anything.  To the contrary, Mr. Tarnovsky testified

25   that he was shown only a small portion of the Headend Report by Mr. Mordinson

26   on a single occasion in California "sometime in late 2001."  (Tarnovsky Trial

27   Transcript 4/23/08, Vol. 3 at 78:18-79:23, 17:17-18:8.)  Further, Mr. Tarnovsky

28   testified that he was absolutely sure that he was shown the report in 2001, because

- 32 -

1    that was when EchoStar closed the hole opened by the December 2000 postings.

2    (*Id.* Vol. 3 at 18:5-8.)  Documentary evidence also establishes that Mr. Mordinson

3    visited Mr. Tarnovsky in California in August 2001.  (TR EX 1443; TR EX 1452.)

4    Mr. Tarnovsky's testimony that he was shown the Report in the "P3 era" is,

5    moreover, consistent with the visit being in 2001.  (*See* Tarnovsky Trial Testimony,

6    4/23/08, Vol. 3 at 17:12-16.)  Mr. Mordinson also testified that he showed the pages

7    from the Headend Report to Mr. Tarnovsky in California in August 2001, and that

8    he had never previously provided that or similar information to Mr. Tarnovsky.

9    (*See* Mordinson Trial Testimony, 4/11/08, Vol. 1 at 26:14-27:1; Vol. 2 at 17:3-8,

10   21:14-22:11; Vol. 3 at 51:18-52:2.)  NDS further objects to the attempted use of

11   deposition testimony that is not part of the trial record.

12

13          **PROPOSED FOF 50.**    However, it is clear that Tarnovsky had

14   access to the Headend Report as early as March 1999.  For example, March 28,

15   1999, Tarnovsky e-mailed to Jan Saggiori portions of EchoStar's ROM and the

16   Confidential User Manual from the e-mail address von@metro2000.net.  (Saggiori

17   Trial Testimony 04/16/08, Vol. 1, p. 41:17-42:7; TR EX 2002 (e-mail from

18   von@metro2000.net); Tarnovsky Trial Testimony 04/23/08, Vol. 3, p. 13:16-23.)

19          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

20   There is no evidence, cited or otherwise, that "Tarnovsky had access to the

21   Headend Report as early as March 1999."  Tarnovsky testified unequivocally that

22   he was not shown the Report until 2001.  (*See* Tarnovsky Trial Testimony, 4/23/08,

23   Vol. 3 at 17:17-18:8, 78:18-79:23.)  Mr. Mordinson also testified that he showed

24   the pages from the Headend Report to Mr. Tarnovsky in California in August 2001,

25   and that he had never previously provided that or similar information to

26   Mr. Tarnovsky.  (*See* Mordinson Trial Testimony, 4/11/08, Vol. 1 at 26:14-27:1;

27   Vol. 2 at 17:3-8, 21:14-22:11; Vol. 3 at 51:18-52:2.)  Nor are the portions of

28   EchoStar's ROM or the "Confidential User Manual" allegedly attached to TR EX

2002 included in the Headend Report; consequently, even if Tarnovsky had sent TR EX 2002 to Saggiori, it would not provide evidence of Tarnovsky's possession of the Headend Report.  (*Compare* TR EX 2002 *with* TR EX 98.)  Finally, Tarnovsky testified that he did not send the e-mail that comprises Trial Exhibit 2002.  (*See* Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 15:10-16:20.)

**PROPOSED FOF 51.**    Tarnovsky admitted that von@metro2000.net was one of the e-mail addresses that he used. (*Id.*, p. 13:16-23.)

**NDS RESPONSE:**  No objection.

**PROPOSED FOF 52.**    The March 28, 1999 e-mail from von@metro2000.net has the file name "16cf54.asc," which corresponds to the ST Thomson 16cf54 chip in Plaintiffs' SmartCards (and the chip that was the subject of Defendants' hack). (*Id.* p. 14:17-15:9; TR EX 2002 p. 5.)

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. NDS objects to the extent that this proposed finding is intended to support the notion that  "Tarnovsky had access to the Headend Report as early as March 1999" because no evidence, cited or otherwise, supports that notion.  Tarnovsky testified unequivocally that he was not shown the Report until 2001.  (*See* Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 17:17-18:8, 78:18-79:23)  Mr. Mordinson also testified that he showed the pages from the Headend Report to Mr. Tarnovsky in California in August 2001, and that he had never previously provided that or similar information to Mr. Tarnovsky.  (*See* Mordinson Trial Testimony, 4/11/08, Vol. 1 at 26:14-27:1; Vol. 2 at 17:3-8, 21:14-22:11; Vol. 3 at 51:18-52:2.)  Finally, Tarnovsky testified that he did not send the e-mail that comprises Trial Exhibit 2002.  (*See* Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 15:10-16:20.)

1       **PROPOSED FOF 53.**   There are many indications that Tarnovsky

2 posted the EchoStar code contained in the Headend Report on the Internet on behalf

3 of NDS.

4       **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

5 There is no evidence, cited or otherwise, that "Tarnovsky posted the EchoStar code

6 contained in the Headend Report on the Internet on behalf of NDS."  Nor is there

7 any evidence, cited or otherwise, that the any content in the Headend Report ever

8 appeared on the Internet.  Further, the jury's verdict is contrary to this proposed

9 finding of fact because the jury found that NDS was not responsible for posting the

10 Nipper Post or any code intended to harm Plaintiffs..

11

12       **PROPOSED FOF 54.**   For example, "Nipper," a term that

13 Defendants found in the EchoStar code during their hack, was the alias used to post

14 the code on the Internet.  (Mordinson Trial Testimony, 4/11/08, Vol. 2, p. 50:1-6).

15       **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

16 NDS objects to the notion that any involvement by Tarnovsky or NDS in posting

17 "EchoStar code" or anything else is demonstrated by either of both of the facts that

18 (a) "NiPpEr2000" was an alias used by a person to post pirate EEPROM code and

19 (b) the text "Nipper Clauz 00" was included in a posting by XBR21 that contained

20 instructions on how to dump Plaintiffs' ROM3 EEPROM code.  Further, NDS

21 objects to the implication that Defendants had unique knowledge that the term

22 "Nipper" was found in Plaintiffs' ROM3 EEPROM.  To the contrary, the evidence

23 established that anyone looking at that EEPROM would be able to see the term

24 "Nipper."  (*See* Mordinson Trial Testimony, 4/11/08, Vol. 3 at 108:8-20.)   The

25 evidence also established that the term "Nipper" had been published on the Internet

26 by at least October 26, 1998.  (*See* Kummer Trial Testimony, 4/30/08, Vol. 3 at

27 72:16-25; TR EXS 1692, 1694.)  Finally, the jury's verdict is contrary to this

28

1  proposed finding of fact because the jury found that NDS was not responsible for

2  posting the Nipper Post or any code intended to harm Plaintiffs.

3

4      **PROPOSED FOF 55.**   The code was posted on the DR7 website,

5  which belonged to Menard; Menard also worked with Tarnovsky to pirate DirecTV.

6  (Menard Trial Designations, pp. 111:18-24, 127:25-128:08.)

7      **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

8  NDS objects to the notion that, even if these facts had been proven, they would

9  somehow provide evidence that Tarnovsky was responsible for posting "the code"

10  or anything else.  NDS objects to the notion that "Menard also worked with

11  Tarnovsky to pirate DirecTV," because no evidence, cited or otherwise, supports

12  this notion.  Further, the jury's verdict is contrary to this proposed finding of fact

13  because the jury found that NDS was not responsible for posting the Nipper Post or

14  any code intended to harm Plaintiffs..

15

16      **PROPOSED FOF 56.**   Tarnovsky frequently visited DR7 while

17  working for NDS.  (Tarnovsky Trial Testimony 04/23/08, Vol. 2, p. 19:23-20:6;

18  Norris Trial Testimony, 4/16/08, Vol. 4, p. 27:10-14.)

19      **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

20  NDS objects to the notion that, even if it had been proven that Tarnovsky

21  "frequently" visited DR7, that would somehow provide evidence that Tarnovsky

22  was responsible for posting "the code" or anything else.  Further, the jury's verdict

23  is contrary to this notion.

24

25      **PROPOSED FOF 57.**   NDS was aware of Tarnovsky's relationship

26  with Menard when NDS hired Tarnovsky.  (Tarnovsky Trial Testimony 04/23/08,

27  Vol. 4, pp. 16:22-25, 17:1-8 ("Menard was running probably the largest

28  pirate/hacker website for satellite-related pirate activities in the world.").)

NDS'S OBJECTIONS TO PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW
Case No. SA CV 03-950 DOC(JTLx)

1          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

2    NDS objects to the notion that any such awareness would somehow provide

3    evidence that Tarnovsky was responsible for posting "the code" or anything else.

4    Further, the jury's verdict is contrary to this notion.

5

6          **PROPOSED FOF 58.**    In October 2000, Defendants instructed

7    Tarnovsky to get NDS an account on www.pirateden.com. (TR EX 42; Tarnovsky

8    Trial Testimony 04/23/08, Vol. 4, p. 66:10-15.)

9          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

10    NDS objects to the notion that some proof that Tarnovsky or NDS was responsible

11    for posting "the code" or anything else is somehow provided by the fact that NDS's

12    Yoni Shiloh requested that Mr. Tarnovsky send a money order to

13    www.pirateden.com in October 2000 so that Mr. Shiloh could obtain an account

14    under the user name jarjar_banks with an email address of

15    jarjarbanks_manoman@yahoo.com  for the purpose of monitoring Latin American

16    piracy.  (*See* TR EX 42.)  Further, the jury's verdict is contrary to this notion.

17

18          **PROPOSED FOF 59.**    The account was registered using the e-mail

19    address ChrisVon@s4interpass.com. (TR EX 351.)

20          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

21    NDS objects to the notion that the account requested by Mr. Shiloh was "registered

22    using the email address ChrisVon@s4.interpass.com" because no evidence, cited or

23    otherwise, supports that notion.  In fact, the email from Mr. Shiloh requesting a

24    money order for an account on www.piratesden.com was sent two months earlier,

25    requested that the email address "jarjarbanks_manoman@yahoo.com" be used, and

26    requested a user name ("jarjar_banks") that was not associated with the

27    ChrisVon@s4.interpass.com email address.  (*See* TR EX 42.)  NDS further objects

28    to the notion that Tarnovsky or NDS registered any account using the email address

1   ChrisVon@s4.interpass.com because no evidence, cited or otherwise, supports that

2   notion.  To the contrary, Tarnovsky specifically denied that he obtained the Pirate's

3   Den account with the user name "NiPpEr2000" that was associated with the e-mail

4   address ChrisVon@s4.interpass.com and identified in TR EX 351.  (Tarnovsky

5   Trial Testimony, 4/23/08, Vol. 2 at 51:13-17, 62:8-10, 62:24-25.)  NDS also objects

6   to the notion that, even this fact had been proven, that it would somehow provide

7   evidence that Tarnovsky was responsible for posting "the code" or anything else.

8   Further, the jury's verdict is contrary to this proposed finding of fact because the

9   jury found that NDS was not responsible for posting the Nipper Post or any code

10  intended to harm Plaintiffs.

11

12          **PROPOSED FOF 60.**    Tarnovsky used the alias "Von" to post

13  information on Menard's website DR7. (Tarnovsky Trial Testimony 04/23/08,

14  Vol. 2, p. 20:18-23.)

15          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

16  NDS objects to the notion that the fact that Tarnovsky "believed" he used the alias

17  Von to post information on Menard's website DR7 somehow provides evidence

18  that Tarnovsky was responsible for posting "the code" or anything else.  Further,

19  the jury's verdict is contrary to this notion.

20

21          **PROPOSED FOF 61.**    The screen name used for this account was

22  "NiPpEr2000." (TR EX 351; TR EX 354; TR EX 39.)

23          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

24  NDS objects to the notion that the account requested by Mr. Shiloh used a screen

25  name of "NiPpEr2000" because no evidence cited or otherwise, supports that

26  notion.  In fact, the email from Mr. Shiloh requesting a money order for an account

27  on www.piratesden.com was sent two months earlier, requested that a different

28  email address be used, and requested that a user name be used that was different

1   from that associated with the ChrisVon@s4.interpass.com email address.  (*See*

2   TR EX 42.)  NDS further objects to the notion that Tarnovsky or NDS registered

3   any account using the screen name "NiPpEr2000" because no evidence, cited or

4   otherwise, supports that notion.  To the contrary, Tarnovsky specifically denied that

5   he obtained the Pirate's Den account with the user name "NiPpEr2000" that was

6   associated with the e-mail address ChrisVon@s4.interpass.com and identified in

7   TR EX 351.  (*See* Tarnovsky Trial Testimony, 4/23/08, Vol. 2 at 51:13-17, 62:8-10,

8   62:24-25.)  NDS also objects to the notion that, even if this notion had been proven,

9   that it would somehow provide evidence that Tarnovsky was responsible for

10  posting "the code" or anything else.  NDS further objects to Plaintiffs' citation to

11  exhibits—TR EX 351 and TR EX 354—that were not admitted into evidence.

12  Finally,  the jury's verdict is contrary to this proposed finding of fact because the

13  jury found that NDS was not responsible for posting the Nipper Post or any code

14  intended to harm Plaintiffs.

15

16          **PROPOSED FOF 62.**    Tarnovsky has been linked to the alias

17  "Nipper" through an Internet Crimes Group ("ICG") report. Tarnovsky used aliases

18  "Von" "biggun," "BG," "shrimp," "Geo," "Geoll," "ChristoGeo," "Chris Berry,"

19  "Chris Geo," and "Arthur Von Neuman," all of which are listed on the ICG Report.

20  (Norris Trial Testimony, 4/17/08, Vol. 2, pp. 77:2-8, 78:3-12; Tarnovsky Trial

21  Testimony 04/23/08, Vol. 2, p. 56:14-58:7; Vol. 4, p. 36:8-10; TR EX 27 (ICG

22  Report); *see also* TR EX 351; Menard Trial Designations, p. 62:11-15; TR EX 39

23  (Investigative Report); Ereiser Trial Testimony, 4/22/08, Vol. 2, pp. 58:5-13, 53:22-

24  54:20).)

25          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

26  NDS objects to the notion that any "link" stated in the ICG report established that

27  Mr. Tarnovsky used "Nipper" or any other alias, because no evidence, cited or

28  otherwise, supports that notion.  To the contrary, ICG testimony established that

1  they used the term "link" to signify an investigative lead and not to signify proof.

2  (*See* Bedser Trial Testimony, 4/24/08, Vol. 2 at 11:16-13:2.)  ICG's Mr. Bedser

3  further testified that the postings that were the basis of the supposed link between

4  Mr. Tarnovsky and "Nipper" all originated with paid EchoStar informants: Charles

5  Perlman, Dean Love, and Reggie Scullion.  (*Id.* at 17:3-19:2, 41:21-46:9.)  Nor

6  does the ICG report provide any other evidence.  Furthermore, Mr. Tarnovsky

7  denied using the aliases "Nipper," "Nipper2000," and "NipperClauz."  (*See*

8  Tarnovsky Trial Testimony, 4/23/08, Vol. 2 at 49:8-21, 68:21-25; Vol. 4 at 22:20-

9  22.)

10        NDS also objects to the assertion that Mr. Tarnovsky used the alias

11  "Geo."  There is no evidence that Mr. Tarnovsky used that alias, and the ICG report

12  states that "this alias may be used by Steven Lamothe" and that "we have been

13  unable to determine whether Christopher Tarnovsky has previously used, or is

14  currently using [the e-mail address geo@hotmail.com] as an alias to post on the

15  message boards." (TR EX 27-01, -02.)  Mr. Tarnovsky also denied using the alias

16  "Chris Geo." (*See* Tarnovsky Trial Transcript 4/23/08, Vol. 2 at 60:23-25.)

17        NDS also objects to the claim that, even if any of these notions had

18  been proven, that they would somehow provide evidence that Tarnovsky was

19  responsible for posting "the code" or anything else.  NDS further objects to

20  Plaintiffs' citation to an exhibit—TR EX 351—that was not admitted into evidence.

21  Finally,  the jury's verdict is contrary to this proposed finding of fact because the

22  jury found that NDS was not responsible for posting the Nipper Post or any code

23  intended to harm Plaintiffs.

24

25        **PROPOSED FOF 63.**    The <u>only</u> name Tarnovsky did not admit to in

26  the ICG report is "Nipper." (Tarnovsky Trial Transcript 04/23/08, Vol. 2, p. 59:8-

27  22.)

28        **NDS RESPONSE:**  NDS objects to this proposed finding of fact.  In

1   addition to denying use of the alias "Nipper" or variations thereof, Mr. Tarnovsky

2   also denied using the alias "Chris Geo." (*See* Tarnovsky Trial Testimony, 4/23/08,

3   Vol. 2 at 60:23-25.)  Nor did Mr. Tarnovsky admit to using the alias "Geo."

4          NDS also objects to the notion that, even if any of these notions had

5   been proven, that they would somehow provide evidence that Tarnovsky was

6   responsible for posting "the code" or anything else.  Finally,  the jury's verdict is

7   contrary to this proposed finding of fact because the jury found that NDS was not

8   responsible for posting the Nipper Post or any code intended to harm Plaintiffs..

9

10         **PROPOSED FOF 64.**   Tarnovsky admitted that the other

11   information on the ICG report is substantially correct, however. (Id., p. 59:23-

12   63:17; TR EX 27 (ICG Report).)

13         **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

14   NDS objects to the notion that Tarnovsky admitted that "the other information on

15   the ICG report is substantially correct" because the evidence, cited or otherwise,

16   does not support this notion.  Mr. Tarnovsky was not questioned about "the other"

17   or "all other" information in the report, he denied using the alias "Chris Geo," and

18   he testified that the chart or form in the ICG report was "totally wrong on a lot of

19   things."  (Tarnovsky Trial Testimony, 4/23/08, Vol. 2 at 60:3-4, 60:23-25.)

20   NDS also objects to the notion that, even if this notion had been proven, that it

21   would somehow provide evidence that Tarnovsky was responsible for posting

22   "the code" or anything else.  Finally,  the jury's verdict is contrary to this proposed

23   finding of fact because the jury found that NDS was not responsible for posting the

24   Nipper Post or any code intended to harm Plaintiffs.

25

26         **PROPOSED FOF 65.**   Moreover, the fundamental components and

27   methodologies of NDS's hack (contained in the Headend Report) and the hack

28

1  posted by "Nipper" on DR7 (the "Nipper Post") are materially identical. (Avi Rubin

2  Trial Testimony, 4/16/08, Vol. 3, p. 43:15-18.)

3          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

4  NDS objects that there is no evidence that "Nipper" posted any hack on DR7.com,

5  whether cited or otherwise.  Instead, the December 2000 post on DR7.com of a

6  method to access the EchoStar ROM3 smart cards was made by Marco Pizzo using

7  the alias "xbr21" and code that he found on the Interesting Devices website.

8  (*See* Pizzo Trial Testimony, 4/24/08, Vol. 1 at 56:18-60:25; TR EX 511A.)

9  NDS further objects to the notion that either the "fundamental components" or

10  "methodology" of anything in the Headend Report is "materially identical" to the

11  hack posted by Pizzo on DR7.com or to any other hack posted on the Internet.

12  To the contrary, and as explained during the unrebutted testimony of Defendants'

13  expert Nigel Jones, the two methodologies differ in many significant ways, and the

14  Headend Report was not the source of the code posted by Nipper.  (*See* Jones Trial

15  Testimony, 4/29/08, Vol. 2 at 21:6-30:22.)  NDS also objects to the claim that, even

16  if any of these notions had been proven, that it would somehow provide evidence

17  that Tarnovsky was responsible for posting "the code" or anything else.  Finally,

18  the jury's verdict is contrary to this proposed finding of fact because the jury found

19  that NDS was not responsible for posting the Nipper Post or any code intended to

20  harm Plaintiffs.

21

22          **PROPOSED FOF 66.**    Both NDS's hack and the Nipper Post

23  contain the same fundamental four fundamental components:

24              •      they exploit a buffer overflow in the same way;

25              •      they rely on the RAM ghosting or memory aliasing property

26  unknown to the general public;

27              •      they rely on and demonstrate a complete understanding of the

28  operation of the index variable; and

1   •   they use an incorrect checksum which causes a jump to the end

2 of the stack, where the shell code is located.

3     (Avi Rubin Trial Testimony, 4/16/08, Vol. 3, p. 29:9-30:4; Mordinson

4 Trial Testimony, 4/11/08, Vol. 2, p. 48:29-49:4-5.)

5     **NDS RESPONSE:** NDS objects to this proposed finding of fact.

6 NDS objects to the notion that because the methodology described in the Headend

7 Report and the code found in the Nipper Post contain the same allegedly

8 "fundamental components," the Headend Report and the Nipper Post are somehow

9 related and not independently developed. As explained during the unrebutted

10 testimony of Nigel Jones, any buffer overflow attack on a ROM3 CAM would

11 necessarily employ memory aliasing, modification of the index variable, and use of

12 an incorrect checksum (*i.e.*, exception handling). (*See* Jones Trial Testimony,

13 4/29/08, Vol. 2 at 37:10-48:18.) As also explained during the unrebutted testimony

14 of Defendants' expert Nigel Jones, the two methodologies differ in many

15 significant ways, and the Headend Report was not the source of the code posted by

16 Nipper. (*Id*. at 21:6-30:22.) NDS also objects to the notion that, even if any of

17 these notions had been proven, that it would somehow provide evidence that

18 Tarnovsky was responsible for posting "the code" or anything else. Finally, the

19 jury's verdict is contrary to this proposed finding of fact because the jury found that

20 NDS was not responsible for posting the Nipper Post or any code intended to harm

21 Plaintiffs.

22

23     **PROPOSED FOF 67.** The Nipper Post could not have been done

24 without access to the Headend Report; while buffer overflow attacks are common,

25 the method used in the Headend Report and the Nipper Post is complicated and

26 relies on things that were not commonly known. (*Id*. p. 40:13-14; Vol. 4, p. 8:3-18.)

27     **NDS RESPONSE:** NDS objects to this proposed finding of fact.

28 The notion that the "Nipper Post could not have been done without access to the

1  Headend Report" is not supported by the evidence.  Instead, as explained during the

2  unrebutted testimony of Nigel Jones, the Headend Report was not the source of the

3  Nipper Post and the code in that post was developed independently.  (*See* Jones

4  Trial Testimony, 4/29/08, Vol. 2 at 30:15-22.)  The methods used by the Headend

5  Report and the Nipper Post are, moreover, quite common.  (*Id*. at 40:6-10 (memory

6  aliasing "almost standard"); *id*. at 45:15-16 (use of index variables "very standard

7  procedure").)  Finally,  the jury's verdict is contrary to this proposed finding of fact

8  because the jury found that NDS was not responsible for posting the Nipper Post or

9  any code intended to harm Plaintiffs.

10

11          **PROPOSED FOF 68.**    Additionally, Marco Pizzo ("Pizzo"), who

12  used the alias "xbr21," saw the full EchoStar code posted on a U.K. website on

13  December 23, 2000.  Pizzo cut and pasted the code to DR7 a few hours later; and

14  was certain no one could have posted the EchoStar code to DR7 before he did.

15  (Pizzo Trial Testimony 04/24/08, Vol. 1, pp. 56:18-57:1, 58:15-59:9, 72:15-20,

16  75:4-12; TR EX 511A (xbr21 reposting on dr7.com).)

17          **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

18  NDS objects to the assertion that Pizzo "saw the full EchoStar code posted on a

19  U.K. website on December 23, 2000."  The information discovered by Mr. Pizzo on

20  a U.K. website consisted of instructions and code to dump the EEPROM contents

21  from an EchoStar ROM3 CAM, not the "full EchoStar code" or any EchoStar code

22  at all.  NDS also objects that Mr. Pizzo was not a administrator of DR7 and, as

23  such, could not know whether the same information had been posted on and then

24  removed from DR7 prior to Mr. Pizzo's search of DR7.  NDS further objects to the

25  assertion that any of these supposed facts would provide proof that Mr. Tarnovsky

26  or NDS was somehow responsible for posting "the code," "the full EchoStar code,"

27  the "Nipper Post," or anything else.  Finally, the jury's verdict is contrary to this

28

1  proposed finding of fact because the jury found that NDS was not responsible for

2  posting the Nipper Post or any code intended to harm Plaintiffs.

3

4        **PROPOSED FOF 69.**   Yet, Tarnovsky reported the posting of the

5  EchoStar code on the Internet to Defendants on December 22, 2000 when he sent

6  an e-mail to NDS employees entitled "Cat's Out of the Bag" (referring to the post

7  of Plaintiffs' code on DR7 – a day before Pizzo first saw the code on the Internet).

8  (TR EX 113; Tarnovsky Trial Testimony 04/23/08, Vol. 4, p. 27:21-25.)

9  Tarnovsky simply could not have known about the DR7 posting on December 22

10  (which was no longer posted by December 23) unless he had posted the code

11  himself.

12        **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

13  NDS objects to the assertion that because Christopher Tarnovsky sent an e-mail to

14  NDS employees on the night of December 22 that referred to a post on DR7.com—

15  a post that did not, moreover, consist of Plaintiffs' code—he must have made that

16  post.  On its face, the email is inconsistent with the notion that Tarnovsky posted

17  the code; instead, it states that he "saw" the code on DR7.com and Interesting

18  Devices.  (TR EX 113.)  NDS also objects to the assertion that the DR7 posting

19  "was no longer posted by December 23."  The code identified in Trial Exhibit 511A

20  appeared on December 23, 2000, so it was indeed still posted on that date.  NDS

21  further objects to the assertion that any of these supposed facts would provide proof

22  that Mr. Tarnovsky or NDS was somehow responsible for posting "the code," "the

23  full EchoStar code," the "Nipper Post," or anything else.  Finally, the jury's verdict

24  is contrary to this proposed finding of fact because the jury found that NDS was not

25  responsible for posting the Nipper Post or any code intended to harm Plaintiffs.

26

27        **PROPOSED FOF 70.**   Finally, and poignantly, NDS was

28  responsible for hacking the CAS of Canal+, which was substantially similar to the

1    EchoStar hack and which also was posted on the Internet.  (Saggiori Trial

2    Testimony, 4/16/08, Vol. 2, p. 50:25-52:15; Mordinson Trial Testimony 04/11/08,

3    Vol. 1, p. 35:25-36:14; Shkedy Trial Testimony 04/10/08, Vol. 2, p. 49:11-18.)

4            **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

5    NDS objects to the notions that it "was responsible for hacking the CAS of

6    Canal+," that some Canal+ hack "was substantially similar to the EchoStar hack,"

7    and that some Canal+ hack "was posted on the Internet," because there is no

8    evidence, whether cited or otherwise, supporting any of those notions.  Finally, the

9    jury's verdict is contrary to this proposed finding of fact because the jury found that

10   NDS was not responsible for posting the Nipper Post or any code intended to harm

11   Plaintiffs.

12

13           **PROPOSED FOF 71.**    At the time of the Nipper Post, Tarnovsky's

14   salary was not paid by his employer NDS Americas; rather, it was paid by a related

15   entity, HarperCollins.  (Abe Peled Trial Testimony 05/6/08, Vol. 2, p. 104:1-3.)

16           **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

17   NDS objects to the implication that because Tarnovsky's salary was paid by

18   HarperCollins and not by NDS Americas, that this somehow supports the notion

19   that he was responsible for the Nipper Post or any other posting.  Finally, the jury's

20   verdict is contrary to this notion because the jury found that NDS was not

21   responsible for posting the Nipper Post or any code intended to harm Plaintiffs.

22

23           **PROPOSED FOF 72.**    Also, at the end of 2006, Mr. Tarnovsky

24   received a $5,000 bonus from NDS Israel (also not Tarnovsky's employer)—home

25   to the Haifa Research Center from which the EchoStar hack originated.  (*Id*.,

26   p. 104:4-9.)

27           **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

28   NDS objects to the implication that because Tarnovsky received a bonus from NDS

- 46 -

1  Israel, that this somehow supports the notion that he was responsible for the Nipper

2  Post or any other posting.  Finally, the jury's verdict is contrary to this notion

3  because the jury found that NDS was not responsible for posting the Nipper Post or

4  any code intended to harm Plaintiffs.

5

6     **PROPOSED FOF 73.** Defendants' hack methodology and the

7  identified vulnerability, which was published on the Internet in December 2000,

8  was effective as to all EchoStar ROM3 access cards and allowed pirates (and

9  others) to make their own pirated ROM3 cards.  (Nicolas Trial Testimony, 4/15/08,

10  Vol. 1, p. 42:7-21.)

11     **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

12  There is no evidence, cited or otherwise, that any "methodology" or "identified

13  vulnerability" described or developed by Defendants was published on the Internet.

14  NDS further objects that the information in the "Nipper Post" was only effective as

15  to EchoStar ROM3 access cards until February 2001 when plaintiffs patched those

16  cards.  (*See* Nicolas Trial Testimony, 4/15/08, Vol. 1 at 70:13-17; Nicolas Trial

17  Testimony, 4/15/08, Vol. 3 at 65:18-66:9; Jones Trial Testimony, 4/29/08, Vol. 2 at

18  16:1-17; H. Kudelski Trial Testimony, 4/25/08, Vol. 3 at 40:2-8.)  Finally, the

19  jury's verdict is contrary to this proposed finding of fact because the jury found that

20  NDS was not responsible for posting the Nipper Post or any code intended to harm

21  Plaintiffs.

22

23     **PROPOSED FOF 74.** These pirated ROM3 cards then could be

24  used to circumvent Plaintiffs' security system and steal EchoStar's copyrighted

25  programming. (*Id.* pp. 23:6-18, 23:19-24:1, 42:7-16.)

26     **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

27  NDS objects to the implication that "these pirated ROM3 cards" were somehow

28  connected to NDS, because no evidence—whether cited or otherwise—supports

- 47 -

1   this notion.  NDS further objects that the information in the "Nipper Post" was only

2   effective as to EchoStar ROM3 access cards until February 2001 when plaintiffs

3   patched those cards.  (*See* Nicolas Trial Testimony, 4/15/08, Vol. 1 at 70:14-17;

4   Nicolas Trial Testimony, 4/15/08, Vol. 3 at 65:18-66:9; Jones Trial Testimony,

5   4/29/08, Vol. 2 at 16:1-17; H. Kudelski Trial Testimony, 4/25/08, Vol. 3 at 40:2-8.)

6   Finally, the jury's verdict is contrary to this proposed finding of fact because the

7   jury found that NDS was not responsible for posting the Nipper Post or any code

8   intended to harm Plaintiffs.

9

10      **PROPOSED FOF 75.**   Immediately following the December 2000

11   postings, NagraCard's Senior Vice President and Chief Technology Officer,

12   Christophe Nicolas, led the team that developed software updates (patches) and a

13   February 2001 electronic countermeasure ("ECM") designed to combat the piracy.

14   (*Id.*, p. 68:21-71:15.)

15      **NDS RESPONSE:**  No objection.

16

17      **PROPOSED FOF 76.**   Combating the piracy was not a simple

18   matter, because any change to the code could seriously slow the operation of the

19   card and thus increase the wait time of the customer using an EchoStar receiver.

20   (Avi Rubin Trial Testimony 4/16/08, Vol. 3, p. 127:1-129:8.)

21      **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

22   The testimony of Nigel Jones established that the change to the code did not

23   "seriously slow the operation of the card" or "increase the wait time of the customer

24   using an EchoStar receiver."  (*See* Jones Trial Testimony, 4/29/08, Vol. 3 at 29:16-

25   30:14.)

26

27

28

- 48 -

1    **PROPOSED FOF 77.**   This is illustrated by the fact that when

2    Nagra issued a patch or ECM in February 2001, the programming had to be

3    completely restructured.  (*Id.*, p. 127:1-129:8.)

4    **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

5    "This" was not "illustrated" because the testimony of Nigel Jones established that

6    the change to the code did not "seriously slow the operation of the card" or

7    "increase the wait time of the customer using an EchoStar receiver."  (*See* Jones

8    Trial Testimony, 4/29/08, Vol. 3 at 29:16-30:14.)

9

10    **PROPOSED FOF 78.**   The ECM launched in February 2001 was

11    designed to disable pirate access cards that had been reprogrammed using

12    Defendants' hack methodology published on the Internet. (Nicolas Trial Testimony

13    04/15/08, Vol. 1, p. 70:14-71:15.)

14    **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

15    NDS further objects to the notion that any "hack methodology" described or

16    developed by Defendants was published on the Internet, because no evidence, cited

17    or otherwise, supports that notion.  Further, the jury's verdict is contrary to this

18    proposed finding of fact because the jury found that NDS was not responsible for

19    posting the Nipper Post or any code intended to harm Plaintiffs.

20

21    **PROPOSED FOF 79.**   But the patch was not completely effective,

22    because pirates could circumvent it with a blocker or by "glitching."  (Avi Rubin

23    Trial Testimony, 4/16/08, Vol. 3, p. 134:2-16; Vol. 4, p. 4:7-9; Nicolas Trial

24    Testimony 04/15/08, Vol. 1, p. 71:16-72:5; Tarnovsky Trial Testimony 04/23/08,

25    Vol. 4, pp. 54:22-25, 55:7-10 (pirates used blockers to block the ECMs and

26    glitching to "bounce over" them).)

27    **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

28    Nigel Jones testified that patch was completely effective in preventing buffer

- 49 -

1  overflow attacks, (*see* Jones Trial Testimony, 4/29/08 Vol. 3 at 54:11-56:18), and

2  Avi Rubin testified that he had no reason to disagree with Mr. Jones' opinion that

3  the patch effectively precluded buffer overflow attacks  (*see* Avi Rubin Trial

4  Testimony, 4/16/08, Vol. 3 at 94:11-15).

5

6         **PROPOSED FOF 80.**   Nonetheless, Plaintiffs continued to try to

7  combat piracy.  Eventually, however, a global card swap of all DNASP-II access

8  cards with a different encryption platform became necessary even though Plaintiffs

9  did everything to avoid a card swap.  (Nicolas Trial Testimony 04/15/08, Vol. 1,

10 p. 72:6-73:6; *see also* Tarnovsky Trial Testimony 04/23/08, Vol. 3, p. 35:18-36:1;

11 TR EX 41.)

12        **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

13 None of the evidence, cited or otherwise, establishes that Plaintiffs "did everything

14 to avoid a card swap."  NDS further objects to the implication that the Nipper Post

15 made a card swap necessary.  The unrebutted testimony of Nigel Jones establishes

16 that the Nipper Post did not necessitate the card swap.  (*See* Jones Trial Testimony,

17 4/29/08, Vol. 3 at 57:5-18.)  Furthermore, EchoStar's David Kummer testified that

18 EchoStar did not decide to undertake the card swap until free-to-air piracy became

19 popular.  (*See* Kummer Trial Testimony, 4/30/08, Vol. 3 at 82:18-25, 86:18-25.)

20        To the extent this proposed finding of fact purports to tie the card swap

21 to Tarnovsky or NDS, it is contrary to the jury's verdict because the jury found that

22 NDS was not responsible for posting the Nipper Post or any code intended to harm

23 Plaintiffs.

24

25        **PROPOSED FOF 81.**   The global card swap began in 2002 and

26 ended in 2005. (Nicolas Trial Testimony 04/15/08, Vol. 1, p. 72:6-72:23; Vol. 2, p.

27 77:2-8; *see also* Tarnovsky Trial Testimony 04/23/08, Vol. 3, p. 35:18-36:1; TR EX

28 41.)

1    **NDS RESPONSE:**  To the extent this proposed finding of fact

2    purports to tie the card swap to Tarnovsky or NDS, NDS objects that it is contrary

3    to the jury's verdict because the jury found that NDS was not responsible for

4    posting the Nipper Post or any code intended to harm Plaintiffs.

5

6    **PROPOSED FOF 82.**    The cost to EchoStar of the global card swap

7    were almost $94,638,625.10. (Lenoir Trial Testimony 04/10/08, Vol. 1, p. 64:11-

8    16; Orban Trial Testimony 04/17/08, Vol. 4, p. 8:7-13:2.)  Thus, the value to

9    EchoStar of a secure card is approximately $94,638,625.10.

10   **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

11   NDS objects that the valuation of the cost to EchoStar of the global card swap was

12   entirely speculative.  (*See* TR EX 1585A; Orban Trial Testimony, 4/17/08, Vol. 4

13   at 22:9-24:4; Orban Trial Testimony, 4/18/08, Vol. 1 at 19:11-21:7.)  NDS further

14   objects to the assertion that "value to EchoStar of a secure card is approximately

15   $94,638,625.10" because there is no evidence, cited or otherwise, regarding the

16   "value of a secure card."   In addition, EchoStar knew prior to the Nipper Post that a

17   swap of the smart cards was "inevitable" and only "a matter of timing."  (Kummer

18   Trial Testimony, 4/30/08, Vol. 4 at 23:9-14.)  To the extent this proposed finding of

19   fact purports to tie the card swap to Tarnovsky or NDS, moreover, it is contrary to

20   the jury's verdict because the jury found that NDS was not responsible for posting

21   the Nipper Post or any code intended to harm Plaintiffs.

22

23   **PROPOSED FOF 83.**    The global card swap cost NagraStar

24   approximately $1.3 million. (Lenoir Trial Testimony 04/10/08, Vol. 1, p. 64:11-16.)

25   **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

26   NDS objects that the valuation of the cost to NagraStar of the global card swap was

27   entirely speculative.  In fact, Mr. Lenoir could not explain the basis for the $1.3

28   million claim—only that people in his organization somehow arrived at that

- 51 -

1  figure—and he was not employed at NagraStar during the card swap.  (*See* Lenoir

2  Trial Testimony, 4/10/08, Vol. 1 at 52:11-12, 64:11-20.)  In addition, EchoStar

3  knew prior to the Nipper Post that a swap of the smart cards was "inevitable" and

4  only "a matter of timing."  (Kummer Trial Testimony, 4/30/08, Vol. 4 at 23:9-14.)

5  To the extent this proposed finding of fact purports to tie the card swap to

6  Tarnovsky or NDS, moreover, it is contrary to the jury's verdict because the jury

7  found that NDS was not responsible for posting the Nipper Post or any code

8  intended to harm Plaintiffs.

9

10         **PROPOSED FOF 84.**    NagraStar also suffered damages to its

11  reputation and to its goodwill with customers. (Lenoir Trial Testimony 04/10/08,

12  Vol. 1, p. 64:21-65:8.)

13         **NDS RESPONSE:**  NDS objects to this proposed finding of fact.

14  NDS further objects that Mr. Lenoir did not work for NagraStar until March 2007

15  (Lenoir Trial Testimony, 4/10/08, Vol. 1 at 52:11-12) and, as such, did not have

16  foundational knowledge to testify to any alleged reputational damage or loss of

17  goodwill suffered by NagraStar.  In addition, EchoStar knew prior to the Nipper

18  Post that a swap of the smart cards was "inevitable" and only "a matter of timing."

19  (Kummer Trial Testimony, 4/30/08, Vol. 4 at 23:9-14.)  To the extent this proposed

20  finding of fact purports to tie purported damages to Tarnovsky or NDS, moreover,

21  it is contrary to the jury's verdict because the jury found that NDS was not

22  responsible for posting the Nipper Post or any code intended to harm Plaintiffs.

23

24         **PROPOSED FOF 85.**    The costs of piracy are ultimately borne by

25  the consumer; if piracy is significant, it results in an increase in security costs,

26  which are then passed on to the consumer through increases in pricing.  (Peled Trial

27  Testimony, 5/6/08, Vol. 2, pp. 117:9-21, 118:9-13.)

28

**NDS RESPONSE:**  NDS objects to this proposed finding of fact. The cited evidence establishes that the costs of a conditional access system comprise only 1.0-1.5% of a pay television operators revenue; accordingly, an increase in CAS costs of 10% would, if passed entirely to the customer, result in a mere 0.10-0.15% price increase.  There was, moreover, no evidence—whether cited or otherwise—that Plaintiffs ever actually passed on piracy costs to their consumers.  To the extent this proposed finding of fact purports to tie costs of piracy to Tarnovsky or NDS, moreover, it is contrary to the jury's verdict because the jury found that NDS was not responsible for posting the Nipper Post or any code intended to harm Plaintiffs.

## III.   ARGUMENT AND OBJECTIONS TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

Plaintiffs cannot establish that NDS is liable under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL").  To begin with, their proposed conclusions of law would violate the Seventh Amendment's proscription against re-examining evidence submitted to a jury.  Also, Plaintiffs did not suffer the loss of money or property required by the statute.  The only act the jury found NDS to have committed—the P1 Test, a one-time decryption test of Plaintiffs' broadcast using a single DirecTV smart card—did not deprive Plaintiffs of money or property in their possession.  In addition, the P1 Test was not an "unfair" business act and practice.

Even assuming *arguendo* that NDS were liable under the UCL, Plaintiffs would not be entitled to any remedies because the Court previously ruled that Plaintiffs' restitution claim should be stricken as contrary to California law and no evidence establishes a reasonable probability of recurrence of the sole act that the jury found to violate any law.  Moreover, the equitable defense of unclean hands precludes any remedy for Plaintiffs.

For these reasons, Plaintiffs' proposed conclusions of law ("COL") regarding the UCL should be rejected as unsupported and contrary to the law, the binding findings of the jury, and the Court's prior order striking the restitution claim.

### A.   Plaintiffs' Proposed Conclusions Of Law Conflict With The Jury Verdict And Thus Violate The Seventh Amendment.

Plaintiffs' proposed conclusions of law rely heavily on evidence related to the claims that the jury rejected, and the requested relief of more than $94 million under the UCL improperly depends on alleged misconduct the jury concluded did not occur.  Under the Seventh Amendment, Plaintiffs cannot obtain

from the Court recovery for the allegations that the jury already has rejected. "[I]n a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'"  *Gates*, 995 F.2d at 1473 (reversing district court ruling on equitable claims because they were contrary to jury's findings of facts as inferred from damages award).

   As a threshold matter, therefore, Plaintiffs can seek **at most** liability and a remedy, under the unlawful and unfair prongs of the UCL,[2] for the P1 Test found by the jury to violate the Communications Act and the California Penal Code ("CPC").  Plaintiffs' broad claim related to NDS's alleged fostering of piracy, and the alleged resulting harm, cannot form the basis for the UCL claim.  Equally important, any remedy under the UCL cannot be based on compensation for the $94 million in losses or an injunction to prevent conduct the jury found NDS had not engaged in.

## B.   Plaintiffs' Lack Of Standing Defeats Their UCL Claim.

   The UCL requires that Plaintiffs have "suffered injury in fact and ha[ve] lost money or property as a result of" the UCL violations.  Cal. Bus. & Prof. Code § 17204.  Plaintiffs' UCL claim fails in its entirety because they cannot establish the required loss of money or property.  This is true with respect not only to the 24 causes of action as to which NDS prevailed[3], but also to the P1 Test underlying the three claims as to which the jury found a single technical violation. For the CPC § 593e(b) claim, the jury expressly found no damage, Verdict Form (Docket No. 1109) at 5, and *a fortiori* no loss of money or property.  Even with

---

[2]   Plaintiffs did not assert any UCL claim under the "deceptive" prong of the UCL.
[3]   Plaintiffs alleged 28 separate causes of action against NDS and other defendants.  Not including the UCL claim being resolved here, Plaintiffs presented six claims at trial (receiving verdicts of liability on three) and 21 claims were dismissed by the Court or abandoned by Plaintiffs before trial.

1    respect to the Communications Act or CPC § 593d(a) claims, Plaintiffs have no

2    evidence of a loss of money or property, even assuming they can satisfy the injury-

3    in-fact requirement by relying on a damage award of $45.69.  *See Daro v. Superior*

4    *Court*, 151 Cal. App. 4th 1079, 1098 (2007) ("[T]o have standing to sue under

5    section 17204, it is not enough for a private person to have suffered an injury in

6    fact"; one must establish both injury in fact and a loss of money or property).

7            The meaning of the language requiring "loss of money or property"

8    under Section 17204 is well-established under the UCL because it is similar to

9    language used to address restitution under Section 17203 which limits restitution to

10   money or property that a defendant took from a plaintiff's possession.  *See Korea*

11   *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149-50 (2003); *infra* at

12   63.  As at least one federal court has recognized, "the 'loss of money or property'

13   required for UCL standing should be construed identically to the 'lost money or

14   property' California courts require for section 17203 purposes."  *Walker v. USAA*

15   *Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D. Cal. 2007).  Accordingly, under

16   Proposition 64, to bring a UCL claim a plaintiff must now also allege a valid claim

17   to restitution.  *See id.*

18           The evidence in this case shows that NDS did not obtain money or

19   property from Plaintiffs.  *Infra* at 63-64.  The Court recognized this fact when it

20   previously struck the UCL restitution claim in this case.  *See* Order Granting in Part

21   and Denying NDS' Motion to Strike Portions of the Fourth Amended Complaint

22   dated 7/26/05 (Docket No. 254) (the "7/26/05 Order") at 3.  Thus, Plaintiffs lack

23   standing under the UCL.

24           Because standing is a required element for any UCL claim, the Court

25   should therefore reject the following conclusions of law proposed by Plaintiffs:

26           **PROPOSED COL 2.**    Because a violation of any *one* of these

27   statutes is a *per se* violation of § 17200, NDS have engaged in an unlawful business

28   practice in violation of § 17200.

**PROPOSED COL 3.**     By developing a hack methodology and sharing with known satellite pirates this methodology, which was published online to the general public, all for the purpose of gaining an unfair competitive advantage, NDS engaged in an unfair business practice in violation of § 17200.

## C.     <u>NDS Did Not Engage In Unfair Business Practices.</u>

Plaintiffs cannot satisfy the standard they admit controls the liability question under the "unfair" prong of the UCL.  In a case between competitors alleging a violation of the "unfair" prong of the UCL, Plaintiffs must show that NDS's business act or practice (1) threatens an incipient violation of an antitrust law; (2) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law; or (3) otherwise significantly threatens or harms competition.  *Cel-Tech*, 20 Cal. 4th at 186-87.

Consistent with this, two of the three cases Plaintiffs cite as examples dealt primarily with threatened antitrust violations.  *Id.* at 188-91 (finding that allegations that duopolist's practice of selling bundled equipment at below market prices may realize anti-competitive concerns identified by California Public Utilities Commission); *MGA Entm't, Inc. v. Mattel, Inc.*, No. CV 05-2727 NM (RNBx), 2005 WL 5894689, at *8 (C.D. Cal. Aug. 26, 2005) (court cited eleven antitrust cases enjoining conduct similar to defendant's behavior).  And the third case Plaintiffs cite expressly recognizes that the reference to competitive harm in *Cel-Tech* requires that Plaintiffs demonstrate that NDS's actions ***harmed consumers***, not just Plaintiffs.  *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, No. C-07-0635 JCS, 2007 WL 1455903, at *6 (N.D. Cal. May 16, 2007).

Plaintiffs make no attempt to establish that NDS's business practices violated the antitrust laws or the spirit of those laws.  Likewise, they present no evidence of harm to competition for the alleged conduct.  Here, the jury found only that NDS engaged in a single act of testing.  Plaintiffs presented no evidence that the P1 Test even affected the security of their CAS, let alone compromised it.

1   Plaintiffs also presented no evidence that the P1 Test was linked in any fashion to

2   their swap from the DNASP-II system to the Aladdin system.  Plaintiffs thus have

3   not established any harm to themselves as a result of the P1 Test.  In fact, the

4   evidence is to the contrary, as Plaintiffs experienced a $1.25 billion increase in

5   revenue for fiscal year 2001 and their ARPU continually increased as well.  *See*

6   Ergen Trial Testimony, 4/9/08, Vol. 5 at 71:9-72:25; Trial Exhibit 406 at 406-01,

7   02.

8          More fundamentally, no evidence indicated that the P1 Test could

9   somehow harm consumers.  Plaintiffs had multiple witnesses on the stand who

10  testified as to their business models and economics.  None of these witnesses

11  testified that Plaintiffs had to raise the price for Dish Network subscriptions as a

12  result of the P1 Test or that they reduced their supply of subscriptions because of

13  the test.  Nor did any of these witnesses testify that Plaintiffs had to raise

14  subscription prices as a result of piracy in general, let alone any conduct the jury

15  found NDS engaged in.

16         Instead, Plaintiffs limit themselves to an unverified assertion that the

17  costs of piracy eventually get passed to the consumer, notwithstanding the fact that

18  the jury found that NDS did not engage in or facilitate any piracy.  Without any

19  evidence of harm to consumers, Plaintiffs fail to establish that NDS violated the

20  "unfair" prong of the UCL.  *See also Belton v. Comcast Cable Holdings, LLC*,

21  151 Cal. App. 4th 1224, 1239-40 (2007) (affirming summary adjudication for

22  defendant under unfair prong because plaintiff could not show how tying

23  arrangement by itself harmed consumers); *RLH Indus., Inc. v. SBC Commc'ns, Inc.*,

24  133 Cal. App. 4th 1277, 1286 (2005) (affirming summary judgment on "unfair"

25  prong due to absence of evidence that defendant's business practices had any

26  adverse effect on customers); *Buller v. Sutter Health*, 160 Cal. App. 4th 981, 991-

27  92 (2008) (affirming demurrer due to plaintiffs' failure to allege harm to

28  competition).

NDS'S OBJECTIONS TO PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW
Case No. SA CV 03-950 DOC(JTLx)

1        In addition, the fact that Plaintiffs similarly intercepted DirecTV

2  programming negates any UCL liability to NDS under the "unfair" prong. *See*

3  D. Rubin Trial Testimony, 4/22/08, Vol. 2 at 15:1-13; S. Guggenheim Trial

4  Testimony, 4/30/08, Vol. 4 at 71:23-75:5; Nicolas Trial Testimony, 4/15/08, Vol. 2

5  at 29:22-30:11, 30:25-31:18.  As a matter of law, a business practice does not

6  threaten competition if competitors also engage in the same practice. *Puentes v.*

7  *Wells Fargo Home Mortgage, Inc.*, 160 Cal. App. 4th 638, 648 (2008) (affirming

8  summary judgment for defendant on "unfair" prong of UCL because defendant

9  proved all competitors calculated interest rates in same "unfair" fashion).

10        Thus, the Court should reject the following conclusion of law proposed

11  by Plaintiffs:

12        **PROPOSED COL 3.**    By developing a hack methodology and

13  sharing with known satellite pirates this methodology, which was published online

14  to the general public, all for the purpose of gaining an unfair competitive advantage,

15  NDS engaged in an unfair business practice in violation of § 17200.

16       **D.**    **Plaintiffs Are Not Entitled To Any Remedy Under The UCL.**

17        The only remedies available under the UCL are restitution and an

18  injunction, and neither remedy is warranted here.  Although Plaintiffs call the

19  monetary relief they seek "restitution," it is not restitution within the meaning of

20  California law.  And no injunctive relief is appropriate because Plaintiffs have

21  shown no reasonable likelihood that the conduct to be enjoined is likely to recur.

22  Courts recognize that remedies under the UCL require independent analysis, even if

23  a violation is found. *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163,

24  180 (2000) ("Section 17203 does not mandate restitutionary or injunctive relief

25  when an unfair business practice has been shown."); *Feitelberg v. Credit Suisse*

26  *First Boston, LLC*, 134 Cal. App. 4th 997, 1021-22 (2005) (holding that courts

27  could decline to issue relief after successful section 17200 claim on multiple

28

1  equitable grounds).  The law governing relief available under the UCL

2  independently dooms Plaintiffs' remedies requests.

3         **1.**    **Plaintiffs' Restitution Claim Has Already Been Rejected By**

4                  **The Court As Improper And Contrary To Law.**

5           The Court already struck Plaintiffs' claim for restitution.  *See* 7/26/05

6  Order at 3:10-19.  The Court correctly recognized that Plaintiffs cannot seek

7  restitution on behalf of any customers and that Plaintiffs do not claim NDS took

8  money or property directly from them.  *Id.*  Plaintiffs later improperly and without

9  leave of this Court repled in the Fifth Amended Complaint ("5AC") the stricken

10 portions of the 4th Amended Complaint ("4AC") as if they had never been struck.

11 *See* FRCP 15(a)("a party may amend its pleading only with the opposing party's

12 written consent or the court's leave").  Even if the amendment were procedurally

13 proper, neither the substance of the 5AC nor the evidence presented at trial provides

14 any basis to revisit the Court's decision that the restitution claim is contrary to law.

15 *Compare* 4AC ¶ 443 *with* 5AC ¶ 209.

16          Moreover, the Court was correct in striking the restitution claim as

17 contrary to California law.  The UCL was designed to provide very limited

18 monetary relief, *Korea Supply*, 29 Cal. 4th at 1144, and ***damages are not available***

19 ***under the UCL***.  Cal. Bus. & Prof. Code § 17203; *Korea Supply*, 29 Cal. 4th at

20 1147; *Cortez*, 23 Cal. 4th at 173.  The California Supreme Court has held that a

21 remedy under section 17203 is not considered restitutionary unless it is limited to

22 recovery of money or property "that defendants took directly from plaintiff," or that

23 can "be traced" to "particular funds" in the defendant's possession.  *Korea Supply*,

24 29 Cal. 4th at 1149-50; *see also Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 338-39

25 (1998) (holding that the UCL "operates only to return to a person those *measurable*

26 *amounts* which are *wrongfully taken* by means of an unfair business practice");

27 *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 699 (2006)

28 (restitution is limited to money or property belonging to the plaintiff that "could

clearly be traced to particular funds or property in the defendant's possession.").

Here, Plaintiffs make no claim that NDS obtained any money or property taken from Plaintiffs. Nor can they make that claim because the uncontested fact is that Plaintiffs' conditional access system has always remained under Plaintiffs' control. Under such circumstances, it is clear that Plaintiffs are not seeking true restitution. *See Korea Supply*, 29 Cal. 4th at 1149-50 (affirming demurrer because defendant's allegedly wrongful profits came from third-party and were not taken directly from plaintiff); *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 455 (2005) (affirming dismissal of restitution claim because plaintiff did not allege that defendant took money formerly possessed by plaintiff).

Moreover, courts have been vigilant in guarding against a plaintiff's attempt, like the effort here, to use the label "restitution" to seek what are actually traditional compensatory damages. *Korea Supply*, 29 Cal. 4th 1148-49 ("In an attempt to fit its claim within the statutory authorization for relief, and as an implicit acknowledgement that nonrestitutionary disgorgement is not an available remedy in an individual action under the UCL, plaintiff describes its requested remedy as 'restitution.' This term does not accurately describe the relief sought by plaintiff"); *United States v. Sequel Contractors, Inc.*, 402 F. Supp. 2d 1142, 1156 (C.D. Cal. 2005) (emphasizing that plaintiff sought "the same monetary relief in its UCL claim that is seeks in its breach of contract and negligence claims" which are "damages, not restitution" in holding that plaintiff failed to state a claim for relief under the UCL based on a devaluation of its business); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1091 (C.D. Cal. 2003) (finding that plaintiff was seeking damages, not restitution, where plaintiff sought the same monetary recovery (*i.e.* expectation damages) under its UCL and tort claims). Courts employ extra scrutiny where, as here, Plaintiffs claim that the measure of restitution and the method for its proof are "identical" to the measure and proof for unrecoverable compensatory damages. *Korea Supply*, 29 Cal. 4th at 1144. Here,

1   Plaintiffs' requested restitution award of $94 million is identical to the $94 million

2   they unsuccessfully claimed in actual damages for their smart card swap.  Efforts to

3   recover restitution and "disgorgement" under the UCL that are "just another way of

4   measuring" damages conflict with both California law and NDS's right to a jury

5   trial on legal claims for damages.  *Id.* at 1151 (noting that the requested

6   "restitutionary" measure was not legitimate restitution but rather was "exactly the

7   same amount that plaintiff is seeking to recovery as damages for its traditional tort

8   claim of interference with prospective economic advantage"); *Sequel Contractors*,

9   402 F. Supp. 2d at 1156.

10          Plaintiffs have no law contradicting *Korea Supply*.  In fact, the

11  principal case they rely on, *People v. Toomey*, 157 Cal. App. 3d 1, 25-26 (1984), is

12  an intermediate decision pre-dating the California Supreme Court's pronouncement

13  in *Korea Supply*; and even in *Toomey* restitution was awarded only to purchasers of

14  deceptive "discount" coupons sold by defendant.  The defendant in *Toomey* had

15  directly received ill-gotten money from his victims and thus restitution was

16  appropriate.  *See id.* at 15-16, 26; *Madrid*, 130 Cal. App. 4th at 457-58 (discussing

17  this fact in the context of another litigant's attempt to use *Toomey* to circumvent

18  *Korea Supply*).  The other case relied on by Plaintiffs, *People v. Baker*, 126 Cal.

19  App. 4th 463 (2005), also is of no help to them.  In *Baker*, the defendant stole cattle

20  from his victims.  The victims eventually recovered their cattle 2-3 years later, but

21  the cattle had been repeatedly bred during the interim.  *Id.* at 468.  Restitution was

22  appropriate because the defendant had stolen the cattle directly from his victims and

23  the restored cattle were of diminished value compared to the stolen cattle.  *Id.*  As

24  already stated however, and unlike *Baker*, NDS never took physical control of any

25  money or property belonging to Plaintiffs.

26          Plaintiffs also argue that NDS's supposed distribution of an EchoStar hack—

27  acts that the jury did not find to have occurred and thus cannot form the basis for

28  UCL restitution—caused a reduction in value for their conditional access system.

1    *See* Plaintiffs' Proposed Findings of Fact at 18.  Even assuming the truth of that

2    claim, it is not sufficient to state a claim for restitution.  In *Sequel Contractors*,

3    the court considered a section 17200 restitution claim where the counterclaimant

4    alleged that the wrongdoer's unfair business practice caused it to incur payroll

5    expenses and suffer a decline in its business.  Citing *Korea Supply*, the court

6    dismissed the claim because neither allegation related to money or property

7    formerly in the counterclaimant's possession.  *Sequel Contractors*, 402 F. Supp. 2d

8    at 1156.

9            Therefore, for these reasons, the Court should reject the following

10   conclusion of law proposed by Plaintiffs:

11           **PROPOSED COL 4.**    Plaintiffs have established that the value of

12   the property taken from them through NDS' conduct (*i.e.*, a secure CAS) is

13   $94,638,625.10; Plaintiffs therefore are entitled to restitution in this amount.

14           **2.    There Are No Grounds For An Injunction.**

15           Plaintiffs also ignore relevant law that precludes their request for

16   injunctive relief.  As a general matter, injunctive relief is not a proper remedy

17   against completed wrongs.  Injunctive relief is appropriate only when there is

18   evidence establishing the reasonable probability the wrongful acts will continue in

19   the future; if it is merely speculative the wrong may arise again, injunctive relief is

20   not proper.  *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388, 1403 n.6

21   (2002).  *See also Madrid*, 130 Cal. App. 4th at 463 ("Injunctive relief [under

22   section 17200] has no application to wrongs which have been completed, absent a

23   showing that past violations will probably recur.") (citations omitted).  Plaintiffs'

24   own authorities are not to the contrary.  *See Barquis v. Merchants Collection Ass'n*,

25   7 Cal. 3d 94, 111 (1972) (stating court could enjoin any "*ongoing* wrongful

26   business conduct"); *People v. E.W.A.P., Inc.*, 106 Cal. App. 3d 315, 317 (1980)

27   (plaintiff sought to enjoin *ongoing* illegal distribution of obscene films and

28   magazines for profit).

1          Here, Plaintiffs do not point to any facts establishing the reasonable

2    probability that NDS will engage in any wrongful acts in the future.  The jury

3    already found that NDS did not engage in or facilitate piracy of Plaintiffs' smart

4    card.  And Plaintiffs cannot demonstrate that NDS will likely repeat the P1 Test.

5    For example, the P1 Test occurred over seven years ago, there is no evidence that

6    there are any DirecTV P1 cards in the field, and Plaintiffs retired years ago the CAS

7    involved in the test.  Nor is there any evidence that any pirate code currently exists

8    to reprogram a P1 card for use on any version of Plaintiffs' CAS.

9          Plaintiffs also cannot base a claim for injunctive relief on NDS's

10   reverse-engineering activities, which they seek to do.  *See* Plaintiffs' [Proposed]

11   Injunction Order at 3:16-21.  Regarding the practice of reverse-engineering itself,

12   the Court has found that this practice is legal.  *See* Jury Instruction No. 24 (Docket

13   No. 1110).  And the evidence at trial established that many companies, including

14   Kudelski, engage in reverse-engineering a competitor's product.  *See* DeHaan Trial

15   Testimony, 5/6/08, Vol. 4 at 13:2-14:2; Peled Trial Testimony, 5/6/08, Vol. 3 at

16   25:22-26:5.  Plaintiffs, of course, apparently view NDS's reverse-engineering

17   practices as the centerpiece to NDS's allegedly wrongful conduct towards them.

18   *See* 5AC ¶¶ 12-13 (alleging that NDS "unlawfully and impermissibly cracked"

19   Plaintiffs' smart card); Plaintiffs' Closing Argument Trial Transcript, 5/7/08, Vol. 1

20   at 29:5-14.  But, given reverse-engineering is a completely legitimate and wide-

21   spread business practice, there is no basis for an injunction.

22          Thus, there is no probable wrongful behavior for the Court to enjoin.

23   *See Madrid*, 130 Cal. App. 4th at 465-66 (affirming dismissal of section 17200

24   injunction claim because plaintiff did not allege any facts showing that another

25   incident of the unlawful business practice would likely be repeated in the future);

26   *Am. States Ins. Co. v. Federmann Constr. Co.*, No. CV 04-1635 FMC (FMQx),

27   2004 WL 5458406, at *1 (C.D. Cal. Dec. 3, 2004) (dismissing section 17200

28   injunctive relief claim with prejudice because plaintiff did not allege existence of

1   continuing contractual relationship so as to show potential for future injury or has

2   alleged a concrete, as opposed to speculative, future injury).  Therefore, the Court

3   should reject the following conclusion of law proposed by Plaintiffs:

4      **PROPOSED COL 5.** Because they engaged in a long term scheme

5   to pirate Plaintiffs' SmartCard, and hacked and facilitated the piracy of Canal+ and

6   DirecTV, there is a reasonable probability that NDS will repeat their violations

7   § 17200; therefore, Plaintiffs are entitled to an injunction enjoining NDS' unlawful

8   conduct.

9      **3. Plaintiffs' Unclean Hands Preclude Any UCL Remedy.**

10      The California Supreme Court has held that a defendant's equitable

11   defenses may preclude a plaintiff from any recovery on its successful UCL claim.

12   *Cortez*, 23 Cal. 4th at 180.  This stems from the judicial principle that "one who

13   seeks equity must be willing to do equity."  *Id.*

14      During the trial, NDS proved that Plaintiffs engaged in conduct similar

15   to that for which they seek relief under section 17200.  For example, Plaintiffs

16   intercepted DirecTV signals to test various piracy devices and intercepted a

17   DirecTV signal on one occasion simply as a negotiating tactic.  *See* D. Rubin Trial

18   Testimony, 4/22/08, Vol. 2 at 15:1-13; S. Guggenheim Trial Testimony, 4/30/08,

19   Vol. 4 at 71:23-75:5.  Plaintiffs also paid money to acquire stolen and highly

20   sensitive documents concerning NDS's technology to use for their own purposes

21   (*see* Gee Trial Testimony, 4/24/08, Vol. 3 at 40:22-42:15) and used their consultant

22   Ron Ereiser to acquire 26,000 pages of internal documents stolen from NDS (*see*

23   *id.*, Vol. 4 at 36:22-25).

24      Both of these inequitable actions relate directly to Plaintiffs' UCL

25   claim.  Plaintiffs ask the Court to impose liability on NDS for having intercepted

26   Plaintiffs' signal on one occasion, but they have unlawfully intercepted DirecTV's

27   signal on multiple occasions.  Plaintiffs also seek restitution for the supposed harm

28   done to their conditional access system, but they knowingly purchased stolen,

1   proprietary information about NDS's system.  Plaintiffs' conduct thus constitutes

2   unclean hands.  *See Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App.

3   4th 970, 987-88 (1999) (reversing summary adjudication dismissing unclean hands

4   defense because plaintiff engaged in comparable misconduct in marketing product

5   that it accused defendant of doing).

6         For this reason, and for additional reasons set forth below, the Court

7   should reject the following conclusions of law proposed by Plaintiffs:

8         **PROPOSED COL 4.**    Plaintiffs have established that the value of

9   the property taken from them through NDS' conduct (*i.e.*, a secure CAS) is

10   $94,638,625.10; Plaintiffs therefore are entitled to restitution in this amount.

11         **PROPOSED COL 5.**    Because they engaged in a long term scheme

12   to pirate Plaintiffs' SmartCard, and hacked and facilitated the piracy of Canal+ and

13   DirecTV, there is a reasonable probability that NDS will repeat their violations

14   § 17200; therefore, Plaintiffs are entitled to an injunction enjoining NDS' unlawful

15   conduct.

16

17   **IV.**   **NDS'S PROPOSED FINDINGS OF FACT**

18         **NDS PROPOSED FOF 1.**    NDS engages in various efforts to

19   fight satellite piracy, including cooperating with law enforcement to prosecute

20   satellite pirates, training law enforcement in anti-piracy operations, bringing civil

21   actions against satellite pirates, executing undercover operations against satellite

22   pirate groups, and forwarding information regarding EchoStar piracy to EchoStar.

23   (Norris Trial Testimony, 4/17/08, Vol. 2 at 17:4-55:3, 76:20-78:14; Norris Trial

24   Testimony, 4/17/08, Vol. 3 at 4:15-6:22; Tarnovsky Trial Testimony, 4/23/08,

25   Vol. 3 at 70:12-77:9; Hasak Trial Testimony, 4/30/08, Vol. 4 at 57:9-58:5; Hasak

26   Trial Testimony, 5/01/08, Vol. 1 at 4:19-6:1, 26:9-34:13, 37:13-38:9; Peled Trial

27   Testimony, 5/6/08, Vol. 3 at 38:15-39:23; Trial Exhibits 601, 1366, 1453.)

28

**NDS PROPOSED FOF 2.**      NDS employees John Norris and Christopher Tarnovsky were involved in those efforts.  (Norris Trial Testimony, 4/17/08, Vol. 2 at 17:4-55:3, 76:20-78:14; Norris Trial Testimony, 4/17/08, Vol. 3 at 4:15-6:22; Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 70:12-77:9; Hasak Trial Testimony, Hasak Trial Testimony, 5/01/08, Vol. 1 at 26:9-34:13, 37:13-38:9; Trial Exhibits 601, 1366, 1453.)

**NDS PROPOSED FOF 3.**      In November 2000, Mr. Tarnovsky observed postings on Internet websites that claimed that an NDS Period-1 smart card could be reprogrammed, inserted into an EchoStar receiver, and used to obtain free access to all DISH Network programming.  (Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 22:2-23:1.)

**NDS PROPOSED FOF 4.**      Mr. Tarnovsky tested the websites' claims in John Norris's presence by downloading code from one of the websites, loading that code onto a DirecTV Period-1 smart card, and inserting the card into an EchoStar receiver.  (Trial Exhibit 51 ("[W]hen I was at Mike's yesterday he took an EchoStar hack file from the internet, put it in a P01, put the P01 into an E* receiver and got all programming."); Tarnovsky Trial Testimony, 4/23/08, Vol. 3 at 22:2 - 23:1; Norris Trial Testimony, 4/17/08, Vol. 1 at 22:2-8.)

**NDS PROPOSED FOF 5.**      John Norris then reported the results of the test to others in NDS.  (Trial Exhibit 51; Norris Trial Testimony, 4/17/08, Vol. 1 at 20:17-21:16.)

**NDS PROPOSED FOF 6.**      The test performed by Mr. Tarnovsky resulted in the interception in California of EchoStar's DISH Network signal. (Trial Exhibit 51; Norris Trial Testimony, 4/17/08, Vol. 1 at 22:2-8.)

1

2      **NDS PROPOSED FOF 7.**      Plaintiffs set up a piracy lab in Denver

3   and obtained and "tested" DirecTV piracy devices at that lab.  "Testing" included

4   trying to use pirate devices on legitimate DirecTV set-top boxes to see if they could

5   obtain access to programming without paying.  At a meeting attended by EchoStar

6   CEO Charles Ergen and other EchoStar executives, a DirecTV piracy device was

7   inserted into a set-top box causing it to "light up like a Christmas Tree" and receive

8   DirecTV satellite transmissions without authorization.  (Kudelski Trial Testimony,

9   4/29/08, Vol. 1 at 29:18-34:3; Nicolas Trial Testimony, 4/15/08, Vol. 2 at 29:22-

10  31:18; S. Guggenheim Trial Testimony, 4/30/08, Vol. 4 at 71:23-75:5; D. Rubin

11  Trial Testimony, 4/22/08, Vol. 2 at 15:1-13.)

12

13      **NDS PROPOSED FOF 8.**      Plaintiffs illicitly purchased

14  documents involving highly sensitive NDS technology (Gee Trial Testimony,

15  4/24/08, Vol. 3 at 40:22-42:15) and used their consultant Ron Ereiser to acquire

16  26,000 pages of internal documents stolen from NDS (*id*., Vol. 4 at 36:22-25).

17

18  **V.     DISCUSSION AND NDS'S PROPOSED CONCLUSIONS OF LAW**

19      **A.     A Finding Of Liability Under Section 17200 Would Violate The**

20           **Seventh Amendment.**

21           The Seventh Amendment precludes UCL liability in the face of the

22  verdict.  "[I]n a case where legal claims are tried by a jury and equitable claims are

23  tried by a judge, and the claims are 'based on the same facts,' in deciding the

24  equitable claims 'the Seventh Amendment requires the trial judge to follow the

25  jury's implicit or explicit factual determinations.'"  *Gates*, 995 F.2d at 1473

26  (reversing district court ruling on equitable claims because they were contrary to

27  jury's findings of facts as inferred from damages award).  Here, the jury reached

28  factual findings that NDS did not engage in any wrongful business conduct.  The

- 68 -

Seventh Amendment thus bars the Court from reaching a contrary conclusion because it would be an impermissible re-examination of the jury's findings.

Therefore, NDS requests that the Court make the following conclusions of law:

**NDS PROPOSED COL 1.**     NDS has not engaged in an unlawful business practice in violation of California Business & Professions Code § 17200.

**NDS PROPOSED COL 2.**     NDS has not engaged in an unfair business practice in violation of California Business & Professions Code § 17200.

## B.   Plaintiffs Lack Standing To Recover Under California Business And Professions Code Section 17200.

California Business and Professions Code § 17200 proscribes any "unlawful, unfair or fraudulent" business act or practice.  Cal. Bus. & Prof. Code § 17200.  The UCL, however, requires that Plaintiffs have "suffered injury in fact and ha[ve] lost money or property as a result of" the UCL violations.  Cal. Bus. & Prof. Code § 17204.  Plaintiffs' UCL claim fails in its entirety because they cannot establish the required loss of money or property.  This is true with respect not only to the 24 causes of action as to which NDS prevailed, but also to the P1 Test underlying the three claims as to which the jury found a single technical violation.  Plaintiffs have no evidence of a loss of money or property, *supra* at 61, even assuming they can satisfy the injury-in-fact requirement by relying on a damage award of $45.69.  *See Daro*, 151 Cal. App. 4th at 1098 (2007).  The Court recognized this fact when it previously struck the UCL restitution claim in this case.  *See* 7/26/05 Order at 3:10-19.  Thus, Plaintiffs lack standing under the UCL.

Therefore, NDS requests that the Court make the following conclusions of law:

**NDS PROPOSED COL 1.**     NDS has not engaged in an unlawful business practice in violation of California Business & Professions Code § 17200.

1        **NDS PROPOSED COL 2.**     NDS has not engaged in an unfair

2 business practice in violation of California Business & Professions Code § 17200.

3       **C.**     **NDS Has Not Engaged In Unfair Business Practices.**

4           Business conduct may be "unfair" and violate section 17200 if it

5 (1) threatens an incipient violation of an antitrust law; (2) violates the policy or

6 spirit of one of those laws because its effects are comparable to or the same as a

7 violation of the law; or (3) otherwise significantly threatens or harms competition.

8 *Cel-Tech*, 20 Cal. 4th at 186-87. None of NDS's business practices qualifies as

9 unfair under this standard. To begin with, Plaintiffs have never asserted that NDS's

10 business practices violated the antitrust laws or the spirit of those laws. And it is

11 clear that Plaintiffs were never harmed by the P1 Test, because EchoStar's revenues

12 increased by a record amount in the following year. *Supra* at 58. Also, Plaintiffs

13 presented no evidence that the P1 Test even affected the security of their CAS, let

14 alone compromised it. Similarly, Plaintiffs presented no evidence that the P1 Test

15 was linked in any fashion to their swap from the DNASP-II system to the Aladdin

16 system.

17           And regarding the "anti-competition" prong of *Cel-Tech*, a section

18 17200 plaintiff must demonstrate that a defendant's actions ***harmed consumers***, not

19 just itself. *Belton*, 151 Cal. App. 4th at 1239-40; *RLH Indus.*, 133 Cal. App. 4th at

20 1286. Plaintiffs have put forth no evidence demonstrating any concrete harm to

21 consumers resulting from NDS's business practices. Plaintiffs had multiple

22 witnesses on the stand who testified as to their business models and economics.

23 None of these witnesses testified that Plaintiffs had to raise the price for Dish

24 Network subscriptions as a result of this test. Nor did any of these witnesses testify

25 that Plaintiffs had to raise subscription prices as a result of piracy in general.

26 Without any evidence of harm to consumers, the Court should not find that NDS

27 violated the "unfair" prong of section 17200. *See Belton*, 151 Cal. App. 4th at

28 1239-40 (affirming summary adjudication for defendant under unfair prong because

1   plaintiff could not show how tying arrangement by itself harmed consumers); *RLH*

2   *Indus.*, 133 Cal. App. 4th at 1286 (affirming summary judgment on "unfair" prong

3   due to absence of evidence that defendant's business practices had any adverse

4   effect on customers).

5          In addition, the fact that Plaintiffs similarly intercepted DirecTV

6   programming negates any UCL liability to NDS under the "unfair" prong.

7   *See supra* at 65.  As a matter of law, a business practice does not threaten

8   competition if competitors also engage in the same practice.  *Puentes*, 160 Cal.

9   App. 4th at 648 (affirming summary judgment for defendant on "unfair" prong of

10  UCL because defendant proved all competitors calculated interest rates in same

11  "unfair" fashion).

12         Therefore, NDS requests that the Court make the following conclusion

13  of law:

14         **NDS PROPOSED COL 2.**     NDS has not engaged in an unfair

15  business practice in violation of California Business & Professions Code § 17200.

16   **D.     Plaintiffs Are Not Entitled To Restitution Or An Injunction.**

17         Even if NDS did violate either the "unlawful" or "unfair" prongs of

18  section 17200, Plaintiffs are not entitled to either restitution or injunctive relief

19  under California Business & Professions Code § 17203.  Courts recognize that

20  remedies under the UCL require independent analysis, even if a violation is found.

21  *Cortez*, 23 Cal. 4th at 180 ("Section 17203 does not mandate restitutionary or

22  injunctive relief when an unfair business practice has been shown."); *Feitelberg*,

23  134 Cal. App. 4th at 1021-22 (holding that courts could decline to issue relief after

24  successful section 17200 claim on multiple equitable grounds).

25   **1.     Plaintiffs May Not Receive Restitution.**

26         This Court previously struck Plaintiffs' claim for restitution under

27  section 17200.  *See* 7/26/05 Order at 3:10-19.  The 5AC's request for restitution is

28  procedurally improper, and neither the 5AC nor the evidence at trial presented any

1    basis to revisit the Court's prior ruling.  *Compare* 4AC ¶ 443 *with* 5AC ¶ 209.

2               In addition, Plaintiffs may receive restitution only to the extent that

3    NDS obtained money or property formerly in Plaintiffs' possession.  *See Korea*

4    *Supply*, 29 Cal. 4th at 1149-50; *see also Day*, 63 Cal. App. 4th at 338-39 (holding

5    that the UCL "operates only to return to a person those *measurable amounts* which

6    are *wrongfully taken* by means of an unfair business practice"); *Colgan*, 135 Cal.

7    App. 4th at 699 (restitution is limited to money or property belonging to the

8    plaintiff that "could clearly be traced to particular funds or property in the

9    defendant's possession.").

10              Here, there is no evidence that NDS obtained any money or property

11   taken from Plaintiffs.  The uncontested fact is that Plaintiffs' conditional access

12   system has always remained under Plaintiffs' control.  Under such circumstances,

13   Plaintiffs may not obtain restitution.  *See Korea Supply*, 29 Cal. 4th at 1149-50

14   (affirming demurrer because defendant's allegedly wrongful profits came from

15   third-party and were not taken directly from plaintiff); *Madrid*, 130 Cal. App. 4th at

16   455 (affirming dismissal of restitution claim because plaintiff did not allege that

17   defendant took money formerly possessed by plaintiff).

18              Therefore, NDS requests that the Court make the following conclusion

19   of law:

20              **NDS PROPOSED COL 3.**      Plaintiffs are not entitled to restitution

21   under California Business & Professions Code § 17203.

22              **2.     There Are No Grounds For An Injunction.**

23              A successful section 17200 plaintiff may receive injunctive relief.

24   Cal. Bus. & Prof. Code § 17203.  Injunctive relief, however, is not a proper remedy

25   against completed wrongs, but is appropriate only when there is evidence

26   establishing the reasonable probability the wrongful acts will continue in the future.

27   *Gafcon, Inc.*, 98 Cal. App. 4th at 1403 n.6; *Madrid*, 130 Cal. App. 4th at 463.

28              Here, there are no facts establishing the reasonable probability that

1   NDS will engage in any wrongful acts in the future.  The jury already found that

2   NDS did not engage in or facilitate piracy of Plaintiffs' smart card.  And Plaintiffs

3   have not produced any evidence showing that NDS will likely repeat their one-time

4   test of a DirecTV smart card intercepting Dish Network programming.

5           Plaintiffs also cannot base a claim for injunctive relief on NDS's

6   reverse-engineering activities.  Reverse-engineering is legal.  *See* Jury Instruction

7   No. 24 (Docket No. 1110).  And the evidence at trial established that many

8   companies, including Kudelski, engage in reverse-engineering a competitor's

9   product.  *See supra* at 64.  As reverse-engineering is a completely legitimate and

10  wide-spread business practice, there is no basis for an injunction.

11          There is therefore no probable wrongful behavior for the Court to

12  enjoin.  *See Madrid*, 130 Cal. App. 4th at 465-66 (affirming dismissal of section

13  17200 injunction claim because plaintiff did not allege any facts showing that

14  another incident of the unlawful business practice would likely be repeated in the

15  future); *Am. States Ins.*, 2004 WL 5458406, at *1 (dismissing section 17200

16  injunctive relief claim with prejudice because plaintiff did not allege facts showing

17  potential for future or concrete injury).

18          Therefore, NDS requests that the Court make the following conclusion

19  of law:

20          **NDS PROPOSED COL 4.**     Plaintiffs are not entitled to any

21  injunctive relief under California Business & Professions Code § 17203.

22          **3.**     **Plaintiffs' Unclean Hands Preclude Any UCL Remedy.**

23          The California Supreme Court has held that a defendant's equitable

24  defenses may preclude a plaintiff from any recovery on its successful UCL claim.

25  *Cortez*, 23 Cal. 4th at 180.  This stems from the judicial principle that "one who

26  seeks equity must be willing to do equity."  *Id.*

27          During the trial, NDS proved that Plaintiffs engaged in conduct similar

28  to that for which they seek relief under section 17200.  For example, Plaintiffs

1   intercepted DirecTV signals to test various piracy devices and intercepted a

2   DirecTV signal on one occasion simply as a negotiating tactic.  *See supra* at 65.

3   Plaintiffs also paid money to acquire stolen and highly sensitive documents

4   concerning NDS's technology and used their consultant Ron Ereiser to acquire

5   26,000 pages of internal documents stolen from NDS.  *Id.*

6          Both of these inequitable actions relate directly to Plaintiffs' UCL

7   claim.  The Court cannot provide a remedy to Plaintiffs for NDS having intercepted

8   Plaintiffs' signal on one occasion when Plaintiffs have unlawfully intercepted

9   DirecTV's signal on multiple occasions.  The Court also cannot provide a remedy

10  to Plaintiffs for any supposed harm done to their conditional access system by the

11  P1 Test when Plaintiffs have stolen proprietary information about NDS's system.

12  Plaintiffs' conduct thus constitutes unclean hands.  *See Kendall-Jackson Winery*,

13  76 Cal. App. 4th at 987-88 (reversing summary adjudication dismissing unclean

14  hands defense because plaintiff engaged in comparable misconduct in marketing

15  product that it accused defendant of doing).

16         Therefore, NDS requests that the Court make the following

17  conclusions of law:

18         **NDS PROPOSED COL 3.**      Plaintiffs are not entitled to restitution

19  under California Business & Professions Code § 17203.

20         **NDS PROPOSED COL 4.**      Plaintiffs are not entitled to any

21  injunctive relief under California Business & Professions Code § 17203.

22
23   Dated:   June 16, 2008                    DARIN W. SNYDER
                                              DAVID R. EBERHART
24                                            O'MELVENY & MYERS LLP

25
26                                            By: /s/ David Eberhart
                                                 David R. Eberhart
27                                            Attorneys for Defendants NDS GROUP
                                              PLC and NDS AMERICAS, INC.
28
SF1:718310.10