O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECHOSTAR SATELLITE CORP., et al., <br><br> Plaintiff(s), <br><br> v. <br><br> NDS GROUP PLC, et al. , <br><br> Defendant(s). | CASE NO. SA CV03-0950 DOC (JTLx) <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Before the Court is Plaintiffs EchoStar Satellite Corp.'s ("EchoStar")[1] Proposed Findings of Fact and Conclusions of Law re: California Business and Professions Code § 17200 (the "Proposed Findings"). After considering the Proposed Findings, NDS Group PLC's ("NDS")[2] Objections, EchoStar's Response to NDS' Objections, and NDS' Response, the Court finds as follows:

---

[1] EchoStar is the principal plaintiff in this matter. Accordingly, where appropriate, the Court refers to plaintiffs collectively as "EchoStar."

[2] NDS is the principal defendant in this matter. Accordingly, where appropriate, the Court refers to defendants collectively as "NDS."

# FINDINGS OF FACT

**A.   Background**

1. Plaintiff, EchoStar Satellite Corp., using the name DISH Network, provides satellite television programming to consumers on a paid subscription basis – i.e. consumers purchase subscriptions depending on the channels they wish to view or order certain programming on a "pay per view" basis;

2. EchoStar and its major competitor DirecTV are the largest satellite television providers in the United States;

3. Both EchoStar and DirecTV rely on conditional access systems ("CAS") to provide security for their satellite signal;

4. A CAS protects the provider's programming through the following process:
   a. The signal is encrypted before being transmitted by the satellite provider to consumers;
   b. It is then decrypted by the consumer's "set-top box" in conjunction with a "SmartCard" provided by the signal provider to the consumer;
   c. The SmartCard contains keys which act in conjunction with the keys in the consumer's set-top box to allow consumers to unlock the channels they purchase;

5. EchoStar purchased its SmartCards and other CAS services from NagraStar, a joint venture with the Kudelski Group;

6. During the relevant time period EchoStar's CAS used the DNASP-II encryption platform, which worked with the ROM series of SmartCards – i.e ROM 2, ROM 3, ROM 10, and ROM 11;

7. The ROM series cards used the ST Thompson ST16CF54 microprocessor or "chip," which contained the following memory components
   a. Read Only Memory ("ROM"), which stored permanently inscribed instructions for operating the card;
   b. Electronically Erasable Read Only Memory ("EEPROM"), which contained a

        portion of the key-pairings necessary to decrypt the signal; and

        c.    Random Access Memory ("RAM"), used to execute code on the cards;

8. DirecTV purchased CAS services from NDS – both companies were owned by News Corporation during the relevant period;

9. NDS is the Kudelski Group's largest competitor and in the late-1990s both were competing for the business of EchoStar and DirecTV;

10. During 1997, NagraStar bid to replace NDS as DirecTV's CAS provider, and DirecTV paid NagraStar to create a proposal for a replacement CAS system;

11. However, DirecTV ultimately decided not contract with NagraStar because NagraStar was part-owned by EchoStar, DirecTV's largest U.S. competitor;

12. EchoStar also decided not to engage NDS to provide CAS service;

13. Both EchoStar and DirecTV suffered piracy, including substantial piracy of the DirecTV system provided by NDS;

14. To demonstrate the extent of NDS piracy, EchoStar CEO Charles Ergen ("Ergen") brought a pirate DirecTV SmartCard to a meeting with NDS and placed it in a DirecTV set-top box, causing the box to "light up like a Christmas tree" – i.e. to gain unauthorized access to all of DirecTV's programming;

15. An important factor in remaining competitive in the satellite security field is the relative security of a CAS provider's system as compared to other CAS providers;

16. NDS engaged in efforts to combat satellite piracy, including working with law enforcement, suing pirates, engaging in undercover operations, and cooperating with other satellite programming providers;

**B.**   **NDS Retains Christopher Tarnovsky**

17. Christopher Tarnovsky ("Tarnovsky") is one of the best satellite and SmartCard hackers in the world;

18. He began his involvement in satellite piracy while in the Army stationed overseas so that he could receive American television channels;

19. Tarnovsky developed relationships with a number of satellite pirates;
20. In 1997, Tarnovsky was involved in piracy of DirecTV's CAS;
21. Tarnovsky, using the alias "Big Gun," engaged in commercial distribution of hacked DirecTV SmartCards, for which he received $20,000;
22. After approximately nine-months, NDS approached Tarnovsky and attempted to hire him to help them combat piracy and to prevent him from engaging in DirecTV piracy;
23. Tarnovsky worked for NDS from an NDS provided laboratory in his home;
24. One of Tarnovsky's earliest assignments with NDS was to act in an undercover capacity to bring down a distribution network of pirated DirecTV SmartCards;
25. To this end, Tarnovsky developed a reprogrammer for DirecTV devices that could be controlled by NDS;

**C.    NDS Reverse Engineers the ROM 3 Card**

26. Over a six-month period, under the direction of David Mordinson ("Mordinson") and Zvi Shkedy ("Shkedy"), NDS reverse engineered a ROM 3 SmartCard
27. This allowed them to extract the ROM and EEPROM codes from one of the ROM 3 SmartCards;
28. They then analyzed this code to identify vulnerabilities in the card, including:
    a. The fact that the card was susceptible to a buffer-overflow hack;
    b. That the card had a property known as RAM ghosting or address aliasing;
    c. That hackers could use the index variable to execute attacks on the card; and
    d. That an invalid checksum could be used to manipulate the "stack" of the card;
29. The two then traveled to New Jersey to log communications between a set-top box and the SmartCard, which was necessary to reverse engineer the card;
30. Later, they traveled to Windsor, Canada to test their findings and found that they had successfully reverse engineered the EchoStar card;
31. They incorporated their findings in a report known as the "Headend Report," which described the vulnerabilities of the card, listed the contents of various locations in the

4

card's memory, and described how a hacker could use the vulnerabilities identified above to obtain all of EchoStar's DISH Network programming while only paying for a basic subscription;

32. Mordinson and Shkedy then sent their report to another NDS office in Israel to be archived with other documents describing hacks of various SmartCards;

33. In August 2001, Mordinson showed Tarnovsky portions of the Headened Report during a visit to California;

**D. The P1 Test**

34. In November 2000, Tarnovsky saw postings on internet websites stating that an individual could reprogram an obsolete, Period-1 ("P1") DirecTV SmartCard to obtain access to DISH Network;

35. Tarnovsky then told his supervisor, John Norris ("Norris") about the claims;

36. With Norris present, Tarnosky tested the claims on these websites by loading the code provided onto a P1 card and placing the P1 card in his EchoStar receiver;

37. Similar tests were common in the satellite security industry;

38. Tarnovsky was then able to gain access to all DISH Network programming although he had a basic subscription, demonstrating that the website's claims were accurate;

39. Norris reported the results of the test to others at NDS;

40. The P1 Test violated the Communications Act and California Penal Code §§ 593d(a) and 593e(b).

**E. December 2000 Internet Postings**

41. On December 21, 2000, an individual using the alias NiPpEr2000 posted a "hack methodology" on a portion of the www.DR7.com website that would cause a dump of the EEPROM contents of an EchoStar ROM 3 card;

42. This "hack methodology" contained the following components:
   a. Use of a buffer-overflow attack;
   b. Use of address aliasing or the ROM ghosting effect;

5

|     |     |     |
| --- | --- | --- |
| 1 |  | c. Manipulation of the index variable; and |
| 2 |  | d. Use of an invalid checksum to manipulate the stack; |
| 3 | 43. | The methodology posted by NiPpEr2000 shared these aspects with the methodology described in the Headend Report; |
| 5 | 44. | However, the code used in the Headened Report and the NiPpEr2000 posting also contained significant differences; |
| 7 | 45. | On December 22, 2000, Tarnovsky sent an email to other NDS employees stating that the "Cat [was] out of the bag"; |
| 9 | 46. | On December 23, 2000 Marco Pizzo, using the alias "xbr21" reposted the "hack methodology" on the DR7 website; |
| 11 | 47. | As a result of the December 2000 posting, EchoStar piracy increased significantly; |

**F.  EchoStar Swaps Out the DNASP-II Platform**

48. Following the December 2000 posting, NagraStar set up a team of engineers to attempt to prevent further attacks on the ROM 3 card;
49. In February 2001, NagraStar developed an ECM that would limit the size of packets the ROM 3 card could receive, thus preventing buffer overflow attacks of the type posted in December 2000;
50. After this ECM, the piracy community began developing ways to avoid the ECM and continue piracy of the ROM 3 card as well as the other cards in the DNASP-II system;
51. Eventually, pirates developed methods of hacking the DNASP-II system that did not require hacking a SmartCard;
52. In 2005, EchoStar completed the process of replacing all of the SmartCards using the DNASP-II platform with cards using the DNASP-III platform;
53. EchoStar then shut off the DNASP-II encryption platform entirely;
54. This card swap cost $94,638,636.10;

**G.  EchoStar's Lawsuit and Jury Trial**

55. EchoStar filed suit alleging that NDS was responsible for the December 2000 posting as

well as a distribution network of pirated EchoStar SmartCards;

56. EchoStar sought to hold NDS liable for the cost of the card swap on the theory that the posting necessitated that swap;

57. EchoStar's claims included:

    a. Violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201(a)(1)(A) and 1201(a)(2);

    b. Violations of the Communications Act, 47 U.S.C. § 605(a);

    c. Violations of California Penal Code §§ 593d(a) and 593e(b);

    d. Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)

58. NDS raised a counterclaim under the California Uniform Trade Secrets Act ("CUTSA"), California Civil Code § 3426;

59. These claims and counterclaims were tried to a jury from April 9, 2008 to May 15, 2008;

60. On May 15, 2008 the jury rendered a verdict as follows:

    a. NDS did not violate the DMCA;

    b. NDS did violate the Communications Act;

    c. NDS did violate California Penal Code §§ 593d(a) and 593e(b);

    d. NDS did not violate RICO; and

    e. EchoStar did not violate CUTSA;

61. The jury awarded actual damages of $45.69 on the Communications Act and Penal Code § 593d(a) claims, no actual damages on the Penal Code § 593e(b) claim, and the minimum statutory damages of $1,000 on the Communications Act claim and $500 on the Penal Code § 593e(b) claim;

62. The jury further found that NDS did not act with oppression, fraud or malice and did not engage in a conspiracy;

63. EchoStar also brought a claim for unfair or unlawful business practices under California Business & Professions Code § 17200, which must now be resolved by the Court.

## CONCLUSIONS OF LAW

The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Because a UCL claim is equitable in nature, the Court, rather than the jury, must decide whether defendants engaged in such an act or practice. *Bradstreet v. Wong*, 161 Cal. App. 4th 1440, 1458 (2008) (citation omitted). However, in making this determination, the Court is bound by the explicit and implicit findings of the jury. *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989)); *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991).

Under the "unlawful" prong, the UCL borrows violations of other law. *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). An unlawful act is one "forbidden by law, be it civil or criminal, federal, state or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994). A violation of another law is *per se* a violation of Section 17200.

The "unfair" prong of the UCL is broader than the "unlawful" prong. Even absent a violation of law, a plaintiff may prevail on a UCL claim if the defendant engaged in unfair practices. *Cel-Tech*, *supra*. In *Cel-Tech*, the California Supreme Court defined unfairness under Section 17200, as it relate to suits by competitors, as follows:

> When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that [1] threatens an incipient violation of an antitrust law, or [2] violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or [3] otherwise significantly threatens or harms competition.

*Cel-Tech*, 20 Cal. 4th at 186-87 (footnote omitted).

8

**1.     Plaintiffs Have Standing to Bring a UCL Claim**

In 2004, the citizens of California passed Proposition 64, which limited the right of action under the UCL.  *Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1263 (2007).  A private party may enforce Section 17200 only if it "suffered injury in fact . . . lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.

In awarding EchoStar $45.69, the jury plainly found that EchoStar did suffer actual damages, or injury in fact.

The phrase "lost money or property" is interpreted the same under Sections 17203 and 17204.  *Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D. Cal. 2007) (where legislature or electorate uses terms that have been decisively interpreted by the courts, the terms are presumed to have the meaning given by the courts).  In defining the scope of restitution available under the UCL, Section 17203, California courts have interpreted "lost money or property" to mean money or property given by the plaintiff to the defendant, or a vested interest in money or property held by the defendant.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149-50 (2003) ("lost money or property" does not include proceeds of prospective contract); *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 178 (2000) ("lost money or property" includes vested interest in earned but unpaid wages).

As discussed in more detail below, the jury's findings indicate that EchoStar's actual damages resulted from the P1 Test.  Based on the P1 Test, EchoStar provided Tarnovsky access to all channels while Tarnovsky only paid for a basic subscription.  Thus, EchoStar had a vested interest in the increased price of a subscription including all ordinary channels and all pay per view programming available at the time Tarnovsky executed the P1 Test.  Because Tarnovsky did not pay EchoStar this amount, EchoStar "lost money or property" for purposes of Proposition 64.

Accordingly, EchoStar has standing to pursue a claim under the UCL.

**2.     The Jury's Findings Establish that NDS Violated Section 17200**

Because EchoStar has standing to pursue its UCL claims, and because the jury found that NDS's conduct violated the Communications Act and California Penal Code §§ 593d(a) and

9

593e(b), that conduct also meets the "unlawful" prong of Section 17200.

Accordingly, NDS violated California Business and Professions Code Section 17200 by engaging in unlawful activity.

### 3. **EchoStar Is Entitled to Restitution in an Amount Equal to the Price of a Full Subscription in November 2000 and the Retail Price of All Pay Per View Programming Available at the Time of the P1 Test Less the Cost of the Tarnovsky's Basic Subscription**

EchoStar seeks restitutionary relief in the amount of $94,638,636.10 on the theory that this is the price of a secure CAS, namely the DNASP-III system. EchoStar contends that NDS took away EchoStar's secure CAS system by causing the December 2000 internet posting. Thus, EchoStar claims that it is entitled to the value of such a system.

This theory is defective for two reasons: a) the conclusion that NDS is responsible for the December 2000 posting is contrary to the jury's explicit and implicit findings; and b) the UCL does not permit the Court to impose actual damages under the guise of restitution.

Instead, EchoStar is entitled to restitution for its "vested interest" in the benefit it conferred on NDS, namely the cost of the programming Tarnovsky had access to, less the cost of his subscription.

#### a. The Jury Explicitly and Implicitly Found that NDS Was Not Responsible for the December 2000 Internet Posting

The jury's findings of liability on the Communications Act claim, liability on the California Penal Code claims, no liability on EchoStar's DMCA claims, $45.69 in actual damages, and no malice, oppression or fraud demonstrate that the jury rejected EchoStar's theory that NDS was responsible for the December 2000 internet posting. Accordingly, the Court cannot base its equitable findings on that theory.

The claims that the jury upheld involved unauthorized interception of EchoStar's signal. The most straightforward violation of each statute was the P1 Test, in which Tarnovsky admitted that he connected an unauthorized access device – i.e. a DirecTV P1 card – to his set-top box and received unauthorized access to EchoStar signal, as evidenced by his flipping through several

1 channels to make sure that he had such access.  Although EchoStar did not ultimately argue that
2 the P1 Test was a basis for liability, Tarnovsky was questioned at length about the test and its
3 legality.  Ultimately he admitted to undertaking the test but stated that he believed that it was
4 acceptable because every security provider engaged in such testing.

   Further, each of the California Penal Code claims was limited to acts committed in
6 California.  The jury was instructed on this point.  The P1 Test occurred at Tarnovsky's residence
7 in California.  On the other hand, the December 2000 Posting arguably occurred in Canada, where
8 the DR7 website's servers were located.  Accordingly, it is more likely that the jury found that
9 Tarnovsky violated the California Penal Code through the P1 Test than the December 2000
10 posting.

11   The jury was instructed that it could find NDS liable under the Communications Act, 47
12 U.S.C. § 605(a) if it found, *inter alia*, that NDS intercepted, received or helped another to
13 intercept EchoStar's signal.  To find that NDS violated this statute, the jury had to find that NDS,
14 or someone with NDS assistance, intercepted EchoStar's signal.  During the P1 Test, Tarnovsky
15 admittedly intercepted EchoStar's signal.  The jury was further instructed that it could find NDS
16 liable under California Penal Code § 593d(a) if it found, *inter alia*, that NDS *for the purpose of*
17 *intercepting, receiving or using* any service carried by EchoStar made an unauthorized connection,
18 attached or assisted others in attaching an unauthorized device, made an unauthorized
19 modification to an authorized device, or obtained and used an unauthorized device to gain access
20 to EchoStar's signal.  Again, Tarnovsky satisfied the elements of this offense when he placed the
21 modified P1 card in the EchoStar set-top box.  Further, the fact that NDS would have to engage in
22 such conduct *for the purpose of intercepting, receiving or using* EchoStar's service, cuts against a
23 finding that NDS violated Section 593d(a) by making the December 2000 posting.  Posting a hack
24 methodology on the internet would not assist NDS in intercepting, receiving or using EchoStar's
25 signal, but the P1 Test admittedly helped NDS to do this.  Finally, to find a violation of California
26 Penal Code § 593e(b), the jury was required to find that NDS manufactured, imported, assembled,
27 distributed, sold, offered to sell, possessed, advertised or otherwise provided a device, plan, or kit

11

designed to decode EchoStar's signal. Again, loading pirate code on to a P1 card violated Section 593e(b) because it was a device that decoded EchoStar's signal.

Accordingly, the clearest violation of each of these statutes is NDS's admitted conduct in connecting a reprogrammed P1 card to the EchoStar system. Although the jury was also instructed that each of these statutes could be violated by aiding and abetting or assisting another in a direct violation, such a finding would be inconsistent with the damages awarded by the jury.

The jury awarded actual damages of $45.69. Despite EchoStar's contention that this represents "nominal damages," the jury was not instructed on nominal damages and $45.69 was awarded as actual damages. Further, an amount of this specificity strongly suggests that the jury expressly found that EchoStar was harmed in the amount of $45.69.

The only evidence involving this specific amount was EchoStar's average revenue per user ("ARPU") for 2000, the year of the P1 Test. The ARPU corresponds to the average revenue generated by each DISH Network subscriber for one month. Implicit in the finding that EchoStar was harmed by one month's revenue for one user is that one individual gained unauthorized access to EchoStar's signal. The only situation presented at trial that corresponded to one, and only one, individual gaining unauthorized access for one month was the P1 test.

EchoStar presented substantial evidence that far more than one individual gained free service as a result of the December 2000 posting. Indeed, EchoStar's piracy-based damages ranged in the millions of dollars. Accordingly, a finding that NDS was responsible for the December 2000 posting is inconsistent with the jury's award of $45.69 in actual damages. Indeed, EchoStar's theory was that the actual damages attributable to the December 2000 posting were more than $100,000,000.

Further, the jury did not find NDS liable on EchoStar's DMCA, 17 U.S.C. § 1201(a)(2) claim. The jury was instructed to find NDS liable if NDS "manufactured, imported, offered to the public, provided, or otherwise trafficked in any technology, product, service, device, component, or part thereof, that" designed to circumvent access controls to a copyrighted work. During argument EchoStar expressly tied the December 2000 internet posting to this claim, contending

12

that the posting was a "technology" designed to circumvent EchoStar's CAS system. Indeed, this claim most closely tracks EchoStar's theory regarding the December 2000 posting. However, the jury found that NDS did not violate this provision, either directly or through the acts of others. Such a verdict strongly suggests that the jury found that NDS was not responsible for December 2000 posting.

Finally, the fact that the jury did not find that NDS acted with fraud, oppression or malice, indicates that the jury found that NDS was not responsible for the December 2000 posting. EchoStar's theory was that NDS intentionally sabotaged the DNASP-II system in order to gain a competitive advantage against the Kudelski group. Intentionally harming a competitor in order to gain a competitive advantage is necessarily malicious and oppressive. The jury was instructed that "[c]onduct is malicious . . . if it is for the purpose of injuring another." Intentionally sabotaging a competitor's security system is *per se* malicious. Likewise, the jury was instructed that oppressive conduct "violates the rights of Plaintiffs with unnecessary harshness or severity, such as . . . by taking advantage of some weakness or disability or misfortune of the Plaintiffs." Intentionally taking advantage of the vulnerabilities of EchoStar's security system is *per se* oppressive. Implicit in the jury's finding that NDS did not act maliciously or oppressively is the fact that NDS did not undertake the December 2000 posting.

Taken in sum, the jury's findings strongly suggest that the jury found NDS liable based on the P1 Test, which clearly violated the Communications Act and the California Penal Code, rather than the December 2000 posting.

**b.     Actual Damages Under the Guise of Restitution Are Not Available Under the UCL**

California Business and Professions Code § 17203 provides for equitable relief in the form of an injunction or restitution. It does not provide for damages. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992). The restitutionary relief available under the UCL permits the Court to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of . . . unfair competition." Cal. Bus. & Prof. Code § 17203. The

13

1  goal of restitution under the UCL is "to restore the status quo by returning to the plaintiff funds in
2  which he or she had an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.
3  4th at 1149; *see also People v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 135 (2003).
4        EchoStar claims that it is entitled to restitution because NDS took from it the value of a
5  secure smart card. While this claim has some initial plausibility, it is defective on a number of
6  grounds.
7        Restitution under the UCL is only available where the sum at issue can "clearly be traced to
8  particular funds or property in the defendant's possession." *Colgan v. Leatherman Tool Group,*
9  *Inc.*, 135 Cal. App. 4th 663, 699 (2006). As the Court previously recognized, NDS never directly
10 took anything from EchoStar. July 26, 2005 Order Granting Striking Claims (striking EchoStar's
11 theory of restitution under Section 17200 because EchoStar could not proceed on behalf of
12 customers and NDS never took money or property from EchoStar). Although EchoStar contends
13 that NDS took the value of a secure card, this definition of the word "took" is not consistent with
14 the statutory definition of restitution. NDS did not "acquire" the value of the secure system from
15 EchoStar. *See* Bus. & Prof. Code § 17203; *see also U.S. v. Sequel Contractors, Inc.*, 402 F. Supp.
16 2d 1142 , 1156 (dismissing claim for restitution under UCL based on lost value of a business). It
17 is not the case that NDS stole or somehow duped EchoStar out of its secure system. Accordingly,
18 NDS could not, as a matter of logic, be caused to restore anything to EchoStar.
19       Instead, EchoStar's proposed definition of restitution would eviscerate the distinction
20 between restitution and damages. Any plaintiff who suffered injury to property could claim
21 restitution because the defendant "took away" the value of the property. This is not an equitable
22 remedy authorized under Section 17203.
23       Even the way that EchoStar conceptualizes its restitution claim is substantially identical to
24 the way it presented its actual damages claim to the jury: the loss of a secure system versus the
25 cost of replacing that system. *National Rural Telecom. Co-op. v. DirecTV, Inc.*, 319 F. Supp. 2d
26 1059, 1091 (2003) ("Plaintiffs are not entitled to monetary relief on their UCL Claims because the
27 remedy they are seeking closely resembles a claim for damages-something not allowed under the
28

1  UCL.") EchoStar goes so far as to assume that the measure of restitution should be the
2  replacement value of that system. However, the Court must be weary of claims for restitution that
3  are identical to claims for actual damages. *See Sequel Contractors*, *supra* (noting that the plaintiff
4  sought the same monetary relief under its damages claim and UCL restitution claim). Simply put,
5  it is plain that EchoStar is seeking to dress up its unsuccessful damages claim as one for restitution
6  under the UCL. However, such relief is not available and is inconsistent with the jury's rejection
7  of EchoStar's damages claim.

**3.   EchoStar Is Entitled to the Price of the Programming Tarnovsky Gained Access to Less the Cost of His Subscription**

The evidence did demonstrate that, when Tarnovsky conducted the P1 Test, he gained access to programming above his normal subscription. Thus, much like the employees in *Cortez*, EchoStar had a vested interest in payment for that programming. Further, this benefit was conferred directly on NDS through Tarnovsky. Whether Tarnovsky or NDS actually took advantage of this benefit is immaterial in terms of restoring EchoStar to the status quo ante.

Accordingly, NDS is liable to EchoStar for restitution for the cost of such programming. This includes the cost of a month-long subscription to all EchoStar channels for the month of November 2000 less the cost of the subscription Tarnovsky paid for. It also includes the cost of all of the pay per view programming that Tarnovsky gained access to by using the modified P1 card.

**4.   NDS Is Not Entitled to an Unclean Hands Defense**

Unclean hands is an equitable defense which provides that a party seeking equitable relief from the Court must have acted equitably in the transaction giving rise to its claim. *Fladeboe v. American Isuzu Motors, Inc.*, 150 Cal. App. 4th 42, 56 (2007) (citations omitted). "The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff *in connection with the matter in controversy*." *Id.* (citations omitted) (emphasis added). There is no exception to this requirement simply because the plaintiff engaged in similar conduct on a different occasion. Thus, the fact that Ergen tested a pirated DirecTV device does not excuse

15

NDS from doing the same on a separate occasion. Simply put, the two are unrelated transactions.

Accordingly, NDS is not entitled to the defense of unclean hands.

## 5.    EchoStar Is Entitled to an Injunction Barring Further Illegal Conduct

The jury's verdict establishes that NDS engaged in illegal conduct in undertaking the P1 Test.

An injunction is only available under Section 17200 if the unlawful or unfair practice "is ongoing or likely to recur." *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 463 (2005). It is likely that NDS will continue to engage in future testing like the P1 Test if not enjoined. Tarnovsky, who undertook the test, testified that this sort of testing is pervasive in the satellite security industry. Ergen also testified that he engaged in such a test to demonstrate the vulnerability of NDS's system.

On the other hand, EchoStar is not entitled to an injunction that prohibits more than the unlawful conduct that NDS engaged in. Accordingly, the injunction should be limited to prohibiting NDS from engaging in the illegal conduct found by the jury.

## CONCLUSION

NDS did engage in unlawful business practices in conducting the P1 Test in November 2000. Accordingly, EchoStar is entitled to restitution for the retail price of the programming that Tarnovsky gained access to less the cost of his subscription. Further, EchoStar is entitled to an injunction. The Court will issue a separate order setting forth such injunction.

IT IS SO ORDERED.

DATE: October 15, 2008

*David O. Carter*
DAVID O. CARTER
United States District Judge